## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| *In re*: Application Pursuant to 28 U.S.C. § 1782 of<br>THE REPUBLIC OF THE GAMBIA<br>Attorney General's Chambers<br>Ministry of Justice<br>Marina Parade<br>Banjul<br>The Gambia<br><br>   Petitioner,<br><br>  v.<br><br>FACEBOOK, INC.<br>575 7th Street, NW<br>Washington, DC 20004,<br><br>   Respondent. | No. 20-mc- |

## MEMORANDUM OF LAW IN SUPPORT OF THE REPUBLIC OF GAMBIA'S
## APPLICATION FOR ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782

## TABLE OF CONTENTS

I.    INTRODUCTION..............................................................................................1

II.   BACKGROUND ..............................................................................................2

    A.    Myanmar's Perpetration of Genocide Against the Rohingya............................2

    B.    The ICJ Proceedings.................................................................................6

    C.    The Discovery Requested ..........................................................................8

III.  ARGUMENT ..................................................................................................17

    A.    The Gambia's Application Satisfies All of the Statutory
         Requirements of 28 U.S.C. § 1782 .................................................................18

         1.    Facebook is Found in the District of Columbia....................................19

         2.    The ICJ Proceedings Are Before an International
             Tribunal .....................................................................................20

         3.    As a Litigant in the ICJ Proceedings, The Gambia is an
             "Interested Party".........................................................................20

    B.    The *Intel* Discretionary Factors Weigh in Favor of Granting
         The Gambia's Application .........................................................................21

         1.    Facebook is Not a Participant in the ICJ Proceedings.........................22

         2.    The ICJ is Not Resistant to § 1782 Discovery....................................22

         3.    The Gambia Is Not Concealing an Attempt to
             Circumvent Any ICJ Proof-Gathering Restrictions............................23

         4.    The Discovery The Gambia Seeks is Relevant and
             Narrowly Tailored .......................................................................24

IV.   CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Ex Parte Application of Kleimar N.V.*,
220 F. Supp. 3d 517 (S.D.N.Y. 2016)...................................................................................25

*In re Barnwell Enters.*,
265 F. Supp. 3d 1 (D.D.C. 2017).................................................................19, 22, 23, 25

*In re Digiulian*,
314 F. Supp. 3d 1 (D.D.C. 2018).............................................................................23, 24

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)........................................................................................... *passim*

*In re the Republic of Ecuador*,
No. C-10-80225 MISC CRB (EMC), 2010 U.S. Dist. LEXIS 132045, at *7-9
(N.D. Cal. Dec. 1, 2010).........................................................................................21

*In re Veiga*,
746 F. Supp. 2d 8 (D.D.C. 2010)...........................................................................18, 23, 24

**Statutes**

28 U.S.C. § 1782............................................................................................. *passim*

28 U.S.C. § 1782(a) ...........................................................................................1, 18, 22, 23

Charter of the United Nations & Statute of the Int'l Court of Justice, art. 34, June
26, 1945, 59 Stat 1055, T.S No. 993...........................................................................22

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* .......................................1

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 103 cmt. b
(Am. Law Inst. 1987)...........................................................................................20

**Other Authorities**

Antoni Slodkowski, *Facebook bans Myanmar army chief, others in
unprecedented move*, REUTERS (Aug. 27, 2018),
https://www.reuters.com/article/us-myanmar-facebook/facebook-bans-
myanmar-army-chief-others-in-unprecedented-move-idUSKCN1LC0R7 ......................10, 12

*Application of the Convention on the Prevention and Punishment of the Crime of
Genocide (The Gambia v. Myanmar)*, Order  (Jan. 23, 2020), https://www.icj-
cij.org/files/case-related/178/178-20200123-ORD-01-00-EN.pdf........................................1, 7

*April 2020 Coordinated Inauthentic Behavior Report,* Facebook (Apr. 2020),
https://about.fb.com/wp-content/uploads/2020/05/April-2020-CIB-Report.pdf....................14

Coconuts Yangon, *Facebook Bans Myanmar Military Chief, Removes 70
Accounts and Pages Over 'Hate and Misinformation',* Coconuts Yangon
(Aug. 27, 2018), https://coconuts.co/yangon/news/facebook-bans-myanmar-
military-chief-removes-70-accounts-pages/ ..........................................................11

*Convention on the Prevention and Punishment of the Crimoe of Genocide,* art.
IX, Dec. 9, 1948, 78 U.N. ................................................................................6

*Coordinated Inauthentic Behavior Explained,* Facebook (Dec. 6, 2018),
https://about.fb.com/news/2018/12/inside-feed-coordinated-inauthentic-
behavior/ ...............................................................................................13, 14

*Council Decision (CFSP) 2019/678 of 29 April 2019 Amending Decision
2013/184/CFSP Concerning Restrictive Measures Against Myanmar/Burma,*
OFFICIAL JOURNAL OF THE EUROPEAN UNION (Apr. 30, 2019),
https://eur-lex.europa.eu/legal-
content/EN/TXT/HTML/?uri=CELEX:32019D0678&from=EN ...........................11

*DOCUMENTING ATROCITY CRIMES COMMITTED AGAINST THE ROHINGYA IN
MYANMAR'S RAKHINE STATE: FACTUAL FINDINGS & LEGAL ANALYSIS,* PUBLIC
INTERNATIONAL LAW AND POLICY GROUP (Dec. 2018),
https://www.publicinternationallawandpolicygroup.org/s/PILPG-
ROHINGYA-REPORT-Factual-Findings-and-Legal-Analysis-3-Dec-2018-
1.pdf .......................................................................................................5

*DOCUMENTING ATROCITY CRIMES COMMITTED AGAINST THE
ROHINGYA IN MYANMAR'S RAKHINE STATE: FACTUAL FINDINGS,*
PUBLIC INTERNATIONAL LAW AND POLICY GROUP (Sept. 2018),
https://www.publicinternationallawandpolicygroup.org/s/PILPG-Documeting-
Atrocity-Crimes-Against-Rohingya-Factual-Findings-Report-September-
2018-h7tk.pdf............................................................................................5

Fed. R. Crim. P. 30(b)(6) .....................................................................1, 17, 25

*Human Rights Impact Assessment Facebook in Myanmar,* Facebook (Oct. 2018),
https://fbnewsroomus.files.wordpress.com/2018/11/bsr-facebook-myanmar-
hria_final.pdf........................................................................................8, 9, 10, 12

Jon Banister, *Facebook, Silicon Valley Quietly Growing D.C. Office Footprint
Amid Federal Scrutiny,* BISNOW (Apr. 11, 2018),
https://www.bisnow.com/washington-dc/news/office/facebook-silicon-valley-
quietly-growing-dc-office-footprint-amid-federal-scrutiny-87210 ...................19, 20

Kieran McQuilkin, *Office Envy: Facebook's DC Digs are Far From Low Key*,
  AMERICANINNO (Apr. 17, 2019), https://www.americaninno.com/dc/office-
  envy/office-envy-the-facebook-privacy-teams-dc-digs-are-far-from-low-key/ ...............19, 20

*Location: Washington, DC*, Facebook,
  https://www.facebook.com/careers/locations/washington/?p[offices][0]=Wash
  ington%2C%20DC&offices[0]=Washington%2C%20DC ......................................................20

*Museum Finds Compelling Evidence Genocide was Committed Against Rohingya,
  Warns of Continued Threat*, U.S. Holocaust Memorial Museum (Dec. 3,
  2018), https://www.ushmm.org/information/press/press-releases/museum-
  finds-compelling-evidence-genocide-was-committed-against-rohingya-wa ............................5

Paul Mozur, *A Genocide Incited on Facebook, With Posts From Myanmar's
  Military*, The N.Y. Times (Oct. 15, 2018),
  https://www.nytimes.com/2018/10/15/technology/myanmar-facebook-
  genocide.html ....................................................................................................................13

*Removing Myanmar Military Officials from Facebook*, Facebook (Aug. 28, 2018,
  (updated Dec. 18, 2018)), https://about.fb.com/news/2018/08/removing-
  myanmar-officials ..........................................................................................................12, 13

*Report of the detailed findings of the Independent International Fact-Finding
  Mission on Myanmar*, UN Doc. A/HRC/39CRP.2, U.N. Human Rights
  Council (Sept. 17, 2018),
  https://www.ohchr.org/Documents/HRBodies/HRCouncil/FFM-
  Myanmar/A_HRC_39_CRP.2.pdf................................................................................ *passim*

*Resolution to Declare the Rohingya Persecution a Crime of Genocide and Crimes
  Against Humanity*, INTERNATIONAL ASSOCIATION OF GENOCIDE SCHOLARS
  (April 22, 2020), https://genocidescholars.org/persecution-of-rohingya-
  declared-genocide-crime-against-humanity/.............................................................................6

*Rules of Court*, Int'l Court of Justice, art. 50 (1978)....................................................................23

*Treasury Sanctions Commanders and Units of the Burmese Security Forces for
  Serious Human Rights Abuses*, U.S. DEP'T OF THE TREASURY (Aug. 17,
  2018), https://home.treasury.gov/news/press-releases/sm460 ..............................................11

*Treasury Sanctions Individuals for Roles in Atrocities and Other Abuses*, U.S.
  DEP'T OF THE TREASURY (Dec. 20, 2019),
  https://home.treasury.gov/news/press-releases/sm852 ..........................................................11

## I.      INTRODUCTION

The Republic of The Gambia ("The Gambia"), a sovereign State located on the coast of West Africa, respectfully submits this memorandum of law in support of its application pursuant to 28 U.S.C. § 1782 for an order directing Facebook, Inc. ("Facebook") to produce a limited number of documents and submit to a Fed. R. Civ. P. 30(b)(6) deposition to aid The Gambia in connection with ongoing judicial proceedings that it instituted in November 2019 against the Republic of the Union of Myanmar ("Myanmar"), a sovereign State located in Southeast Asia, before the International Court of Justice ("ICJ"), in The Hague, Netherlands.[1] Those proceedings are styled *The Gambia v. Myanmar (Application of the Convention on the Prevention and Punishment of the Crime of Genocide)*. In the case now pending before the ICJ, The Gambia seeks to hold Myanmar accountable under international law for commission of the crime of genocide against the Rohingya people, an ethnic and religious minority in Myanmar, and to obtain an order from the ICJ that Myanmar, *inter alia*, cease and desist from further acts of genocide against the Rohingya.

The Gambia respectfully appears before this honorable District Court to seek limited discovery from Facebook, pursuant to § 1782, in aid of the proceedings before the ICJ. That section provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceedings in a foreign or international tribunal ...." 28 U.S.C. § 1782(a).

As explained below, the application should be granted because it satisfies the statutory requirements for obtaining discovery under § 1782. In particular, (i) The Gambia seeks discovery

---

[1] The Republic of The Gambia does not waive any rights or privileges to which it is entitled under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.*, or any other rights or privileges. All such rights or privileges are expressly reserved.

from an entity (Facebook) that is found in this District; (ii) the discovery will be used in proceedings that are pending before an international tribunal, namely the ICJ; and (iii) The Gambia – as the Applicant (*i.e.*, Plaintiff) in the ICJ case – is an interested party in the litigation. Further, the discretionary factors identified by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), all militate in favor of granting the requested discovery; (i) Facebook is not a party to the case before the ICJ; (ii) the ICJ is receptive to discovery obtained pursuant to § 1782; (iii) The Gambia's application is not an attempt to circumvent the ICJ's proof-gathering requirements; and (iv) the discovery that The Gambia seeks is highly relevant to the matters in dispute in the underlying litigation and is narrowly tailored to avoid imposing any undue burden or intrusion on the respondent.

For these reasons, which are set forth more fully below, The Gambia respectfully submits that its application for discovery pursuant to § 1782 should be granted.

## II.     BACKGROUND

### A.     Myanmar's Perpetration of Genocide Against the Rohingya

Nearly all Rohingya have historically resided in Myanmar's Rakhine State, a political subdivision of Myanmar, which is located in the westernmost extremity of the country, along the border with Bangladesh. The Rohingya are an ethnic and religious minority within Rakhine State as well, where the majority of the population are ethnic Rakhine (also known as Arakanese)), a group that is predominantly Buddhist. The Rohingya are predominantly Muslim.

The Government of Myanmar has subjected the Rohingya to extreme forms of persecution. In 2017, the United Nationals Human Rights Council established an International Fact-Finding Mission on Myanmar ("UN Fact-Finding Mission" or "the Mission") to investigate and report on serious allegations of human rights violations in Rakhine State. The UN Fact-Finding Mission concluded: "[t]he Rohingya are in a situation of severe, systematic and

- 2 -

institutionalized oppression from birth to death. Their extreme vulnerability is a consequence of State policies and practices implemented over decades."[2] Indeed, the Mission found that the "level of oppression faced by the Rohingya is hard to fathom" and that "[c]umulatively" the "rules, regulations, orders and practices" which Myanmar has imposed have "made life for the Rohingya in Rakhine State slowly but steadily unbearable."[3] Myanmar adopted these measures, the Mission concluded, "to implement a racist and exclusionary vision."[4]

Myanmar's persecution of the Rohingya escalated dramatically in October 2016, when its military (the "Tatmadaw") and security forces commenced what Myanmar itself refers to as "clearance operations" against Rohingya villages. During these operations, Myanmar forced systematically shot, killed, carried out mass executions, forcibly disappeared, raped, gang raped, sexually assaulted, detained, beat and tortured Rohingya civilians, and burned down and destroyed Rohingya homes, mosques, madrassas, shops and Qur'ans.[5]

The initial wave of clearance operations lasted approximately four months; they resumed with even greater brutality in August 2017. Myanmar soldiers, accompanied by other security forces, entered Rohingya villages early in the morning whilst most villagers were asleep and fired rocket launchers, mortars, and bullets into Rohingya homes.[6] The Government forces then tortured, raped and killed the inhabitants, including those who tried to flee, before burning

---

[2] *Report of the detailed findings of the Independent International Fact-Finding Mission on Myanmar*, UN Doc. A/HRC/39CRP.2, ¶ 458, U.N. Human Rights Council (Sept. 17, 2018), https://www.ohchr.org/Documents/HRBodies/HRCouncil/FFM-Myanmar/A_HRC_39_CRP.2.pdf (hereinafter "2018 Detailed FFM Report").

[3] *Id.* at ¶ 622.

[4] *Id.* at ¶ 497.

[5] *Id.* at ¶¶ 1069-95.

[6] *Id.* at ¶¶ 752, 961.

their homes to the ground, often with members of the Rohingya group inside.[7] "Rape and other sexual and gender-based violence," including gang rapes, sexually humiliating acts, sexual slavery and sexual mutilations, were "perpetrated on a massive scale."[8] Satellite imagery reveals that wherever the Tatmadaw carried out a clearance operation in an area of mixed ethnicity, only Rohingya settlements were targeted.[9]

The U.N. Fact-finding Mission concluded that the "actions of those who orchestrated the attacks on the Rohingya read as a veritable check-list" of indicators of their intent to commit genocide, that is, the intent to destroy the Rohingya in whole or in part. These include "the systematic stripping of human rights, the dehumanizing narratives and rhetoric, the methodical planning, mass killing, mass displacement, mass fear, overwhelming levels of brutality, combined with the physical destruction of the home of the targeted population, in every sense and on every level." The Mission therefore determined there are reasonable grounds to conclude that Myanmar had committed genocide.[10]

Other highly respected organizations likewise concluded that Myanmar is responsible for committing genocide against the Rohingya. In December 2018, the United States Holocaust Memorial Museum concluded there is "compelling evidence that Burmese authorities have intentionally sought to destroy the Rohingya people because of their ethnic and religious

---

[7] *Id.* at ¶¶ 884-991.

[8] *Id.* at ¶ 920.

[9] *Id.* at ¶¶ 972-73.

[10] *Id.* at ¶¶ 1440-41.

identity.... The world has turned a blind eye to their persecution – just as it did for victims of the

Holocaust."[11]

Similarly, the Public International Law and Policy Group ("PILPG"), a global pro bono

law firm focused on issues of war crimes and transitional justice, undertook a comprehensive

investigation of the Rohingya situation on behalf of the U.S. State Department.[12] Based on its

analysis of more than 1,000 witness interviews, PILPG stated:

> With regard to the crime of genocide, this Report concludes that there are reasonable grounds to believe that genocide was committed against the Rohingya in Myanmar's northern Rakhine State. The Rohingya are a protected group for purposes of the law on genocide, and the investigation mission revealed extensive evidence of underlying acts of genocide committed against a substantial population of Rohingya, including killings, causing serious bodily or mental harm, and deliberately inflicting conditions of life calculated to bring about the Rohingya's physical destruction in whole or in part. The investigation mission also revealed circumstantial evidence providing reasonable grounds to believe these acts were committed with the intent to destroy, at least in part, the Rohingya in northern Rakhine State.[13]

---

[11]*Museum Finds Compelling Evidence Genocide was Committed Against Rohingya, Warns of Continued Threat,* U.S. Holocaust Memorial Museum (Dec. 3, 2018),
https://www.ushmm.org/information/press/press-releases/museum-finds-compelling-evidence-genocide-was-committed-against-rohingya-wa.

[12]*DOCUMENTING ATROCITY CRIMES COMMITTED AGAINST THE ROHINGYA IN MYANMAR'S RAKHINE STATE: FACTUAL FINDINGS* at i, PUBLIC INTERNATIONAL LAW AND POLICY GROUP (Sept. 2018),
https://www.publicinternationallawandpolicygroup.org/s/PILPG-Documeting-Atrocity-Crimes-Against-Rohingya-Factual-Findings-Report-September-2018-h7tk.pdf.

[13]*DOCUMENTING ATROCITY CRIMES COMMITTED AGAINST THE ROHINGYA IN MYANMAR'S RAKHINE STATE: FACTUAL FINDINGS & LEGAL ANALYSIS* at vii, PUBLIC INTERNATIONAL LAW AND POLICY GROUP (Dec. 2018), https://www.publicinternationallawandpolicygroup.org/s/PILPG-ROHINGYA-REPORT-Factual-Findings-and-Legal-Analysis-3-Dec-2018-1.pdf.

On April 22, 2020, the International Association of Genocide Scholars formally adopted a resolution declaring Myanmar's persecution of the Rohingya a crime of genocide.[14]

## B.    The ICJ Proceedings

On November 11, 2019, The Gambia commenced judicial proceedings against Myanmar in the International Court of Justice in The Hague (the "ICJ Proceedings") under the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9. 1948, 78 U.N.T.S. 277 (the "Genocide Convention"). The Gambia and Myanmar are both parties to the Genocide Convention, which provides for jurisdiction before the ICJ for "[d]isputes between the Contracting Parties relating to the interpretation, application or fulfilment of the present Convention, including those relating to the responsibility of a State for genocide."[15] The Gambia and Myanmar are the only parties to the case.

The Gambia contends that Myanmar is responsible for acts of genocide committed against the Rohingya, as well as attempting to commit genocide, conspiring to commit genocide, inciting genocide, complicity in genocide, and failing to prevent and punish genocide. A finding that acts of genocide occurred against the Rohingya requires The Gambia to prove that Myanmar committed any of the acts enumerated in Article II of the Genocide Convention – which include killing, causing serious bodily and mental harm, inflicting conditions that are calculated to bring about physical destruction, and imposing measures to prevent births – with the intent to destroy the Rohingya, in whole or in part.

---

[14]*Resolution to Declare the Rohingya Persecution a Crime of Genocide and Crimes Against Humanity,* INTERNATIONAL ASSOCIATION OF GENOCIDE SCHOLARS (April 22, 2020), https://genocidescholars.org/persecution-of-rohingya-declared-genocide-crime-against-humanity/.

[15] Convention on the Prevention and Punishment of the Crime of Genocide, art. IX, Dec. 9, 1948, 78 U.N.T.S. 277.

On December 10-12, 2019, oral proceedings were held before the ICJ on a request by The Gambia that the Court order provisional measures (akin to a preliminary injunction) to protect its rights and the rights of the Rohingya during the pendency of the ICJ Proceedings. On January 23, 2020, in a unanimous 17-0 ruling, the Court ordered Myanmar to take all measures within its power to prevent the commission of all acts of genocide against the Rohingya, including killings, causing serious bodily or mental harm, inflicting conditions of life calculated to bringing about their physical destruction, and imposing measures to restrict births.[16] The Court also ordered Myanmar and all units under its direction, control, or influence to not commit genocide, conspiracy to commit genocide, incitement to genocide, attempt to commit genocide, or complicity in genocide.[17] Myanmar was ordered as well to preserve all evidence relating to allegations of the crime of genocide, and to report back to the Court in four months and then every six months thereafter on its compliance with the Order.[18] In issuing its January 23, 2020 Order, the ICJ underscored that the Rohingya "remain extremely vulnerable" to genocide, and that "there is a real and imminent risk of irreparable prejudice to the rights invoked by The Gambia."[19]

Proceedings before the ICJ generally consist of two phases: a written phase, during which the parties exchange written briefs and supporting documentary evidence; and a subsequent oral hearing, during which the parties may present witness testimony and oral argument. The

---

[16] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar), Order,* ¶ 86 (Jan. 23, 2020), https://www.icj-cij.org/files/case-related/178/178-20200123-ORD-01-00-EN.pdf.

[17] *Id.*

[18] *Id.*

[19] *Id.* ¶¶ 72, 75.

Parties are currently in the midst of the written phase, which will extend at least until January 23, 2021. After the written phase concludes, the ICJ will schedule the oral hearing.

### C.    The Discovery Requested

Statements on social media, including Facebook, made by officials and representatives of Myanmar hostile to the Rohingya, or encouraging violence against them, including but not limited to statements made by senior military officers directed at rank-and-file soldiers or armed civilians who carried out attacks against the Rohingya, may constitute evidence of genocidal intent necessary to support a finding of responsibility for genocide.

Facebook is a dominant platform in Myanmar of disseminating anti-Rohingya hate speech and incitement to violence. Indeed, an independent report commissioned by Facebook found that the platform "is being used [in Myanmar] by bad actors to spread hate speech, incite violence, and coordinate harm."[20] Moreover, the UN Fact-Finding Mission concluded that such hate speech is directed against the Rohingya and is pervasive in Myanmar, and that "[m]essages portraying Rohingya as violent, dishonest, anti-Bamar, anti-Buddhist, illegal immigrants and/or terrorists … are particularly widespread on social media."[21]

Because the people of Myanmar only gained widespread access to the Internet in 2011 following democratic reforms, Facebook holds a unique place in Myanmar society due to the relative unfamiliarity of the country with the Internet and digital platforms. Out of a population of 53 million, Facebook users in Myanmar number as many as 20 million.[22] The population of

---

[20]*Human Rights Impact Assessment Facebook in Myanmar* at 24, Facebook (Oct. 2018), https://fbnewsroomus.files.wordpress.com/2018/11/bsr-facebook-myanmar-hria_final.pdf

[21] 2018 Detailed FFM Report at ¶ 1342.

[22] *Id.* at ¶ 1344.

Myanmar considers Facebook to be *the* Internet and, many use Facebook as their main source of information and a dominant avenue for communication.[23]

Because Facebook provides a direct channel to almost half of Myanmar's population, government officials, key government institutions, and the military have weaponized Facebook to disseminate information in their incitement campaign against the Rohingya.[24]   Indeed, the government's reliance on Facebook to make official announcements augments the public's perception that Facebook is a reliable source of information.[25]  Using the Facebook platform, the military has circulated discriminatory posts to generate fear, mistrust and hatred against Rohingya Muslims, including:

- Posts and messages warning of an "Islamic" takeover and Muslim men harming Buddhist women;

- 2012 posts about an alleged rape and murder of a Buddhist woman by Rohingya men;

- 2014 posts about the rape of a Buddhist woman by Muslims in Mandalay, contributing to riots;

---

[23] 2018 Detailed FFM Report ¶ 1345; *Human Rights Impact Assessment Facebook in Myanmar* at 12, Facebook (Oct. 2018), https://fbnewsroomus.files.wordpress.com/2018/11/bsr-facebook-myanmar-hria_final.pdf (Facebook's independently commissioned human rights impact assessment report states "For the majority of Myanmar's 20 million internet-connected citizens, Facebook is the internet.")

[24] 2018 Detailed FFM Report ¶ 1345 ("It has become the main mode of communication among the public and a regularly used tool for the Myanmar authorities to reach the public."); *Human Rights Impact Assessment Facebook in Myanmar* at 13, Facebook (Oct. 2018), https://fbnewsroomus.files.wordpress.com/2018/11/bsr-facebook-myanmar-hria_final.pdf

[25] 2018 Detailed FFM Report ¶ 1345.

- 2017 chain messages circulated to Muslim and Buddhist communities, each similar and stating that the other group was preparing for major violence on September 11 and encouraging recipients to be prepared; and

- Targeting of human rights defenders with "beggar-dog species," "national traitor," and "Muslim" labels for cooperation with the U.N. Mission.[26]

In what Facebook's independent report on this issue described as a "strong statement . . . to act against those seeking to use Facebook . . . [to] enable genocide, "[27] Facebook banned Senior-General Min Aung Hlaing, the current Commander-in-Chief of the Myanmar Armed Forces, and nineteen other Burmese military individuals and organizations from its platform.[28] Although Facebook has not published an official list of the individuals and organizations that it banned and the pages it removed, news reports state that among the banned individuals and organizations are the following:

(1) Myanmar General Min Aung Hlaing;

(2) Myanmar Vice Senior General Soe Win;

(3) Myanmar Brigadier General Khin Maung Soe;

(4) Myanmar Brigadier General Aung Aung;

(5) Myanmar Brigadier General Than Oo;

(6) Myanmar General Than Oo;

---

[26]2018 Detailed FFM Report at ¶¶ 1347-48; 1351.

[27]*Human Rights Impact Assessment Facebook in Myanmar* at 27, Facebook (Oct. 2018), https://fbnewsroomus.files.wordpress.com/2018/11/bsr-facebook-myanmar-hria_final.pdf

[28]*See* Antoni Slodkowski, *Facebook bans Myanmar army chief, others in unprecedented move*, REUTERS (Aug. 27, 2018), https://www.reuters.com/article/us-myanmar-facebook/facebook-bans-myanmar-army-chief-others-in-unprecedented-move-idUSKCN1LC0R7; 2018 Detailed FFM Report ¶ 1329 n.2942 ("The pages of the office of the Commander-in-Chief, Senior-General Min Aung Hlaing and of Senior-General Min Aung Hlaing himself were deactivated by Facebook on 27 August 2018").

(7) Myanmar General Aung Kyaw Zaw;

(8) Myanmar Major General Aung Myo Thu;

(9) Myanmar Major General Maung Maung Soe;

(10)    Myanmar Brigadier General Thura San Lwin;

(11)    Myanmar Major Thant Zaw Win;

(12)    Myanmar Officer Tun Naing;

(13)    Myanmar Border Guard Police Corporal Kyaw Chay;

(14)    Myanmar Staff Sergeant Ba Kyaw;

(15)    Myanmar 99th Light Infantry Division Leader Khin Hlaing;

(16)    Thant Zin Oo;

(17)    Phay Sit Gyi;

(18)    Myanmar 33rd Light Infantry Division; and

(19)    Myanmar 99th Light Infantry Division.[29]

The United States and the European Union have placed sanctions on most of these

military officers for their responsibility for the crimes that Myanmar committed against the

Rohingya.[30]  Included in Facebook's permanent ban is the military's Myawady television

network – for "covertly push[ing] the messages of the Myanmar military" to prevent the spread

---

[29]Coconuts Yangon, *Facebook Bans Myanmar Military Chief, Removes 70 Accounts and Pages Over 'Hate and Misinformation'*, Coconuts Yangon (Aug. 27, 2018), https://coconuts.co/yangon/news/facebook-bans-myanmar-military-chief-removes-70-accounts-pages/.

[30]*Treasury Sanctions Individuals for Roles in Atrocities and Other Abuses*, U.S. DEP'T OF THE TREASURY (Dec. 20, 2019), https://home.treasury.gov/news/press-releases/sm852; *Treasury Sanctions Commanders and Units of the Burmese Security Forces for Serious Human Rights Abuses*, U.S. DEP'T OF THE TREASURY (Aug. 17, 2018), https://home.treasury.gov/news/press-releases/sm460; *Council Decision (CFSP) 2019/678 of 29 April 2019 Amending Decision 2013/184/CFSP Concerning Restrictive Measures Against Myanmar/Burma*, OFFICIAL JOURNAL OF THE EUROPEAN UNION (Apr. 30, 2019), https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32019D0678&from=EN.

of "hate and misinformation."[31] The ban came hours after the United Nations investigators

reported that the army carried out mass killings and rapes against the Rohingya with "genocidal

intent."[32]

As further evidence of the military's widespread use of Facebook, Facebook's removal

of the pages and accounts resulted in "an essential blackout of the military's main channel of

public communication."[33] The removed accounts and pages were followed by at least 12 million

Burmese users.[34] Min Aung Hlaing alone had two known active Facebook accounts[35]—one

account had 1.4 million followers and the other had 2.9 million followers. The permanent ban on

Myanmar military leaders and organizations makes the content of the banned accounts

unavailable on Facebook and Instagram platforms. However, Facebook has preserved the data

and content of these pages.[36]

---

[31] *See* Antoni Slodkowski, *Facebook bans Myanmar army chief, others in unprecedented move*, REUTERS (Aug. 27, 2018), https://www.reuters.com/article/us-myanmar-facebook/facebook-bans-myanmar-army-chief-others-in-unprecedented-move-idUSKCN1LC0R7; *Human Rights Impact Assessment Facebook in Myanmar* at 27, Facebook (Oct. 2018), https://fbnewsroomus.files.wordpress.com/2018/11/bsr-facebook-myanmar-hria_final.pdf ("The decision to ban 20 military individuals and organization for Facebook in August 2018 was a strong statement of the company's determination to act against those seeking to use Facebook in ways that spread violence and enable genocide.")

[32] *See* Antoni Slodkowski, *Facebook bans Myanmar army chief, others in unprecedented move*, REUTERS (Aug. 27, 2018), https://www.reuters.com/article/us-myanmar-facebook/facebook-bans-myanmar-army-chief-others-in-unprecedented-move-idUSKCN1LC0R7.

[33] *Id.*

[34] *Id; Removing Myanmar Military Officials from Facebook*, Facebook (Aug. 28, 2018 (updated Dec. 18, 2018)), https://about.fb.com/news/2018/08/removing-myanmar-officials/ (stating on August 28, 2018, "Today, we are taking more action in Myanmar, removing a total of 18 Facebook accounts, one Instagram account and 52 Facebook Pages, followed by almost 12 million people. We are preserving data, including content, on the accounts and Pages we have removed.")

[35] 2018 Detailed FFM Report ¶ 1329 n.2942 ("The pages of the office of the Commander-in-Chief, Senior-General Min Aung Hlaing and of Senior-General Min Aung Hlaing himself were deactivated by Facebook on 27 August 2018.").

[36] 2018 Detailed FFM Report ¶ 1353 ("Importantly, Facebook stated that it had preserved all data and content from these pages. The removed data and content should be available to properly constituted

Additionally, in October and December 2018, in response to international attention to the Rohingya genocide, Facebook removed at least 438 Facebook pages, 17 Facebook Groups, 145 Facebook accounts, and 15 Instagram accounts in Myanmar for spreading military propaganda against the Rohingya people.[37]  The pages Facebook removed appeared to be entertainment, beauty, and lifestyle pages, but, as Facebook has confirmed, were in-fact covert accounts linked to the Myanmar military.[38]  Some of the most popular pages, with a combined estimate of 4 million followers, were titled "Beauty and Classic," "Young Female Teachers, " Collection of Soldier's Photos," "Lord of Heaven," "Down for Anything," "Let's Laugh Casually," "We Love Myanmar," "Knowledge," and "All About Myanmar."[39]  In its investigation to remove these accounts and pages, Facebook determined that the pages and accounts violated Facebook's misrepresentation policy and were part of a scheme of "coordinated inauthentic behavior"[40] designed to influence the large population of Myanmar Facebook users against the Rohingya people with misinformation and hate speech.[41]

---

international and national judicial authorities for accountability purposes. . . ."); *Removing Myanmar Military Officials from Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018)), https://about.fb.com/news/2018/08/removing-myanmar-officials/ ("We are preserving data, including content, on the accounts and Pages we have removed.")

[37] *Removing Myanmar Military Officials from Facebook*, Facebook (Aug. 28, 2018 (updated Dec. 18, 2018)), https://about.fb.com/news/2018/08/removing-myanmar-officials/.

[38] Paul Mozur, *A Genocide Incited on Facebook, With Posts From Myanmar's Military*, The N.Y. Times (Oct. 15, 2018), https://www.nytimes.com/2018/10/15/technology/myanmar-facebook-genocide.html ("The company's head of cybersecurity policy, Nathaniel Gleicher, said it had found 'clear and deliberate attempts to covertly spread propaganda that were directly linked to the Myanmar military.'")

[39] *Removing Myanmar Military Officials from Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018)), https://about.fb.com/news/2018/08/removing-myanmar-officials/.

[40] *Id.*; 2018 Detailed FFM Report ¶ 1353.

[41] *Id.*

Facebook's efforts to remove violative content are on-going, and it has most recently, in April 2020, removed anti-Rohingya content posted by the Myanmar Police Force for "coordinated inauthentic behavior."[42]  The content of these removed accounts and pages are no longer available on the Facebook platform, but are available because Facebook has a practice of preserving the data and content from pages it takes down.

The Gambia is interested in all evidence indicating the involvement of Myanmar State officials and entities, or those affiliated with State officials and entities, in spreading anti-Rohingya hate speech on Facebook, including the content of related Facebook accounts and evidence of coordinated activity.  Specifically, The Gambia's request for discovery is limited to the following narrow and discrete categories of electronic content and documents:

1. All documents and communications produced, drafted, posted, or published by the Facebook page of the Office of the Commander-in-Chief, Senior-General Ming Aung Hlaing;

2. All documents and communications produced, drafted, posted, or published by the Facebook account of Myanmar Senior-General Min Aung Hlaing;

3. All documents and communications produced, drafted, posted, or published by the Facebook accounts of the following individuals:

    a. Myanmar Vice Senior General Soe Win;

    b. Myanmar Brigadier General Khin Maung Soe;

    c. Myanmar Brigadier General Aung Aung;

    d. Myanmar Brigadier General Than Oo;

    e. Myanmar General Than Oo;

---

[42] *April 2020 Coordinated Inauthentic Behavior Report,* Facebook (Apr. 2020), https://about.fb.com/wp-content/uploads/2020/05/April-2020-CIB-Report.pdf.

      f.  Myanmar General Aung Kyaw Zaw;

      g.  Myanmar Major General Aung Myo Thu;

      h.  Myanmar Major General Maung Maung Soe;

      i.  Myanmar Brigadier General Thura San Lwin;

      j.  Myanmar Major Thant Zaw Win;

      k.  Myanmar Officer Tun Naing;

      l.  Myanmar Border Guard Police Corporal Kyaw Chay;

      m. Myanmar Staff Sergeant Ba Kyaw;

      n.  Myanmar 99th Light Infantry Division Leader Khin Hlaing;

      o.  Thant Zin Oo; and

      p.  Phay Sit Gyi.

4.  All documents and communications produced, drafted, posted, or published by the Facebook accounts of the following organizations:

      a.  Myawady, the television network owned by the Myanmar military;

      b.  Myanmar 33rd Light Infantry Division; and

      c.  Myanmar 99th Light Infantry Division.

5.  All documents and communications produced, drafted, posted, or published by any Facebook account belonging to the Myanmar Police Force;

6.  All documents produced, drafted, posted, or published on the following pages: "Beauty and Classic," "Young Female Teachers," Collection of Soldier's Photos," "Lord of Heaven," "Down for Anything," "Let's Laugh Casually," "We Love Myanmar," "Knowledge," and "All About Myanmar."

7. All documents and communications produced, drafted, posted, or published by the 20 military individuals and organizations that Facebook banned in August 2018;

8. All documents and communications produced, drafted, or published by any other **account** belonging to or controlled by a Myanmar state official, representative, or entity whose account was suspended or terminated by Facebook from 2012 to the present for concerns relating to human rights or the dissemination of hate speech;

9. All documents produced, drafted, or published by any other Facebook **page** belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar state entities that was suspended or terminated by Facebook from 2012 to the present for "coordinated inauthentic behavior" in violation of Facebook's misrepresentation policy;

10. All documents produced, drafted, or published by any other Facebook **group** belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar state entities that was suspended or terminated by Facebook from 2012 to the present for "coordinated inauthentic behavior" in violation of Facebook's misrepresentation policy;

11. All documents and communications produced, drafted, or published by any other Facebook **account** belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar state entities that was suspended or terminated by

Facebook from 2012 to the present for "coordinated inauthentic behavior" in violation of Facebook's misrepresentation policy;

12. All documents and communications produced, drafted, or published by any other **Instagram account** belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar state entities that was suspended or terminated by Facebook from 2012 to the present for "coordinated inauthentic behavior" in violation of Facebook's misrepresentation policy;

13. All documents relating to any internal investigations conducted by Facebook of "coordinated inauthentic behavior," or other terms of service violations, from 2012 to the present, committed by accounts belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar state entities.

14. A deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding the subject-matters described above.

## III.    ARGUMENT

This Court has the authority to grant The Gambia's § 1782 request for assistance in obtaining evidence for use in connection with the ICJ Proceedings. As shown below, The Gambia's application meets the statutory requirements for obtaining discovery under § 1782. As the Court has previously explained, "[a] district court has the authority to grant an application when three conditions are met: (1) the person from whom discovery is sought resides or is found within the district; (2) the discovery is for use in a proceeding before a foreign or international tribunal; and (3) the application is made by an interested person." *In re Veiga*, 746 F. Supp. 2d 8, 17 (D.D.C. 2010). The Gambia satisfies all three requirements: Facebook is found in the District

of Columbia; The Gambia seeks the discovery for use in connection with a proceeding pending

before an international tribunal (the ICJ); and, since it is a litigant in the ICJ Proceedings, The

Gambia is an "interested person" for purposes of § 1782.

In addition, the four discretionary factors that have been identified by the United States

Supreme Court in *Intel Corp.*, 542 U.S. at 249, all weigh in favor of granting The Gambia's

request. Facebook is not a party to the ICJ proceedings; the ICJ is not opposed to this form of

discovery; The Gambia is not concealing an attempt to circumvent the requirements of the ICJ;

and the discovery sought is both highly relevant to the matters in dispute and narrowly tailored to

avoid imposing any undue burden or intrusion on the respondents.

### A.   The Gambia's Application Satisfies All of the Statutory Requirements of 28 U.S.C. § 1782

28 U.S.C. § 1782 authorizes federal district courts to assist foreign litigants and other

interested parties in gathering evidence for use in a proceeding before a foreign or international

tribunal. *See Intel*, 542 U.S. at 247. The statute provides that:

> The district court of the district in which a person resides or is
> found may order him to give his testimony or statement or to
> produce a document or other thing for use in a proceeding in a
> foreign or international tribunal, including criminal investigations
> conducted before formal accusation. The order may be made
> pursuant to a letter rogatory issued, or request made, by a foreign
> or international tribunal or upon the application of any interested
> person and may direct that the testimony or statement be given, or
> the document or other thing be produced, before a person
> appointed by the court ... To the extent that the order does not
> prescribe otherwise, the testimony or statement shall be taken, and
> the document or other thing produced, in accordance with the
> Federal Rules of Civil Procedure. 28 U.S.C. § 1782(a).

Thus, in deciding whether it has the authority to grant a § 1782 application, the District

court must determine: (1) whether the respondent resides in the district, (2) whether the

discovery is for use in a proceeding before a foreign or international tribunal, and (3) whether the

application is made by a foreign or international tribunal or any interested person. *See In re Barnwell Enters.*, 265 F. Supp. 3d 1, 8-9 (D.D.C. 2017). The Gambia's application satisfies all three requirements.

### 1. Facebook is Found in the District of Columbia

The first statutory requirement to obtain discovery under § 1782 is that the respondent from which discovery is sought must be found or reside in the District where the application is made. Here, Facebook is found in the District of Columbia, with offices at 575 7th Street, NW, Washington, D.C. 20004.[43]  Since 2007, Facebook has significantly expanded its D.C. presence to more than 350 employees.[44] Specifically, Facebook's growing presence in D.C. appears to be a response to the company's increasingly frequent interactions with the federal government.[45] In addition to providing engineering support to build an infrastructure focused on data protection and privacy, the Facebook D.C. office also handles political outreach, public policy, technology policy, and provides legal advice with sanctions and global trade compliance – all business areas

---

[43]*See* Kieran McQuilkin, *Office Envy: Facebook's DC Digs are Far From Low Key*, AMERICANINNO (Apr. 17, 2019), https://www.americaninno.com/dc/office-envy/office-envy-the-facebook-privacy-teams-dc-digs-are-far-from-low-key/ (noting office street address).

[44]*See* Jon Banister, *Facebook, Silicon Valley Quietly Growing D.C. Office Footprint Amid Federal Scrutiny*, BISNOW (Apr. 11, 2018), https://www.bisnow.com/washington-dc/news/office/facebook-silicon-valley-quietly-growing-dc-office-footprint-amid-federal-scrutiny-87210 (noting that Facebook is tripling its D.C. footprint)

[45]*Id.*

that closely connect the D.C. office with business in the District.[46]  Facebook also continues to

actively recruit for staff positions at its D.C. office.[47]

##### 2.   The ICJ Proceedings Are Before an International Tribunal

The second statutory requirement is that the discovery must be sought for use in

connection with a proceeding before a foreign or international tribunal. The discovery sought in

this case will be used for the proceedings before the International Court of Justice, which is

unquestionably an international tribunal. *See Intel*, 542 U.S. at 258. It is the principal judicial

organ of the United Nations. It was established in June 1945 by the Charter of the United Nations

and commenced work in April 1946. The Statute of the International Court of Justice is annexed

to the Charter of the United Nations, of which it forms an integral part. The ICJ's role is to

settle, in accordance with international law, legal disputes submitted to it by States and to give

advisory opinions on legal questions referred to it by authorized United Nations organs and

specialized agencies. The seat of the ICJ is at the Peace Palace in The Hague, The Netherlands.

The ICJ has jurisdiction over disputes between States concerning the interpretation or

application of the Genocide Convention. In light of these characteristics, it is beyond dispute

that the ICJ is an international tribunal. *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS

LAW § 103 cmt. b (Am. Law Inst.1987) (referring to the International Court of Justice as an

example of an "international tribunal").

##### 3.   As a Litigant in the ICJ Proceedings, The Gambia is an "Interested Party"

---

[46]*Id.*; *See* Kieran McQuilkin, *Office Envy: Facebook's DC Digs are Far From Low Key*, AMERICANINNO (Apr. 17, 2019), https://www.americaninno.com/dc/office-envy/office-envy-the-facebook-privacy-teams-dc-digs-are-far-from-low-key/.

[47]*Location: Washington, DC*, Facebook,
https://www.facebook.com/careers/locations/washington/?p[offices][0]=Washington%2C%20DC&office s[0]=Washington%2C%20DC (noting job postings for Facebook's DC office).

The final statutory requirement is that the applicant must be an "interested party" in the underlying foreign or international proceeding. Here, The Gambia is such an "interested party." Litigants in a case being adjudicated before a foreign or international tribunal are "interested parties" for purposes of § 1782. The Supreme Court has held that "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256. Moreover, as a *foreign state* litigant, The Gambia represents just the sort of "interested party" that § 1782 was intended to assist since its origins in 1863. *See In re the Republic of Ecuador*, No. C-10-80225 MISC CRB (EMC), 2010 U.S. Dist. LEXIS 132045, at *7-9 (N.D. Cal. Dec. 1, 2010) (tracing how the predecessor statutes to § 1782 only covered cases in foreign courts in which a foreign state was a party or had an interest; subsequent amendments broadened, rather than narrowed, the definition of "interested person" under § 1782). Accordingly, The Gambia is an "interested party" within the meaning of § 1782.

In sum, The Gambia's application satisfies all three statutory requirements: the Respondent is found in this District; the discovery The Gambia seeks will be used in litigation before an international tribunal; and The Gambia is an interested party in that proceeding. As discussed *infra*, the discretionary factors identified by the Supreme Court in *Intel* also weigh in favor of granting The Gambia's application.

## B. The *Intel* Discretionary Factors Weigh in Favor of Granting The Gambia's Application

Four discretionary factors identified by the Supreme Court in *Intel* guide district courts in considering the grant of a § 1782 discovery application: (1) whether the respondent is not a participant in the international tribunal proceedings, (2) whether the tribunal is resistant to § 1782 discovery, (3) whether the petitioner is not concealing an attempt to circumvent tribunal proof-gathering restrictions, and (4) whether the requested discovery is relevant and narrowly

tailored. Each of the discretionary factors weigh in favor of granting The Gambia's § 1782 discovery application.

### 1. Facebook is Not a Participant in the ICJ Proceedings

First, *Intel* held that district courts should consider whether "the person from whom discovery is sought is a participant in the foreign proceeding." This is because "the need for § 1782(a) aid [against a participant] generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel,* 542 U.S. at 264.

Facebook is not a participant in the ICJ Proceedings. Nor could it be since "[o]nly [S]tates may be parties in cases before the Court." Charter of the United Nations & Statute of the Int'l Court of Justice, art. 34, ¶ 1, June 26, 1945, 59 Stat. 1055, T.S. No. 993. Thus, the evidence held by Facebook is outside the jurisdictional reach of the ICJ. Indeed, § 1782 was enacted specifically to assist parties in litigation facing this type of situation. "A foreign tribunal has jurisdiction over those appearing before it … In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent [section] 1782(a) aid." *Intel,* 542 U.S. at 264. Therefore, the fact that the entity from which discovery is sought is a "nonparticipant" in the foreign or international proceedings "typically weigh[s] in favor of granting the requested discovery." *Intel*, 542 U.S. at 264; *see also In re Barnwell Enters.*, 265 F. Supp. 3d at 10 (finding that Respondent "is not a participant in the foreign proceedings … militates in favor of granting Petitioners' application").

### 2. The ICJ is Not Resistant to § 1782 Discovery

Second, *Intel* held that a district court should consider the "receptivity" of the foreign or international tribunal in question to "U.S. federal-court judicial assistance." *Intel,* 542 U.S. at

264. This does not require the district court to engage in an extensive analysis of whether a

foreign or international tribunal would be receptive to discovery assistance. Rather, the inquiry is

confined to determining whether there is authoritative proof that the tribunal would reject

evidence obtained with the aid of § 1782. *In re Digiulian*, 314 F. Supp. 3d 1, 8 (D.D.C. 2018); *In

re Barnwell Enters.*, 265 F. Supp. 3d at 10-11. The Respondent bears the burden of proof of

demonstrating that the tribunal would refuse the evidence in question. *In re Barnwell Enters.*,

265 F. Supp. 3d at 10-11; *In re Veiga*, 746 F. Supp. 2d at 23-24 ("The party resisting discovery

must point to 'authoritative proof' that the foreign tribunal would reject the evidence sought.").

In this case, The Gambia seeks discovery of evidence that would be presented in The

Gambia's written pleadings to the ICJ. Not only is there no basis on which to conclude that the

ICJ would be resistant to such evidence, the governing Rules of the International Court of

Justice expressly permit litigants to present such evidence. *See* Rules of Court, Int'l Court of

Justice, art. 50, ¶ 1 (1978) ("There shall be annexed to the original of every pleading certified

copies of any relevant documents adduced in support of the contentions contained in the

pleading."). Consequently, the second *Intel* factor weights in favor of granting The Gambia's

application.

### 3.   The Gambia Is Not Concealing an Attempt to Circumvent Any ICJ Proof-Gathering Restrictions

Third, *Intel* held that a district court should consider "whether the § 1782(a) request

conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a

foreign country or the United States." *Intel,* 542 U.S. at 264-65. This factor is intended to

protect against an applicant's misuse of the process by verifying that it is not attempting to

avoid proof-gathering restrictions that are imposed in the underlying proceeding. However, the

law is clear that, absent bad faith on the part of the applicant, a court will not weigh this factor

against allowing discovery. *In re Veiga*, 746 F. Supp. 2d at 25 ("no evidence in the record ... that would lead this Court to believe that Applicants have sought to circumvent the proof-gathering procedures or policies of the foreign tribunals or otherwise brought their applications in bad faith").

In this case, there are no proof-gathering restrictions that have been imposed in the ICJ Proceedings. Furthermore, The Gambia's application is a good faith attempt to seek discovery that would assist it in presenting its case at the ICJ, namely by obtaining additional evidence of the genocidal intent of Myanmar's officials and representatives, and the abuse of media platforms by Myanmar state actors to further their acts of genocide against the Rohingya. The Gambia seeks to use § 1782 to aid it in giving effect to its right to present evidence to the ICJ, a right that is codified in Article 50(1) of the Rules of the International Court of Justice. Since the ICJ's jurisdiction extends only to sovereign States, it has no jurisdiction over Facebook, or any other private entity, which makes it necessary for The Gambia to pursue discovery from Facebook through the District Court.

### 4.   The Discovery The Gambia Seeks is Relevant and Narrowly Tailored

Lastly, *Intel* held that a district court should consider whether "unduly intrusive or burdensome requests may be rejected or trimmed." *Intel*, 542 U.S. at 265. In reviewing this factor, courts look to whether the request is sufficiently tailored to the litigation issues for which production is sought. *In re Digiulian*, 314 F. Supp. 3d at 9; *see also In re Veiga*, 746 F. Supp. 2d at 25.

Here, The Gambia's request is narrowly tailored and not unduly burdensome or intrusive. The Gambia has confined its request solely to (1) information in the accounts of specific Myanmar state officials and entities; (2) any other state official, representative, or state affiliated account that may have been similarly suspended; (3) information in accounts that Facebook has

- 24 -

linked to coordinated inauthentic behavior by the Myanmar military; (4) any documents

pertaining to investigations conducted by Facebook regarding Myanmar's use of its platform to

further its persecution of the Rohingya; and (5) a deposition pursuant to Rule 30(b)(6) of the

Federal Rules of Civil Procedure regarding the aforementioned subject matters. This limited

discovery cannot be considered overly broad or unduly burdensome. *In re Barnwell Enters.*, 265

F. Supp. 3d at 14. If Facebook has any legitimate concerns regarding confidentiality and or the

scope of any documents requested, The Gambia is willing to discuss a protective order to

facilitate the production of the requested discovery. *In re Ex Parte Application of Kleimar N.V.*,

220 F. Supp. 3d 517, 522 (S.D.N.Y. 2016).

In sum, The Gambia's § 1782 application satisfies both the relevant statutory

requirements and the discretionary factors that have been identified by the Supreme Court in

*Intel*. The Gambia's application accordingly should be granted.

**IV.     CONCLUSION**

For the foregoing reasons, The Gambia respectfully requests that this Court grant its

section 1782 discovery application and enter the accompanying proposed order directing

Facebook to produce the documents requested and appear for a deposition.

Respectfully submitted,

Dated: June 5, 2020

Timothy P. O'Toole (D.C. Bar No. 469800)
Aiysha S. Hussain (D.C. Bar No. 1019848)
MILLER & CHEVALIER CHARTERED
900 16th Street., N.W.
Washington, D.C. 20006
(202) 626-5800

*Attorneys for Applicant, Republic of The Gambia*

- 26 -