## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re*: Application Pursuant to 28 U.S.C. § 1782 of THE REPUBLIC OF THE GAMBIA<br><br>Petitioner,<br><br>v.<br><br>FACEBOOK, INC.<br><br>Respondent. | Case No.: 1:20-mc-00036-JEB-DAR |

## THE REPUBLIC OF THE GAMBIA'S REPLY TO RESPONDENT'S OPPOSITION TO PETITIONER'S APPLICATION PURSUANT TO 28 U.S.C. § 1782

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................3

ARGUMENT ...............................................................................................................4

I.  The SCA does not protect the privacy of the Myanmar government, its
    officials or its agents and it does not apply to the removed content The
    Gambia has requested. ....................................................................................4

    a.  The Myanmar government, its officials, and its agents are not
        "users" because they do not qualify as "persons or entities" as
        those terms are defined in the SCA..........................................................5

    b.  The Myanmar government, its officials, and its agents are not
        "users" because they are not "duly authorized" by Facebook to use
        its service to coordinate and conspire to commit genocide. ...................9

    c.  The SCA does not apply because the content Facebook has
        removed from its platform is not a "communication while in
        electronic storage" as required by 18 U.S.C. § 2702(a)(1)...................11

II.  Under the SCA the requested content is excepted from the statute's
     prohibitions and can be permissibly disclosed...............................................14

    a.  Facebook can permissibly disclose the requested information under
        section 18 U.S.C. § 2702(b)(5). ............................................................14

    b.  Where, as here, a sovereign state and its agents have weaponized
        the Facebook platform to broadly communicate hate speech and
        incite genocide they have consented to the disclosure of their
        communications under 18 U.S.C. § 2703(b)(3)....................................16

III.  Unlike the MLAT and CLOUD Act processes, a 28 U.S.C. § 1782 action
      is the proper mechanism for The Gambia to request information from
      Facebook. .....................................................................................................18

IV.  The discovery The Gambia seeks is relevant and narrowly tailored. ...............19

CONCLUSION..........................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ex Parte Application of Kleimar N.V.*,
220 F. Supp. 3d 517 (S.D.N.Y. 2016)......................................................................21

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*
447 U.S. 102 (1980).......................................................................................................5

*Crispin v. Christian Audigier, Inc.*,
717 F. Supp. 2d 965 (C.D. Cal. 2010) ....................................................................13

*Delaware Dep't of Nat. Res. & Envtl. Control v. Envtl. Prot. Agency*,
895 F.3d 90 (D.C. Cir. 2018).......................................................................................6

*In re DoubleClick Inc. Privacy Litig.*,
154 F.Supp.2d 497, 511–12 (S.D.N.Y. 2001)........................................................12

*Facebook, Inc. v. Super. Ct. of the City and Cty. of S.F.*,
4 Cal. 5th 1245 (Cal. 2018)..................................................................................16, 17

*Flagg v. City of Detroit*,
252 F.R.D. 346 (E.D. Mich. 2008) ..........................................................................13

*Humane Soc'y of the United States v. McCarthy*,
209 F. Supp. 3d 280 (D.D.C. 2016) ...........................................................................7

*Mees v. Buiter*,
793 F.3d 291 (2d Cir. 2015)........................................................................................21

*In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*,
634 F.3d 557 (9th Cir. 2011) .....................................................................................19

*Sandifer v. U.S. Steel Corp.*,
571 U.S. 220 (2014)........................................................................................................6

*In re Search of Info. Associated with [redacted]@gmail.com that is Stored at
Premises Controlled by Google, Inc.*,
No. 16-MJ-00757 (BAH), 2017 WL 3445634 (D.D.C. July 31, 2017)................19

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir. 2004) ........................................................................ *passim*

*United States ex rel. Turner v. Williams*,
194 U.S. 279, 292 (1904)..............................................................................................9

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ................................................................................................8, 9

*United States v. Weaver*,
   636 F. Supp. 2d 769 (C.D. Ill. 2009) ...........................................................................12

*Viacom Int'l Inc. v. YouTube Inc.*,
   253 F.R.D. 256 (S.D.N.Y. 2008) ..................................................................................16

*In re Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by*
   *Microsoft Corp.*,
   829 F.3d 197 (2d Cir. 2016), *vacated and remanded sub nom. United States v.*
   *Microsoft Corp.*, 138 S. Ct. 1186 (2018) .......................................................................7

*Yates v. United States*,
   574 U.S. 528 (2015) ........................................................................................................6

**Statutes**

18 U.S.C.A. § 2701 (West 2020) ..........................................................................................10

18 U.S.C. § 2510 (2020) ..........................................................................................5, 6, 9, 12

18 U.S.C. § 2702 (2020) ............................................................................................. *passim*

18 U.S.C. § 2703 (2020) ..............................................................................................4, 14, 16

18 U.S.C. § 2711 (2018) ........................................................................................................13

28 U.S.C. § 1782 (2020) ..............................................................................................2, 3, 18

Restatement (Second) of Torts § 173 (Am. Law Inst. 1965) .................................................10

**Other Authorities**

Alexandra Stevenson, *Facebook Admits It Was Used to Incite Violence in*
   *Myanmar*, The New York Times (Nov. 6, 2018)
   https://www.nytimes.com/2018/11/06/technology/myanmar-facebook.html ...........................1

Application of the Convention on the Prevention and Punishment of the Crime of
   Genocide (*The Gambia v. Myanmar*), Order , 2020 I.C.J. 178 (May
   18),https://www.icj-cij.org/files/case-related/178/178-20200518-ORD-01-00-
   EN.pdf ..........................................................................................................................3

*April 2020 Coordinated Inauthentic Behavior Report,* Facebook (Apr. 2020),
   https://about.fb.com/wp-content/uploads/2020/05/April-2020-CIB-Report.pdf ...................11

Black's Law Dictionary (11th ed. 2019) ................................................................................6

BSR, *Human Rights Impact Assessment Facebook in Myanmar*, Facebook (Oct. 2018), https://about.fb.com/wp-content/uploads/2018/11/bsr-facebook-myanmar-hria_final.pdf ...............................................................................4, 20, 21

Elliot Schrage, *Hard Questions: Russian Ads Delivered to Congress*, Facebook (Oct. 2, 2017), https://about.fb.com/news/2017/10/hard-questions-russian-ads-delivered-to-congress/ ................................................................................................1

*February 2020 Coordinated Inauthentic Behavior Report*, Facebook (Mar. 2, 2020), https://about.fb.com/news/2020/03/february-cib-report/...............................................4

Fed. R. Civ. P. 30(b)(6)...................................................................................3, 18, 21

H.R. Rep. No. 99-647 (1986).......................................................................8, 15, 16, 17

*How do we respond to legal requests or prevent harm?*, Facebook (April 19, 2018), https://www.facebook.com/about/privacy/update ...................................10, 15

Human Rights Council, *Report of the detailed findings of the Independent International Fact-Finding Mission on Myanmar*, U.N. Human Rights Office of the High Commissioner (Sept. 17, 2018), https://www.ohchr.org/Documents/HRBodies/HRCouncil/FFM-Myanmar/A_HRC_39_CRP.2.pdf..............................................................................21

Nathaniel Gleicher, *Removing Coordinated Inauthentic Behavior From Russia, Iran, Vietnam, and Myanmar*, Facebook (Feb. 12, 2020), https://about.fb.com/news/2020/02/removing-coordinated-inauthentic-behavior/ .......................................................................................................................11

Nathaniel Gleicher, *Taking Down More Coordinated Inauthentic Behavior in Myanmar*, Facebook (Aug. 21, 2019), https://about.fb.com/news/2019/08/more-cib-myanmar/;....................................4, 11

Orin Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1215 (2004)....................................13

Poppy McPherson, *U.N. investigator says Facebook has not shared 'evidence' of Myanmar crime*, Reuters (Aug. 11, 2020), https://www.reuters.com/article/us-myanmar-facebook/u-n-investigator-says-facebook-has-not-shared-evidence-of-myanmar-crime-idUSKCN2570K9 ..............................................................3, 19

*Removing Myanmar Military Officials from Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/............................................................................ *passim*

S. Rep. No 99-541 (1986)...........................................................................................8

Sara Su, *Update on Myanmar*, Facebook (Aug. 15, 2018),
 https://about.fb.com/news/2018/08/update-on-myanmar/ .....................................................20

*Terms of Service: 3. The permissions you give us*, Facebook (July 31, 2019),
 https://www.facebook.com/legal/terms .................................................................................18

*Treaties, Agreements, and Asset Sharing*, U.S. Department of State, https://2009-
 2017.state.gov/j/inl/rls/nrcrpt/2014/vol2/222469.htm ............................................................2

Twitter Safety, *Disclosing networks of state-linked information operation we've
 removed*, Twitter (June 12, 2020),
 https://blog.twitter.com/en_us/topics/company/2020/information-operations-
 june-2020.html; ........................................................................................................................2

Twitter Safety, *Disclosing new data to our archive of information operations*,
 Twitter (Sept. 20, 2019),
 https://blog.twitter.com/en_us/topics/company/2019/info-ops-disclosure-data-
 september-2019.html ................................................................................................................2

Twitter Safety, *Information operations on Twitter: principles, process and
 disclosure*, Twitter (June 13, 2019),
 https://blog.twitter.com/en_us/topics/company/2019/information-ops-on-
 twitter.html; .............................................................................................................................2

U.S. DEPT. OF JUSTICE, *PROMOTING PUBLIC SAFETY, PRIVACY AND THE RULE OF LAW
 AROUND THE WORLD: THE PURPOSE AND IMPACT OF THE CLOUD ACT* (2019),
 https://www.justice.gov/opa/press-release/file/1153446/download ..................................2, 19

## INTRODUCTION

Publicly, Facebook, Inc. ("Facebook") admits that it "can and should do more"[1] to prevent its platform from being used to incite violence and that of course it wants to cooperate in investigating genocidal behavior.  However, when presented with the opportunity, Facebook claims that its hands are tied, and that it is forced to shield genocidal terrorists under the guise of U.S. Law.  But this is simply not true.  Contrary to Facebook's argument in its opposition, the Stored Communications Act ("SCA" or the "Act") does not apply to The Republic of the Gambia's ("The Gambia") requests because that law – passed to protect the privacy interests of the American people in the content of their lawful electronic communications – does not apply to foreign governments that are, by Facebook's own admission, misusing its electronic communication service.  Moreover, even if the SCA did apply, Facebook can disclose much of the requested information under two clearly-applicable statutory exceptions that would allow Facebook, if it truly wanted to, to side with those investigating genocide.  Instead, Facebook has chosen to protect the privacy interests of foreign government officials of the Republic of the Union of Myanmar ("Myanmar") who have indisputably misused its service and are suspected of genocide.[2]  Facebook cannot credibly deny this is the case since, in the past, when Facebook has determined information is vitally important to release, it has released that information rather than claiming that its hands are tied by the SCA.[3]  Other social media platforms are establishing an

---

[1] Alexandra Stevenson, *Facebook Admits It Was Used to Incite Violence in Myanmar*, The New York Times (Nov. 6, 2018), https://www.nytimes.com/2018/11/06/technology/myanmar-facebook.html

[2] *See* 18 U.S.C. § 2702 (2020).

[3] Elliot Schrage, *Hard Questions: Russian Ads Delivered to Congress*, Facebook (Oct. 2, 2017), https://about.fb.com/news/2017/10/hard-questions-russian-ads-delivered-to-congress/.

industry practice of publicly disclosing content where they have determined the platform was manipulated by bad actors.[4]  But Facebook chooses not to meet that standard.

Facebook also identifies purported procedural hurdles to cooperation with The Gambia's investigation.  But these do not apply either.  Contrary to Facebook's view, a 28 U.S.C. § 1782 action is the proper mechanism for obtaining discovery that is relevant to proceedings taking place before the International Court of Justice ("ICJ") against Myanmar.  Mechanisms that Facebook suggests, such as the Clarifying Lawful Overseas Use of Data Act ("CLOUD Act") and mutual legal assistance treaties ("MLATs"), are arguably irrelevant (because the SCA does not apply to foreign governments or its officials who misuse an electronic communication service) and certainly not the exclusive remedies in these circumstances, as they are most often used in the context of domestic criminal investigations.[5]  Here, The Gambia is not prosecuting a domestic issue, instead it is holding Myanmar, a third-party sovereign, accountable under the 1948 Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention").  Even if the SCA applied, and The Gambia pursued CLOUD Act mechanisms, the CLOUD Act does not require U.S. companies to comply with requests for information and any compliance by Facebook under this provision would be strictly voluntary.[6]  Indeed, civil society

---

[4] *See, e.g.,* Twitter Safety, *Disclosing networks of state-linked information operation we've removed*, Twitter (June 12, 2020), https://blog.twitter.com/en_us/topics/company/2020/information-operations-june-2020.html; Twitter Safety, *Information operations on Twitter: principles, process and disclosure*, Twitter (June 13, 2019), https://blog.twitter.com/en_us/topics/company/2019/information-ops-on-twitter.html; Twitter Safety, *Disclosing new data to our archive of information operations*, Twitter (Sept. 20, 2019), https://blog.twitter.com/en_us/topics/company/2019/info-ops-disclosure-data-september-2019.html.

[5] *See, e.g., Treaties, Agreements, and Asset Sharing*, U.S. Department of State, https://2009-2017.state.gov/j/inl/rls/nrcrpt/2014/vol2/222469.htm ("Mutual Legal Assistance Treaties (MLATs) allow generally for the exchange of evidence and information in criminal and related matters.").

[6] U.S. DEPT. OF JUSTICE, PROMOTING PUBLIC SAFETY, PRIVACY AND THE RULE OF LAW AROUND THE WORLD: THE PURPOSE AND IMPACT OF THE CLOUD ACT 4 (2019), https://www.justice.gov/opa/press-release/file/1153446/download. ("CLOUD Act agreements, however, do not impose any new obligation

organizations, and UN investigative bodies have called on Facebook to voluntarily coordinate with them in investigating the genocide in Myanmar for several years.  In particular, the U.N. Independent Investigative Mechanism for Myanmar ("IIMM") requests for information to Facebook have been pending for a year without progress.[7]  Thus, an enforceable 28 U.S.C. § 1782 order from a U.S. Court is the best avenue for The Gambia to compel Facebook to respond to its requests, and this Court should direct production under 1782 forthwith.

## BACKGROUND

On June 8, 2020, The Gambia submitted its application pursuant to 28 U.S.C. § 1782 before this Court for an order directing Facebook to produce a limited number of documents and submit to a Fed. R. Civ. P. 30(b)(6) deposition to aid The Gambia in connection with ongoing judicial proceedings that it instituted in November 2019 against Myanmar.  The material requested will assist in proving genocidal intent by Myanmar and is critical to The Gambia's brief, which will be submitted on October 23, 2020.[8]  Given the short amount of time before The Gambia's brief is due, The Gambia respectfully requests that the Court act post-haste and order Facebook to produce the requested discovery.

---

on U.S.-based global CSPs to comply with a foreign government order; nor does the fact of an agreement establish, by itself, that a foreign government has jurisdiction over that CSP … In addition, these agreements do not impose any obligation on either government to compel companies to comply with orders issued by the other.  The only legal effect of a CLOUD agreement is to eliminate the legal conflict for qualifying orders.").

[7] Poppy McPherson, *U.N. investigator says Facebook has not shared 'evidence' of Myanmar crime*, Reuters (Aug. 11, 2020), https://www.reuters.com/article/us-myanmar-facebook/u-n-investigator-says-facebook-has-not-shared-evidence-of-myanmar-crime-idUSKCN2570K9 ("Nicholas Koumjian, head of the Independent Investigative Mechanism on Myanmar (IIMM), told Reuters the social media giant was holding material 'highly relevant and probative of serious international crimes' but had not shared any during year-long talks.").

[8] Application of the Convention on the Prevention and Punishment of the Crime of Genocide (*The Gambia v. Myanmar*), Order , 2020 I.C.J. 178 (May 18), https://www.icj-cij.org/files/case-related/178/178-20200518-ORD-01-00-EN.pdf.

Facebook opposes the application stating that it would be a violation of the SCA for it to produce any documents.  As discussed further below, these arguments are without merit.  As a threshold matter, the SCA does not apply to The Gambia's requests.  First, the plain language of the SCA does not apply to foreign governments, its officials, or its agents.  Second, the SCA does not protect actors who have engaged in unauthorized use of a provider's platform—Myanmar's abuse and manipulation of Facebook's platform to foment genocidal hatred against the Rohingya people is well documented by Facebook and by Facebook's consultants.[9]  Such use is not protected under the Act.  Third, The Gambia's requests are limited to information that Facebook has removed from its platform and preserved—the SCA does not protect such content.

Furthermore, even if the SCA were to apply, Facebook could utilize at least two statutory exceptions to produce the discovery The Gambia has requested.  In particular, section 2702(b)(5) permits Facebook to "divulge the contents of a communication" where it is necessary to the performance of the service or to protect its property rights, and section 2703(b)(3) permits disclosure where the information has been publicly disclosed.  As explained further below, this Court should grant The Gambia's application.

## ARGUMENT

**I.    The SCA does not protect the privacy of the Myanmar government, its officials or its agents and it does not apply to the removed content The Gambia has requested.**

Facebook assumes without argument that the SCA protects the Myanmar

---

[9] *Removing Myanmar Military Officials From Facebook*, Facebook (Aug. 28, 2018) (Updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/; *February 2020 Coordinated Inauthentic Behavior Report*, Facebook (Mar. 2, 2020), https://about.fb.com/news/2020/03/february-cib-report/; Nathaniel Gleicher, *Taking Down More Coordinated Inauthentic Behavior in Myanmar*, Facebook (Aug. 21, 2019), https://about.fb.com/news/2019/08/more-cib-myanmar/; BSR, *Human Rights Impact Assessment Facebook in Myanmar* 27, Facebook (Oct. 2018), https://about.fb.com/wp-content/uploads/2018/11/bsr-facebook-myanmar-hria_final.pdf.

government, its officials, and its agents—who have indisputably misused its platform—to the same extent it protects the privacy interests of U.S. citizens who comply with all of Facebook's terms and conditions.  Facebook's Opp'n to Pet'rs Appl. Pursuant to 28 U.S.C. § 1782 6, ECF No. 8 ("Opp'n").  But, given the origins and history of the SCA, this would be a surprising proposition, which the plain language of the SCA refutes.  That language, carefully considered, makes clear that Congress did not set out to protect the privacy interests of foreign governments in the content of their electronic communications; the SCA's protections, on their face are limited to natural persons, domestic governmental officials, and are likewise limited to communications that are in compliance with the system's requirements and thus remain stored on the system.  In other words, the SCA, by its terms, does not protect the removed content of the Myanmar government, its officials, or its agents.

a. **The Myanmar government, its officials, and its agents are not "users" because they do not qualify as "persons or entities" as those terms are defined in the SCA.**

The SCA's protections do not extend to the Myanmar government, its officials, or its agents because they are not included within the definition of "users."[10]  To interpret any statutory provision, the starting point must be the language of the statute itself.  *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.* 447 U.S. 102, 108 (1980).  Ordinarily, the Court will give effect to the plain meaning of the words used by the legislature.  Through the SCA, Congress prohibited an "electronic communications service" provider who provides services to "users" who are defined as "person or entity."[11]  The term "person" is carefully defined under the statute as:  "any *employee, or agent of the United States or any State or political subdivision thereof,*

---

[10] 18 U.S.C. § 2510 (13) (2020).

[11] 18 U.S.C. § 2702 (2020); 18 U.S.C. § 2510 (6), (13), (15) (2020).

and any individual, partnership, association, joint stock company, trust, or corporation."[12]
Notably, only United States governmental agents or employees, U.S. state governmental agents
or employees, and local U.S. governmental agents and employees are included within the
definition of the term "person"— foreign governmental employees and agents are not within that
definition.  Moreover, foreign governmental agents or employees cannot be included under the
term "individual."  If all governmental agents and employees qualified as "individuals" then the
language "any employee, or agent of the United States or any State or political subdivision
thereof" would be entirely superfluous.  That cannot be the case given that Courts take great care
to construe statutes as to give meaning to every term.  *Delaware Dep't of Nat. Res. & Envtl.*
*Control v. Envtl. Prot. Agency*, 895 F.3d 90, 99 (D.C. Cir. 2018) ("Additionally, we strive to
construe statutes 'so that effect is given to all its provisions, so that no part will be inoperative or
superfluous, void or insignificant.'").

Moreover, the Myanmar government cannot fall within the definition of "entity."
Nothing in the statute says an "entity" is a government body or actor.  Indeed, the statute does
not define "entity."   Where words are undefined, courts will strive to give them their ordinary
meaning.  *Sandifer v. U.S. Steel Corp*., 571 U.S. 220, 227 (2014) ("It is a 'fundamental canon of
statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their
ordinary, contemporary, common meaning.'").  Black's Law dictionary defines "entity" as "[a]n
organization (such as a business or a governmental unit) that has a legal identity apart from its
members or owners."[13]  Because, courts construe statutory texts "harmoniously" and in relation
to neighboring words, here, "entity" should be construed in relation to "person."  *See Yates v.*

---

[12] 18 U.S.C. § 2510 (6) (2020) (emphasis added).

[13] Black's Law Dictionary (11th ed. 2019).

*United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."); *Humane Soc'y of the United States v. McCarthy*, 209 F. Supp. 3d 280, 285 (D.D.C. 2016) ("[T]he cannons of statutory interpretation instruct courts to avoid construing the text of a statute to be contradictory; "our task is to fit, if possible, all parts into a harmonious whole.").

As stated previously, the definition of "person" *specifically* included United States government employees, agents, and political subdivisions, and implicitly excluded foreign government employees and agents.  This strongly suggests that the term "entity" does not include governmental bodies, since if it did, there would have been no need for Congress to specifically include them in the definition of "persons."  Why do so if such governmental actors were already included within the definition of "entity"?  Given that Congress clearly did not believe U.S. governmental bodies were "entities," it would be extremely strange if it did want *foreign* governments and agents to fall within the definition of "entity."  This seems clear enough on its face, but to the extent there is any doubt, construing the term "entity" to exclude foreign governments would also conform to the canon of construction that disfavors an extraterritorial construction.  *See, e.g.*, *Microsoft Corp. v. United States (In re Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp*., 829 F.3d 197, 218 (2d Cir. 2016), *vacated and remanded sub nom. United States v. Microsoft Corp*., 138 S. Ct. 1186 (2018) ("No relevant definition provided by either Title I or Title II of [the Electronic Communications Privacy Act] … suggests that Congress envisioned any extraterritorial use for the statute.").

Accordingly, under this reading, the plain language of the statute does not protect the privacy of the Myanmar government, its officials, or its agents.

Moreover, the statutory history shows that Congress did not intend to protect the privacy interests of foreign governments and their actors, much less foreign genocidal government actors, when it passed the SCA.  Congress passed the SCA in 1986 to extend Fourth Amendment protections to new forms of communications.[14]  At that time, it did not contemplate the widespread use of the internet, the possibility that communications would be occurring internationally, and it certainly did not contemplate the advent of social media platforms.  What Congress did contemplate, was that the SCA would apply to the citizens of the United States, which would naturally preclude application to foreign states and their actors:

> But most important, if Congress does not act to protect the privacy of *our citizens*, we may see the gradual erosion of a precious right.  Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances. Additional legal protection is necessary to ensure the continued vitality of the Fourth Amendment.
>
> The Committee believes the bill represent a fair balance between the privacy expectations of *citizens* and the legitimate needs of law enforcement.[15]

Additionally, the Supreme Court has previously held, in the context of search and seizures by U.S. agents of property owned by a nonresident alien and located in a foreign country, that "[t]he Fourth Amendment's drafting history shows that its purpose was to protect the people of the United States against arbitrary action by their own Government and not to restrain the Federal Government's actions against aliens outside United States territory."[16]  The Court based this reading off of the Fourth Amendment's use of the word "people" (versus the Fifth Amendment's protections of "all persons"), which indicates that the Amendment is

---

[14] *See,* S. Rep. No 99-541, at 1-3 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3555-57 (setting forth purpose of the SCA); H.R. Rep. No. 99-647, at 19 (1986) (citing the SCA's intent to provide the "[a]dditional legal protection … necessary to ensure the continued vitality of the Fourth Amendment.").

[15] H.R. Rep. No. 99-647, at 19 (1986) (emphasis added).

[16] *United States v. Verdugo-Urquidez*, 494 U.S. 259, 260 (1990).

intended to protect "a class of persons who are a part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."[17]  Accordingly, based on the plain meaning of the SCA, the statutory history of the SCA, and the contemplated scope of the Fourth Amendment, the SCA's protections do not apply to the Myanmar government, its officials, and its agents, and it imposes no valid impediment to the issuance of the subpoena requested by The Gambia.

> **b. The Myanmar government, its officials, and its agents are not "users" because they are not "duly authorized" by Facebook to use its service to coordinate and conspire to commit genocide.**

The SCA also does not apply for an entirely separate reason:  It limits the term "users" to those who are "duly authorized" by the provider to engage in a particular use of the electronic communications service.  But the Myanmar government, its officials, and its agents have not done so according to Facebook itself – which is why their accounts were removed – meaning that they are not "duly authorized" "users" under the plain language of the SCA.

The SCA protects the privacy rights of a "user" of an "electronic communication service" ("ECS").  A "user" is defined as "any person or entity who (A) uses an electronic communication service; and (B) *is duly authorized by the provider* of such service *to engage in such use*."[18]  An ECS, which Facebook claims it is, is defined as "any service which provides to *users* thereof the ability to send or receive wire or electronic communications."[19]

The statute does not define "authorized."  However, in *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004), applying the common law doctrine of trespass, the Ninth Circuit interpreted

---

[17] *Id.* at 265 (citing *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904)).

[18] 18 U.S.C. § 2510 (13) (2020) (emphasis added).

[19] 18 U.S.C. § 2510 (15) (2020) (emphasis added).

the meaning of "authorized" in the context of section 2701(c)(1),[20] a different section of the

SCA.  *See Id*. (holding that because permission to access the emails at issue was gained through

deceit—i.e., the use of an invalid subpoena—it was not "authorized.").  Applying the doctrine of

trespass as stated in the Restatement 2nd of Torts, the Myanmar government, its officials, and its

agents gained access to Facebook's platform by facially agreeing to its terms, conditions, and

policies and misrepresented their true purpose in using the platform.[21]  *See,* Restatement

(Second) of Torts § 173 (Am. Law Inst. 1965) ("A conscious misrepresentation as to the purpose

for which admittance to the land is sought, may be a fraudulent misrepresentation of a material

fact.").

Certainly, minor infractions would not strip SCA protections.  Facebook's own terms and

conditions warn that Facebook will disclose information where it has a "good-faith belief it is

necessary to detect, prevent and address … unauthorized use of [its] Products, violation of [its]

terms or policies, or other harmful or illegal activity."[22]  Here, Facebook itself has determined

that hundreds of accounts, pages, and posts linked to the Myanmar government, its military, and

---

[20] 18 U.S.C.A. § 2701(a), (c)(1) (West 2020).

[21] Restatement (Second) of Torts § 173 (Am. Law Inst. 1965) ("A conscious misrepresentation as to the
purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material
fact.")  The Restatement provides the following example:

> The A Gas Company, having mistakenly concluded that B has not paid his bill for gas, sends its
> servant, C, to B's house, to remove the meter. C, in accordance with his instructions, fraudulently
> gains admission by stating that he has come to read the gas meter. Having thus gained admission,
> he removes the gas meter. The A Company is subject to liability for trespass.

Restatement (Second) of Torts § 173 (Am. Law Inst. 1965).

[22] *How do we respond to legal requests or prevent harm?*, Facebook (April 19, 2018),
https://www.facebook.com/about/privacy/update ("When we have a good-faith belief it is necessary to:
detect, prevent and address fraud, unauthorized use of the Products, violations of our terms or policies, or
other harmful or illegal activity; to protect ourselves (including our rights, property or Products), you or
others, including as part of investigations or regulatory inquiries; or to prevent death or imminent bodily
harm.")

its agents, have violated the terms of Facebook's use policies by engaging in, among other

things, "coordinated inauthentic behavior," inciting violence, engaging in hate speech, and using

fake accounts.[23]  Indeed, because these actors have misused its platform, their Facebook

accounts, pages, and other content have been removed and, in some instances, Facebook has

blocked violators from the use of its service. *See, e.g.*, *Removing Myanmar Military Officials*

*from Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018),

https://about.fb.com/news/2018/08/removing-myanmar-officials/ ("Today, we are taking more

action in Myanmar, removing a total of 18 Facebook accounts, one Instagram account and 52

Facebook Pages, followed by almost 12 million people. We are preserving data, including

content, on the accounts and Pages we have removed.").  Because these actors have engaged in

use that is not "duly authorized" they are not "user[s]" within the meaning of the SCA, and thus

not protected under the Act.[24]

> **c.  The SCA does not apply because the content Facebook has removed from its platform is not a "communication while in electronic storage" as required by 18 U.S.C. § 2702(a)(1).**

The SCA also does not apply to any content that Facebook has removed from the system;

content that forms virtually all of the subpoenaed information.  In particular, the Gambia's

requests are limited to information that Facebook has removed from its platform such that the

information is not "in electronic storage" as required by the Act.  Indeed, with respect to the

---

[23] Nathaniel Gleicher, *Taking Down More Coordinated Inauthentic Behavior in Myanmar*, Facebook (Aug. 21, 2019), https://about.fb.com/news/2019/08/more-cib-myanmar/; Nathaniel Gleicher, *Removing Coordinated Inauthentic Behavior From Russia, Iran, Vietnam, and Myanmar*, Facebook (Feb. 12, 2020), https://about.fb.com/news/2020/02/removing-coordinated-inauthentic-behavior/; *April 2020 Coordinated Inauthentic Behavior Report,* Facebook (Apr. 2020), https://about.fb.com/wp-content/uploads/2020/05/April-2020-CIB-Report.pdf.

[24] *See, e.g., Theofel*, 359 F.3d at 1072–73 (9th Cir. 2004) (interpreting "authorize" under section 2701 and holding that ISP did not "authorize" access where defendants accessed information by exploiting a known mistake—i.e., the ISP's belief in the validity of the subpoena).

content requested, Facebook is not acting as a facilitator of electronic communications as it typically does but is merely a preserver of information.[25]

Under the SCA, an ECS provider is prohibited from divulging communications "while in *electronic storage* by that service." 18 U.S.C. § 2702(a)(1) (emphasis added). The SCA defines "electronic storage" in two ways. Specifically, the first type of storage, is defined as "any *temporary*, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(a) (emphasis added). The second type of storage is defined as "any storage of such communication by an electronic communication service for purposes of *backup protection* of such communication." 18 U.S.C. § 2510(17)(b) (emphasis added).

Under section 2510(17)(a), courts have interpreted emails that sit in an e-mail user's mailbox (on an ISP server) after transmission pending the user's retrieval of the message from the mail server as being *temporarily* stored.[26] In contrast, with respect to section 2510(17)(b), Courts have interpreted posts on bulletin boards, or in the context of Facebook, posts on a wall,

---

[25] *Removing Myanmar Military Officials From Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/ ("We are preserving data, including content, on the accounts and Pages we have removed.").

[26] *See, e.g., Theofel*, 359 F.3d at 1072–73, 1075 (citing *In re DoubleClick Inc. Privacy Litig.,* 154 F.Supp.2d 497, 511–12 (S.D.N.Y. 2001) (stating that section (A) is specifically targeted at communications temporarily stored by electronic communications services incident to their transmission—for example, when an email service stores a message until the addressee downloads it, and applying dictionary definitions of "temporary;" and "intermediate" to find that the subsection protects only electronic communications stored "for a limited time" in the "middle" of a transmission, "i.e., when an electronic communication service temporarily stores a communication while waiting to deliver it")); *United States v. Weaver*, 636 F. Supp. 2d 769, 771 (C.D. Ill. 2009) ("Because the emails here have been opened, they are not in temporary, intermediate storage incidental to electronic transmission.").

to be stored for *backup protection* because they are not stored temporarily when posted, rather, the website is their final destination.[27]

Importantly, the classification of a communication can be fluid and may change based on the form it is in at a particular time, influencing the protections it is afforded under the SCA.[28] In previous cases, courts have interpreted whether Facebook's services fall within the SCA's "electronic storage" requirement in the context of communications that are *available* to users on their platform and have not been removed by the provider.  Here, Facebook has removed the information at issue for violating its policies and it is not available to the user to access.  Thus, this information is neither in "temporary" storage or stored for "backup" protection. Accordingly, the content The Gambia has requested cannot be said to be in "electronic storage" by Facebook and is thus not subject to SCA protections.[29]

---

[27] *See, e.g., Crispin v. Christian Audigier, Inc.,* 717 F. Supp. 2d 965, 988-89 (C.D. Cal. 2010) ("Because Facebook wall postings and MySpace comments, on the one hand, and bulletin postings on a website such as Konop's, on the other, cannot be considered to be in temporary, intermediate storage, the court interprets *Konop* as holding that the postings, once made, are stored for backup purposes.")

[28] *See, e.g., Theofel*, 359 F.3d at 1075 (holding that the same email temporarily stored prior to delivery could become a backup after it was opened if the provider retained the message if the user needed to redownload it).  *See generally* Orin Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 GEO. WASH. L. REV. 1208, 1215 (2004) ("the key [to understanding a provider's status under the SCA] is the provider's role with respect to a particular copy of a particular communication, rather than the provider's status in the abstract.").

[29] To the extent Facebook claims it is a "remote computing service" provider ("RCS") storing the data, this argument is unsupported.  A RCS is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system."  18 U.S.C. § 2711(2) (2018). Here, the data is not being stored for the public—it cannot be retrieved by the public or the user because it has been removed from the Facebook platform.  *See, e.g., Flagg v. City of Detroit*, 252 F.R.D. 346, 362-63 (E.D. Mich. 2008) (finding that SkyTel had become an RCS provider because it maintained a database of text messages for its client and served in the capacity of a "virtual filing cabinet.").

## II.   Under the SCA the requested content is excepted from the statute's prohibitions and can be permissibly disclosed.

Even assuming the SCA applies, Facebook is still wrong in its claim that it is "prohibited" from disclosure under the statute.  To the contrary, Facebook ignores at least two statutory exemptions that would clearly allow it to voluntarily disclose the information The Gambia has requested if it wanted to do so.  Opp'n 2.  Section 2702(b)(5) permits ECS providers to "divulge the contents of a communication" where it is necessary to the performance of the service or to protect its property rights, and section 2703(b)(3) permits disclosure where the originator of the communication has impliedly consented to disclosure.  As we discuss below, each could properly and easily be invoked by Facebook if it wanted to disclose the information, and this Court should correct any misimpression on Facebook's part that disclosure of these materials is somehow "prohibited" by the SCA.

### a.   Facebook can permissibly disclose the requested information under section 18 U.S.C. § 2702(b)(5).

Facebook is not "prohibited" from voluntarily releasing the information The Gambia has requested under section 2702(b)(5).  Publicly, Facebook states that it "it has announced its willingness to assist accountability efforts regarding Myanmar," but U.S. law prevents it from fulfilling this desire.  Opp'n 6.  As The Gambia has presented in Section I of this brief, the SCA does not apply to foreign governments or its officials and agents who are misusing the platform – i.e., that are not using it in a way that is "duly authorized."  But even if the SCA applied, Facebook may permissibly release the requested information if it wanted to "as may be necessarily incident … to [protect its rights or property]."  *See* 18 U.S.C. § 2702(b)(5).  As stated previously, Facebook's own terms of use notify users of its rights to disclose information where Facebook has a "good-faith belief" disclosure is "necessary to [] detect, prevent and address"

14

fraud, unauthorized use of the Products, violations of our terms or policies, or other harmful or illegal activity; to protect ourselves (including our rights, property or Products), you or others, including as part of investigations or regulatory inquiries; or to prevent death or imminent bodily harm.[30]

However, in Facebook's view, holding genocidal actors responsible for their acts does not appear to rise to the appropriate level to trigger this mechanism. Unlike Facebook, other social media organizations have opted to disclose information linked to suspended accounts where the accounts have violated the platform's policies.[31]

In its report on the SCA, interpreting section 2702(b)(5), the House Judiciary Committee cited intellectual property rights and theft of services as examples of "rights" and "property."[32] The Myanmar government and its agents using Facebook's platform to coordinate and conspire to commit genocide, engage in hate speech, and incite violence is a theft of Facebook's services as Facebook did not permit them to use its platform to engage in criminal acts. Such use is so outside the bounds of the permissible use of Facebook's platform, that under this provision, it can release the information to protect its rights and property.

Even if the Court disagrees that the abuse of Facebook's platform is a theft, in the most conservative view, using Facebook's platform to conspire to commit genocide and incite violence is at least a misappropriation of Facebook's property. This also falls within the statutory exception. To the extent Facebook is laboring under the misimpression that it would somehow be in violation of the SCA by acceding to The Gambia's discovery requests, the Court should correct it here by making clear that Facebook is not "prohibited" by the SCA or its own

---

[30] *How do we respond to legal requests or prevent harm?*, Facebook (Apr. 19, 2018), https://www.facebook.com/about/privacy/update.

[31] *See, e.g., supra* note 4.

[32] H.R. REP. NO. 99-647, at 67 (1986) ("The terms 'rights' and 'property' here refer to *such rights* as intellectual property rights, the right to be free from the theft of services.") (emphasis added).

terms of use from releasing information in extreme circumstances such as these, under the

exception set forth in 2702(b)(5).  With such corrective guidance, Facebook can freely choose

whether it wants to continue to assist the Myanmar government, its military generals, and its

government officials in hiding their crimes or whether it wants to help The Gambia expose them

by invoking section 2702(b)(5).

> **b. Where, as here, a sovereign state and its agents have weaponized the Facebook platform to broadly communicate hate speech and incite genocide they have consented to the disclosure of their communications under 18 U.S.C. § 2703(b)(3).**

Facebook also takes the position that it cannot release any content under the SCA, even

content that users originally released to the public (but have now been removed due to misuse of

Facebook's system), and that it does not need to comply with requests that have nothing at all to

do with electronic communications.  Opp'n 6.  This is clearly incorrect.  Section 2702(b)(3)

provides that communications can be disclosed with the "lawful" consent of the originator or

recipient where the communication has a reasonable basis for knowing that their communication

is available to the public.[33]

In its report on the SCA, the House Judiciary Committee viewed lawful consent

expansively.  It explained "lawful consent" could be implied and "need not take the form of a

written document of consent."[34]  The report emphasized that "[c]onsent may also flow from a

user having had a reasonable basis for knowing that disclosure or use may be made with respect

to a communication, and having taken action that evidences acquiescence to such disclosure or

---

[33] *See, e.g., Facebook, Inc. v. Super. Ct. of the City and Cty. of S.F.*, 4 Cal. 5th 1245, 1271 (Cal. 2018) ("[O]ne who posts a communication with a reasonable basis for knowing that it will be available to the public should be considered to have implicitly consented to such disclosure under section 2702(b)(3)." (citing *Viacom Int'l Inc. v. YouTube Inc*., 253 F.R.D. 256 (S.D.N.Y. 2008)).

[34] H.R. Rep. No. 99-647, at 66 (1986).

use—e.g., continued use of such an electronic communication system."[35]  The report also noted that any consent could be inferred from a course of dealing with a provider or from a provider's use and disclosure rules, terms, and conditions.[36]

Myanmar targeted Facebook as its channel to disseminate propaganda because of the public nature of Facebook.  As Facebook reported, a limited take down of 18 accounts and 52 pages had almost 12 million followers.[37]  When forming groups on Facebook, the Myanmar military deliberately picked topics such as entertainment, beauty, and lifestyle to attract a broad audience.[38]  A Facebook poster who communicates to large audiences has no expectation of privacy in their posts.  Certainly, such communications are far afield from what the SCA was intended to cover.

Facebook makes no serious argument as to why the  Myanmar government or its officials did not "consent" and waive any privacy interests they had in communications they released to the public at-large and to large audiences.[39]  Accordingly, under the lawful consent exception, Facebook can disclose material that the Myanmar government, its officials, and its agents have made available to the public at-large and large audiences; any materials that could reasonably be construed as being publicly available through course of dealing; and any information that

---

[35] *Id.*

[36] *Id.*

[37] *Removing Myanmar Military Officials from Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/.

[38] *Id.* ("As part of our ongoing investigations into this type of behavior in Myanmar, we discovered that these seemingly independent news, entertainment, beauty and lifestyle Pages were linked to the Myanmar military, and to the Pages we removed for coordinated inauthentic behavior in Myanmar in August.").

[39] Some Courts have applied the lawful consent exception to posts that are tagged as public.  This Court is not bound by this precedent, and The Gambia submits that the facts in this case support a different result. *See, e.g.*, *Facebook, Inc.*,4 Cal. 5th at 1272-73 (noting that posts configured to be public could be disclosed under the lawful consent exception, but posts configured to be restricted could not).

Facebook notified Myanmar users would be public through its rules, terms, and conditions.[40]
This material would include, for example, requests 1-7, which draw on information that is
publicly available regarding accounts, groups, and organizations that Facebook has suspended or
blocked.

Likewise, a number of The Gambia's requests seek information that is not "content"
within the meaning of the SCA.  For example.  The Gambia has sought a deposition pursuant to
Rule 30(b)(6).  Because this request does not fall within the protections of the SCA, the Court
can issue a subpoena permitting a deposition.

### III.   Unlike the MLAT and CLOUD Act processes, a 28 U.S.C. § 1782 action is the proper mechanism for The Gambia to request information from Facebook.

Facebook wrongly suggests other mechanisms are better suited for The Gambia's request.
Opp'n 2.  A 28 U.S.C. § 1782 action is precisely designed to allow The Gambia, a litigant before
an international tribunal, an efficient means to collect evidence for use in that proceeding. Under
28 U.S.C. § 1782, a petitioner is allowed to obtain evidence through a federal district court "for
use in a proceeding in a foreign or international tribunal."  Here, The Gambia is before the ICJ
holding the State of Myanmar accountable under the Genocide Convention.  There is no better
process than a 28 U.S.C. § 1782 action.

In contrast, the MLAT and CLOUD Act processes are cumbersome and/or potentially
inapplicable.  The MLAT process is typically used to facilitate evidence collection for criminal

---

[40] Even Facebook's own terms and conditions authorize Facebook to release certain content.  *See, e.g.*,
*Terms of Service: 3. The permissions you give us*, Facebook (July 31, 2019),
https://www.facebook.com/legal/terms ("Specifically, when you share, post, or upload content that is
covered by intellectual property rights on or in connection with our Products, you grant us a non-
exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute,
modify, run, copy, publicly perform or display, translate, and create derivative works of your content
(consistent with your privacy and application settings).").

prosecutions that are domestic to a foreign state.[41]  It has also been criticized for its inefficiencies

because of significant delays in the process.[42]  The CLOUD Act process also suffers from

deficiencies.  First, the process does not apply to The Gambia's case because, as argued, *supra*

Section I, the SCA does not apply.  However, even if it were to apply, it is a non-mandatory tool

that does not require a provider to comply with a foreign order.[43]  As previously mentioned, the

IIMM has approached Facebook to voluntarily assist with its investigation into the atrocities

occurring in Myanmar, but its request has been pending for over a year.[44]  Thus, contrary to

Facebook's assertions, an enforceable U.S. Court order is the proper mechanism for The

Gambia's request.

**IV.    The discovery The Gambia seeks is relevant and narrowly tailored.**

        Facebook argues that The Gambia's requests are overbroad and questions the utility of

---

[41] *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.,* 634 F.3d 557, 564 (9th Cir. 2011) ("As their names suggest, these treaties [MLATs] provide for bilateral, mutual assistance in the gathering of legal evidence for use by the requesting state in criminal investigations and proceedings.").

[42] *See, e.g.*, *In re Search of Info. Associated with [redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, No. 16-MJ-00757 (BAH), 2017 WL 3445634, at *26 n.28 (D.D.C. July 31, 2017) (noting that the MLAT process is "cumbersome, laborious, and time-consuming … Accordingly, resort to the MLAT process could compromise time-sensitive investigations where expeditious retrieval of information is vital to the investigations success.") (internal quotation marks omitted).

[43] U.S. DEPT. OF JUSTICE, PROMOTING PUBLIC SAFETY, PRIVACY AND THE RULE OF LAW AROUND THE WORLD: THE PURPOSE AND IMPACT OF THE CLOUD ACT 4-5 (2019), https://www.justice.gov/opa/press-release/file/1153446/download ("CLOUD Act agreements, however, do not impose any new obligation on U.S.-based global CSPs to comply with a foreign government order; nor does the fact of an agreement establish, by itself, that a foreign government has jurisdiction over that CSP … In addition, these agreements do not impose any obligation on either government to compel companies to comply with orders issued by the other.  The only legal effect of a CLOUD agreement is to eliminate the legal conflict for qualifying orders.").

[44] Poppy McPherson, *U.N. investigator says Facebook has not shared 'evidence' of Myanmar crime*, Reuters (Aug. 11, 2020), https://www.reuters.com/article/us-myanmar-facebook/u-n-investigator-says-facebook-has-not-shared-evidence-of-myanmar-crime-idUSKCN2570K9 ("Nicholas Koumjian, head of the Independent Investigative Mechanism on Myanmar (IIMM), told Reuters the social media giant was holding material 'highly relevant and probative of serious international crimes' but had not shared any during year-long talks.").

the requested information to The Gambia's case.  Opp'n 10.  The Gambia's requests are targeted

to discovery that will help prove Myanmar intended to commit genocide against the Rohingya.

Myanmar has engaged in a coordinated effort to incite genocide that has involved a variety of

government actors and entities.  Facebook has publicly stated that it has reviewed content from

Myanmar's government, its officials, its entities, and its actors and determined that they used

Facebook to spread hate speech, enable serious human rights abuses, or used the platform to

inflame ethnic and religious tensions.[45]  The information The Gambia is requesting is

information that Facebook has already reviewed and analyzed.  Accordingly, our requests are

limited to four discrete categories of information:

> (1)    Requests 1-7 draw on information that is publicly available and are targeted to
>        specific accounts, groups, and organizations that Facebook has suspended or
>        blocked.  Those requests are limited to "documents and communications
>        produced, drafted, posted or published" by specific Myanmar government or
>        military officials or entities or organizations affiliated with the Myanmar
>        government.
>
> (2)    Requests 8-12 are limited to "documents and communications produced, drafted,
>        or published" by Myanmar state officials, representatives entities, or groups that
>        Facebook has suspended or terminated from 2012 to the present because for
>        concerns relating to human rights, dissemination of hate speech, engaging in
>        coordinated inauthentic behavior, violating Facebook's misrepresentation policy.
>        The 2012 timeframe is relevant because, according to a 2018 United Nations
>        Report, violence erupted across Rakhine State and, during this period, Myanmar

---

[45] *See generally Removing Myanmar Military Officials From Facebook*, Facebook (Aug. 28, 2018)
(Updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/; Sara Su,
*Update on Myanmar*, Facebook (Aug. 15, 2018), https://about.fb.com/news/2018/08/update-on-myanmar/
("It has also become clear that in Myanmar, false news can be used to incite violence, especially when
coupled with ethnic and religious tensions. We have updated our credible violence policies to account for
this, removing misinformation that has the potential to contribute to imminent violence or physical harm
… While we're adapting our approach to false news given the changing circumstances, our rules on hate
speech have stayed the same: it's not allowed. And we are getting much more proactive in designating
Myanmar hate figures and organizations on Facebook …"); BSR, *Human Rights Impact Assessment
Facebook in Myanmar* 27, Facebook (Oct. 2018), https://about.fb.com/wp-content/uploads/2018/11/bsr-
facebook-myanmar-hria_final.pdf ("The decision to ban 20 military individuals and organizations from
Facebook in August 2018 was a strong statement of the company's determination to act against those
seeking to use Facebook in ways that spread violence and enable genocide.").

security forces committed serious human rights violations against the Rohingya.[46] The Report highlighted the 2012 violence as a "key recent turning point" that generated serious human rights violations and abuses.[47]  Importantly, civil society organizations have been raising concerns with Facebook regarding the abuse of its platform going back to 2012.[48]

(3) Request 13 asks for documents relating to any internal investigations conducted by Facebook of "coordinated inauthentic behavior" (or other terms of service violations) committed by accounts belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar government entities.  Contrary to Facebook's representations, this is not a request for Facebook's internal policies and procedures.

(4) Request 14 asks for a Rule 30(b)(6) deposition that is limited to the information requested in Requests 1-13.  A deposition will assist, among other things, in understanding why Facebook removed, suspended, blocked certain accounts, pages, or other information.  In isolation, it will be difficult to understand why Facebook has taken down certain accounts, posts, and information.  Thus, this information will provide important context.

As stated in its application, if Facebook has any legitimate concerns regarding confidentiality and or the scope of any documents requested, The Gambia is willing to discuss a protective order to facilitate the production of the requested discovery.  *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 522 (S.D.N.Y. 2016).  Moreover, to the extent the Court has any concerns regarding the scope of discovery, they can be cured.[49]  The Court can

---

[46] Human Rights Council, *Report of the detailed findings of the Independent International Fact-Finding Mission on Myanmar* at 6, U.N. Human Rights Office of the High Commissioner (Sept. 17, 2018), https://www.ohchr.org/Documents/HRBodies/HRCouncil/FFM-Myanmar/A_HRC_39_CRP.2.pdf.

[47] *Id*.

[48] BSR, *Human Rights Impact Assessment Facebook in Myanmar* 28-29, Facebook (Oct. 2018), https://about.fb.com/wp-content/uploads/2018/11/bsr-facebook-myanmar-hria_final.pdf ("It is important to recognize the length of time, going back to 2012, that civil society organizations have been raising concerns with Facebook … ").

[49] *Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015) ("[T]o the extent a district court finds that a discovery request is overbroad, before denying the application it should ordinarily consider whether that defect could be cured through a limited grant of discovery.").

be assured that The Gambia wants only relevant information and would agree to procure that

information in the most efficient and effective way possible.

## **<u>CONCLUSION</u>**

The Gambia's application complies with U.S. law and this Court should grant it.

Dated: August 18, 2020                                   Respectfully submitted,

                                                         */s/ Timothy P. O'Toole*_____
                                                         Timothy P. O'Toole (D.C. Bar No. 469800)
                                                         Aiysha S. Hussain (D.C. Bar No. 1019848)
                                                         MILLER & CHEVALIER CHARTERED
                                                         900 16th Street, N.W.
                                                         Washington, D.C. 20006
                                                         Telephone: (202) 626-5552
                                                         Fax: (202) 626-5801
                                                         totoole@milchev.com
                                                         ahussain@milchev.com

                                                         *Counsel for Applicant, Republic of The Gambia*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true copy of the above document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF) on this 18th day of August 2020.


*/s/ Timothy P. O'Toole*
Timothy P. O'Toole (D.C. Bar No. 469800)