# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* Application Pursuant to 28 U.S.C. § 1782 of<br><br>THE REPUBLIC OF THE GAMBIA,<br><br>        Petitioner,<br><br>   v.<br><br>FACEBOOK, INC.<br><br>        Respondent. | Case: 1:20-mc-00036-JEB-ZMF |

**FACEBOOK'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER GRANTING IN PART AND DENYING IN PART THE GAMBIA'S SECTION 1782 APPLICATION ON SEPTEMBER 22, 2021**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

    I.     Statutory Background ............................................................................. 4

          A.    The Stored Communications Act ................................................ 4

          B.    The CLOUD Act .......................................................................... 6

          C.    28 U.S.C. § 1782 ......................................................................... 8

    II.    Factual Background ............................................................................... 8

          A.    Facebook and Instagram ............................................................. 8

          B.    Facebook's 2018 Removal of Myanmar Accounts, Groups, and Pages ......................................................................................... 10

          C.    Facebook's Cooperation with the U.N. Myanmar Mechanism ............... 11

          D.    The Gambia's Claims of Genocide against Myanmar ............................ 12

    III.    Procedural Background ......................................................................... 13

          A.    The Gambia's Section 1782 Application Proceedings ............................ 13

          B.    The Magistrate Judge's Order .................................................... 15

LEGAL STANDARD .......................................................................................... 16

STANDARD OF REVIEW ON OBJECTIONS ......................................................... 17

ARGUMENT ..................................................................................................... 18

    I.     The Order's "Electronic Storage" Holding Is Contrary to Law ......................... 19

          A.    The Ordinary Meaning of the SCA's Text Demonstrates the Removed Communications Are Held "For Purposes of Backup Protection" ................................................................................. 19

          B.    The Order's Atextual Limitation of the ECS Disclosure Prohibition Contradicts the SCA's Purpose and Destroys Critical Privacy Rights ..................................................................... 24

II.     The Order's Holdings with Respect to Whether Facebook Is a Remote
        Computing Service Are Contrary to Law and the Record ................................... 27

III.    The Order's Ruling Allows Foreign Governments to Obtain
        Communications without Following the Procedures Congress Established
        in the CLOUD Act ............................................................................................. 31

IV.     The Order's Summary Ruling That All of Facebook's Internal
        Investigative Materials Are Relevant and Discoverable Is Premature and
        Incorrect .......................................................................................................... 35

CONCLUSION ........................................................................................................... 37

## INTRODUCTION

Facebook appreciates the gravity of the issues that The Gambia has brought before the International Court of Justice ("ICJ"), as that tribunal investigates the genocidal crimes committed in Myanmar against the Rohingya people and seeks to bring those responsible to justice. Facebook is committed to supporting the ICJ's efforts in this regard. This commitment is one of the reasons that Facebook initially preserved, and now has been sharing, much of the relevant public data from certain removed user accounts with the United Nations Independent Investigative Mechanism for Myanmar ("Myanmar Mechanism") for more than a year.

As a further demonstration of Facebook's commitment to this cause, Facebook is *not* challenging most of the effect of Magistrate Judge Faruqui's Order (Dkt. 22 ("Order")), which granted in part The Gambia's Section 1782 application to serve Facebook with a subpoena for discovery to be used in support of its ICJ allegations. As a result, Facebook will work to produce to The Gambia public information that Facebook preserved from hundreds of accounts, groups, and pages removed from its platform in 2018 for violating Facebook's terms of service. *E.g.*, Dkt. 19 ("Hr'g Tr.") at 60:12–62:10, 65:12–67:1. As noted, Facebook has been working to provide these same materials to the Myanmar Mechanism to the extent permitted by U.S. law since last year and will continue to do so.

But federal law prohibits Facebook from disclosing other, non-public information that The Gambia seeks. Specifically, The Gambia's Section 1782 Application seeks to force Facebook to violate the Stored Communications Act ("SCA"), 18 U.S.C. § 2702(a), a provision of the federal criminal code that protects billions of global internet users from violations of their right to privacy and freedom of expression. In short, the Order holds that any time a service provider removes and preserves a user's content from its platform, that content is no longer protected by the SCA— meaning the service is free to disclose it to anyone it wishes. This sweeping and unprecedented

ruling is inconsistent with the text and purpose of the SCA, and would have severe unintended consequences that go far beyond the facts of this matter.  As SCA experts and commentators have pointed out, the Order creates grave human rights concerns of its own, leaving internet users' private content unprotected and thereby susceptible to disclosure—at a provider's whim—to private litigants, foreign governments, law enforcement, or anyone else.  *See, e.g.*, Orin Kerr (@OrinKerr), TWITTER (Sept. 23, 2021, 1:32 AM), https://twitter.com/OrinKerr/status/14412743 36984195076.  The Order also circumvents the detailed procedures that Congress established for foreign governments to seek this type of content in coordination with U.S. officials under the SCA. *See* 18 U.S.C. § 2702(b)(9).[1]

Facebook must accordingly object to those portions of the Order pursuant to Federal Rule of Civil Procedure 72.  Facebook respectfully asks this Court to modify or set aside the following parts of the Order:

*First,* the Order is wrong that user communications removed *by Facebook* are no longer subject to the SCA's disclosure prohibitions imposed on an "electronic communication service" ("ECS").  *See* 18 U.S.C. § 2702(a)(1).  That holding is contrary to the plain text of the statute and federal caselaw interpreting the provision.  In order to reach this erroneous ruling, the Order finds that the contents sought by The Gambia are not being held in "electronic storage" because, according to the Order, they were preserved solely for Facebook's "self-reflection" and not "for purposes of backup protection."  But that finding is irrelevant as a matter of law and clearly

---

[1]  Commentators and courts have noted that the SCA is in need of updating.  *See, e.g.*, *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002).  Facebook agrees that Congress should revisit the text of the SCA to ensure it adequately protects privacy while balancing the needs of law enforcement in ways that address modern technologies and support human rights.  But the public interest in a single case cannot be served by ignoring the plain text of the statute, which would risk infringing the privacy rights of billions of people around the world who engage in private communications on platforms like Facebook.

erroneous as a matter of fact.  This Court should set aside Section III.A.3 of the Order.

*Second,* the Order erroneously holds that Facebook is also not a "remote computing service" ("RCS") in this context.  *See* 18 U.S.C. § 2702(a)(2).  Because Facebook is an RCS, it does not matter whether Facebook is also an ECS or whether the contents at issue are being held in "electronic storage" for purposes of the SCA's disclosure prohibitions.  Facebook meets all of the requirements to be subject to the RCS disclosure prohibitions here because Facebook "carried or maintained on [its] service" "the content[] of [these removed] communication[s]" for a customer or subscriber "solely for the purpose of providing storage or computer processing services to [the] subscriber or customer."  *Id.*  The Order holds that Facebook is not an RCS because the contents are not currently "publicly visible" and cannot be "retriev[ed]" by users, but those findings (whether true or not) are irrelevant to the RCS determination.  18 U.S.C. § 2702(a)(2)(A), (B); Order at 11–12 n.6.  The Court thus should set aside Section III.A.2 n.6 of the Order.

*Third,* the Order summarily dismisses the serious privacy and civil liberties concerns implicated by its creation of a gaping loophole in the SCA—a loophole that permits a foreign government to obtain users' private communications without complying with congressionally approved protections set forth in the Clarifying Lawful Overseas Use of Data ("CLOUD") Act. Doing so is clear error in light of Supreme Court precedent that directs district courts to consider whether a Section 1782 application attempts to circumvent U.S. policy.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004).  The Court should set aside Section III.B of the Order, conduct an independent analysis, and modify the holding to prevent The Gambia from serving requests that include communications protected by the SCA.

*Fourth*, the Order grants The Gambia's overbroad request for *all* non-privileged documents related to Facebook's internal investigation of coordinated inauthentic behavior dating back to

3

2012, despite their irrelevance to the ICJ proceeding and The Gambia's concession that they may

be duplicative and unnecessary.  Discovery under Section 1782 must be relevant and proportional.

*In re Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for use in a*

*Foreign Proceeding*, 286 F. Supp. 3d 1, 5 (D.D.C. 2017).  The Order makes no factual finding that

these records meet those requirements.  The Court should set aside or modify Section III.C of the

Order.

If allowed to stand, the Order's erroneous reading of the SCA would impair critical privacy

and freedom of expression rights for internet users—not just Facebook users—worldwide,

including Americans.  This Court should reverse, modify, and/or set aside the specific portions of

the Order described above.

## BACKGROUND

### I.   Statutory Background

#### A.   The Stored Communications Act

Congress passed the SCA as part of the Electronic Communications Privacy Act.  *See* Pub.

L. No. 99-508, 100 Stat. 1860 (Oct. 21, 1986).  The purposes of the Act were to protect individuals'

privacy rights and to encourage the use and development of electronic communications

technologies.  Specifically, Congress was concerned that the public and businesses would resist

using electronic communications because of "legal uncertainty" over the confidentiality of

communications routed through and stored on third-party servers. S. Rep. No. 99-541, at 5 (1986);

*Hately v. Watts*, 917 F.3d 770, 797 (4th Cir. 2019).

The SCA reflects Congress's judgment that electronic communications, including those

routed through and stored by providers, should receive protections similar to those enjoyed by

analog methods of communications.  *E.g.*, H.R. Rep. No. 99-647, at 19 (1986).  Congress observed

that while mail and telephone communications had long enjoyed a variety of legal protections,

4

there were no "comparable Federal statutory standards to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications[.]"  S. Rep. No. 99-541, at 5 (1986); *Hately*, 917 F.3d at 797.  Congress thus sought not only to shield private electronic communications from government intrusion but also to encourage "'innovative forms' of communication by granting them protection against unwanted disclosure *to anyone*."  *O'Grady v. Super. Ct.*, 139 Cal. App. 4th 1423, 1445 (2006); *In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 571 n.24 (D. Md. 2011).  "In the absence of a degree of privacy at least roughly comparable to that accompanying more traditional modes of communication, potential users might be deterred from using the new forms merely out of a feared inability to communicate in confidence."  *O'Grady*, 139 Cal. App. 4th at 1445.

The SCA is codified in the federal Criminal Code and restricts service providers' authority to disclose a person's communications and other records.  An entity "providing" an "electronic communications service" or "remote computing service" "to the public" "shall not knowingly divulge to any person or entity the contents of a [stored] communication."  18 U.S.C. § 2702(a)(1)–(2).  More specifically, an "entity providing an [*ECS*] to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service."  *Id.* § 2702(a)(1).  And an "entity providing [an *RCS*] to the public shall not knowingly divulge . . . any communication which is carried or maintained on that service (A) on behalf of . . . a subscriber or customer of such service; (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing[.]"  *Id.* § 2702(a)(2).

The SCA also contains nine specific exceptions to these disclosure prohibitions under which providers may disclose such stored communications.  18 U.S.C. § 2702(b)(1)–(9).[2]  The SCA provides that any person "aggrieved" by a violation of the statute may recover damages from the person or entity that committed the violation.  18 U.S.C. § 2707(a)–(c).

### B.    The CLOUD Act

On March 23, 2018, the President signed the Clarifying Lawful Overseas Use of Data Act or CLOUD Act.  Consolidated Appropriations Act, 2018, Pub. L. 115–141.  As relevant here, the CLOUD Act amends the SCA by adding a new exception to its disclosure prohibitions for stored communications.  This exception provides that an ECS or RCS "may divulge the contents of a communication" "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies [18 U.S.C. §] 2523."  18 U.S.C. § 2702(b)(9).

In turn, 18 U.S.C. § 2523 requires that information collected by a foreign government "be for the purpose of obtaining information relating to the prevention, detection, investigation, or prosecution of serious crime, including terrorism."  *Id.* § 2523(b)(4)(D).  The "Attorney General, with the concurrence of the Secretary of State, [also must] determine[]" that "the domestic law of the [requesting] foreign government, including the implementation of that law, affords robust substantive and procedural protections for privacy and civil liberties in light of the data collection and activities of the foreign government[.]"  *Id.* § 2523(b).  Moreover, the executive agreement

---

[2]  Notably, a provider "may" divulge the contents of a communication with "the lawful consent" of the sender or an addressee or intended recipient of such communication.  *Id.* § 2702(b)(3).  Congress also recognized that law enforcement officials may have a legitimate need to obtain information from providers.  It therefore created a three-tiered system requiring the government to use a subpoena, court order, or search warrant to compel different types of information from providers.  18 U.S.C. § 2703.  For contents of communications, the government must obtain a search warrant issued upon a finding of probable cause.  18 U.S.C. § 2703(a)–(b); *U.S. v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010).

must require that the foreign government set up procedures to ensure the information is not misused or reviewed by persons "[un]trained in applicable procedures." *Id.* § 2523(b)(4)(F).  The executive agreement further must require the foreign government "us[e] procedures that, to the maximum extent possible, meet the definition of minimization procedures in section 101 of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801), . . . and not disseminate material found not to be information that is . . . relevant to the prevention, detection, investigation, or prosecution of serious crime[.]" *Id.* § 2523(b)(4)(G).  The U.S. Government also must be able to conduct "periodic review of [the foreign government's] compliance." *Id.* § 2523(b)(4)(J).

Congress explained this new exception was meant to address the fact that "[f]oreign governments . . . increasingly seek access to electronic data held by communications-service providers in the United States for the purpose of combating serious crime."  *See* CLOUD Act of 2018, Pub. L. 115–141, § 102(3), 132 Stat. 1213 (2018).  But "[c]ommunications-service providers face potential conflicting legal obligations when a foreign government orders production of electronic data that United States law may prohibit providers from disclosing." *Id.* § 102(4).  Thus, this new SCA exception enables expedited "[i]nternational agreements" between U.S. executive officials and foreign counterparts to "provide a mechanism for resolving these potential conflicting legal obligations where the United States and the relevant foreign government share a common commitment to the rule of law and the protection of privacy and civil liberties," *id.* § 102(6).[3]

---

[3] Prior to the CLOUD Act, foreign governments relied on bilateral or multi-lateral mutual legal assistance treaties ("MLATs") or mutual legal assistance provisions in international conventions and treaties to secure the exchange of discovery across borders, often for specified purposes. *See, e.g.*, United Nations Convention Against Transnational Organized Crime, Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children art. 18, Dec. 15, 2000, 2225 U.N.T.S. 209 (which The Gambia and the United States have ratified).  All of these processes involve cooperation and coordination with U.S. executive officials to help prevent abuse or misuse of discovery.  But The Gambia and the United States have not chosen to enter into a broad MLAT.

### C.    28 U.S.C. § 1782

Section 1782(a) of Title 28 provides that the "district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal[.]"  Unless the order prescribes otherwise, "the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."  *Id.*  Moreover, the statute explicitly recognizes that "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."  *Id.*

Thus, once an interested party to a foreign proceeding makes the requisite initial showing that it has met the Section 1782 statutory factors, the district court *may* grant its application seeking the authority to issue a subpoena.  *Intel*, 542 U.S. at 247.  But even where the court makes this initial determination in favor of the Section 1782 application, the target of any discovery may file a motion to quash or modify the subpoena, *see* Fed. R. Civ. P. 45(d)(3), or seek a protective order, *see* Fed. R. Civ. P. 26(c).  This is the ordinary procedure for a Section 1782 application because the statute "does not establish a standard for discovery," but "[i]nstead it provides for a threshold determination of whether to allow foreign litigants to enjoy discovery in U.S. courts in accordance with federal rules" and "[t]he manner in which discovery proceeds will be determined by normal discovery rules."  *Gov't of Ghana v. ProEnergy Servs., LLC*, 677 F.3d 340, 343 (8th Cir. 2012) (collecting cases); *see also Texas Keystone, Inc. v. Prime Nat. Res., Inc.*, 694 F.3d 548, 556 (5th Cir. 2012) ("[T]he Federal Rules of Civil Procedure govern[] the underlying discovery request[] once the district court grant[s] [the applicant's] Section 1782 application.").

## II.    Factual Background

### A.    Facebook and Instagram

There are more than three billion Facebook and Instagram users worldwide.  Facebook has

become a platform not only for sharing communications with a person's Facebook friends or the Facebook community at large, but also for private communications among account holders.  For many users, Facebook and messaging apps have become significant platforms for electronic communications, replacing email (not to mention the U.S. Postal Service).  *See, e.g.*, Int'l Comm. of the Red Cross, *Humanitarian Future for Messaging Apps*, 5–6, 52–53, 61–65, 68–70 (2017) (explaining "[m]essaging apps like WhatsApp, Snapchat, Viber, WeChat, Telegram, and LINE are becoming the primary mode of communication for hundreds of millions of people around the world," present an important tool of communication for humanitarian organizations, and humanitarian organizations should "select apps with end-to-end encryption enabled by default, run by organizations that collect and retain minimal amounts of data and which have a strong record of resisting unlawful demands for private data from law-enforcement and other agencies"); Ryan A. Ward, Note, *Discovering Facebook: Social Network Subpoenas and the Stored Communications Act*, 24 Harv. J. L. & Tech. 563, 563–64 (2011).  In countries like Myanmar, in particular, many users rely on Facebook for most of their personal communications.  *See* U.N. Human Rights Council, *Report of the Independent International Fact-Finding Mission on Myanmar*, ¶ 74, U.N. Doc. A/HRC/39/64 (Sept. 12, 2018).

Facebook offers people robust privacy options and settings allowing them to tailor the audience of their communications on a message-by-message and post-by-post basis.  For instance, a person can choose to communicate using Facebook Messenger, a chat functionality hosted by Facebook allowing for one-to-one or small group conversations.  These messages are similar to traditional email or letters in that they are not available to any person except the direct participants in the communication.  As such, Facebook messages may contain the type of sensitive information that in the past would have been conveyed by mail or email.  Even when a person chooses to "post"

something to his or her Facebook page, the person controls who may view that post.  A person can restrict access to posts on a person-by-person basis, allowing some, but not all, friends to view a post, and can even make a post that is visible to no one else.  People can also change the audience of a given post or message at any time (for example, adding or removing specific individuals).

Instagram is a photo and video-sharing platform owned by Facebook.  Instagram account holders can designate their posted content "private" so that only approved followers can see it, and also can send direct messages to one or more people.

### B.     Facebook's 2018 Removal of Myanmar Accounts, Groups, and Pages

On August 28, 2018, Facebook announced that, in response to the "truly horrific" "ethnic violence in Myanmar," it was "remov[ing] a total of 18 Facebook accounts, one Instagram account and 52 Facebook Pages, followed by almost 12 million people." *Removing Myanmar Military Officials from Facebook*, FACEBOOK (Aug. 18, 2018, last updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/ ("Removal Post").[4]  Facebook explained "46 pages and 12 [of these] accounts" had engaged in prohibited "coordinated inauthentic behavior on Facebook," meaning "they used seemingly independent news and opinion Pages to covertly push the messages of the Myanmar military."  *Id.*

Facebook further announced in October and December of 2018 that it had removed another 425 Pages, 17 Facebook Groups, 135 Facebook accounts, and 15 Instagram accounts in Myanmar for engaging in coordinated inauthentic behavior.  *Id.*  Moreover, Facebook explained that it was "preserving data, including content, on the accounts and Pages we have removed."  *Id.*

---

[4]  Facebook also said that it would be banning "20 individuals and organizations from Facebook in Myanmar – including Senior General Min Aung Hlaing, commander in-chief of the armed forces" and other military officials that the U.N.'s Fact-Finding Mission on Myanmar had found evidence against for human rights abuses.  *Id.*

C.      **Facebook's Cooperation with the U.N. Myanmar Mechanism**

In September 2018, the United Nations Human Rights Council formed an Independent Investigative Mechanism for Myanmar ("Myanmar Mechanism") in response to the violence against the Rohingya people.  *See* U.N. Human Rights Council, *Independent Investigative Mechanism for Myanmar*,  https://www.ohchr.org/EN/HRBodies/HRC/IIMM/Pages/Index.aspx (last visited Oct. 12, 2021).  The Myanmar Mechanism "became operational on August 30, 2019," and it is "mandated to collect evidence of the most serious international crimes and violations of international law and prepare files for criminal prosecution[.]" *Id.*  This work is conducted "in accordance with international law standards" and includes "an ongoing independent mechanism to collect, consolidate, preserve and analy[z]e evidence of the most serious international crimes and violations of international law committed in Myanmar since 2011." *Independent Investigative Mechanism for Myanmar*, UNITED NATIONS, https://iimm.un.org/ (last visited Oct. 12, 2021).  The Mechanism is composed of international human rights experts and led by a former American prosecutor with decades of experience in criminal justice.  *Id.*, https://iimm.un.org/leadership/.

When the Myanmar Mechanism collects relevant evidence, it "consolidates and preserves the collected material using appropriate information management tools and electronic databases" to "retain the integrity and security of the evidence[.]"  *Id.*, https://iimm.un.org/evidence-collection-and-case-building/.  All "collected material is analyzed based on reliability and probative value, taking into account evidentiary and methodological standards and principles applicable in relevant national and international legal systems." *Id.*  The Myanmar Mechanism's "activities are carried out in line with internal protocols and procedures, . . . [and] relevant international law and jurisprudence, notably the security and well-being of victims and witnesses and the right to a fair trial and other due process provisions." *Id.*

The Myanmar Mechanism asked that Facebook preserve information associated with

Myanmar accounts removed for coordinated inauthentic behavior and other terms of service violations in 2018, and Facebook complied with this request. *Statement to the Human Rights Council by Mr. Nicholas Koumjian, Head of the Independent Investigative Mechanism for Myanmar, on the 45th Regular Session of the Human Rights Council*, UNITED NATIONS (Sept. 14, 2020), https://bit.ly/3D6tAL3 (Facebook "agreed some time ago to preserve material at our request and recently ha[s] begun sharing materials that partially comply with our requests"). Since this first production, Facebook has engaged in an extensive effort to review pages of preserved materials and has worked with the Myanmar Mechanism to produce any relevant material consistent with U.S. law, including thirteen productions totaling more than approximately 1.5 million pages of documents. The Myanmar Mechanism has recently come back to Facebook with additional requests, and Facebook is engaged in an active and ongoing dialogue to produce more in response to these new requests.

The Gambia has stated that it is one of the parties receiving reviewed evidence from the Myanmar Mechanism for use in its ICJ case, discussed below. Hr'g Tr. at 39:9–40:1.

### D.     The Gambia's Claims of Genocide against Myanmar

In November 2019, The Gambia brought an action against the Republic of Myanmar in the ICJ under the 1948 Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"). Dkt. 1 ("App.") at 1. Both The Gambia and Myanmar are parties to the Genocide Convention, which grants the ICJ jurisdiction over adjudicating the responsibility of a State for genocide. *Id.* at 6. In the ICJ proceeding, The Gambia seeks to hold Myanmar accountable for acts of genocide committed against the Rohingya people, an ethnic and religious minority in Myanmar, and seeks an order directing Myanmar to cease further genocidal acts. *Id.* at 1. To prevail, The Gambia must prove that Myanmar committed an act enumerated in Article II of the Genocide Convention, including "killing, causing serious bodily and mental harm,

inflicting conditions that are calculated to bring about physical destruction, and imposing measures to prevent births – with the intent to destroy the Rohingya, in whole or in part." *Id.* at 6.

Last year, the ICJ granted The Gambia's request for a provisional order that directs Myanmar "to take all measures within its power to prevent the commission of all acts of genocide against the Rohingya[.]" *Id.* at 7. At present, however, the ICJ proceedings on the merits are suspended following Myanmar's filing of preliminary objections on January 20, 2021, that challenge the ICJ's jurisdiction over the matter. Art. 79*bis*, ¶ 3, I.C.J. Rules of Court ("Upon receipt . . . of a preliminary objection, the proceeding on the merits shall be suspended[.]").

The ICJ ordered The Gambia to file a response to Myanmar's preliminary objections by May 20, 2021. *The Gambia v. Myanmar (Application of the Convention on the Prevention and Punishment of the Crime of Genocide)*, Order, 2021 I.C.J. Rep. 76, ¶ 180 (Jan. 28, 2021). But the ICJ has yet to make any further public statement on the case or issue a ruling on Myanmar's preliminary objections. Accordingly, at present, there appear to be no merits proceedings occurring in the ICJ and no impending merits deadlines for The Gambia to meet.

## III.   Procedural Background

### A.   The Gambia's Section 1782 Application Proceedings

On June 8, 2020, The Gambia submitted to this court an Application to take discovery from Facebook pursuant to 28 U.S.C. § 1782. Dkt. 1 (App.). The Gambia's stated intent was to obtain documents to supplement its written submissions to the ICJ to support its claims that Myanmar committed genocide against the Rohingya people. *Id.* at 1. The following day, this Court referred the Application to a magistrate judge for full case management. Dkt. 2.

The Gambia's Section 1782 Application broadly requests "[a]ll documents and communications produced, drafted, posted, or published by" a vast array of Facebook and Instagram users, groups, or pages "affiliated with, or suspected of being affiliated with, the

13

Myanmar government or military,"—including private messages—going back to 2012.  App. at 15–16.  The Application does not provide a subject matter or geographic limit to the requested documents or communications.  *See id.* at 14–17.  In addition, the Application seeks "[a]ll documents relating to any internal investigations conducted by Facebook of 'coordinated inauthentic behavior,' or other terms of service violations, from 2012 to the present" by "accounts belonging to or controlled by Myanmar state officials, representatives, entities or groups acting in coordination, or suspected of acting in coordination, with Myanmar state entities." *Id.* at 17.  The Gambia further seeks to compel Facebook to proffer a 30(b)(6) deponent to testify on all aforementioned topics related to the document requests.  *Id.*

Facebook filed a response to the Application, stating its willingness to assist in accountability efforts regarding Myanmar but noting that Facebook's ability to provide the information identified on the face of the Application is circumscribed by the SCA, 18 U.S.C. § 2702(a).  Dkt. 8.  In its response, Facebook noted the sweeping nature of The Gambia's requests, including six years of private communications.  *Id.* at 7–8.

The Gambia filed its Reply on August 18, 2020, which seemed to narrow its requests and raised arguments against the SCA's application to them for the first time.  Dkt. 10.  Whereas the Application sought "[a]ll documents and communications produced, drafted, posted, or published" by broad categories of accounts, App. at 14–15 (RFPs 1–7), The Gambia asserted in its Reply that these requests pertained to only "*publicly available*" information, Dkt. 10 at 20 (emphasis added).  Similarly, where the Application sought "[a]ll documents and communications" by accounts, pages, and groups even "suspected of acting in coordination with Myanmar state entities," App. at 17, the Reply purported to limit these requests to include only "Myanmar state officials, representative entities, or groups[,]" Dkt. 10 at 20.  And whereas in its Application The Gambia

14

sought "[a]ll documents relating to any internal investigations conducted by Facebook of 'coordinated inauthentic behavior[,]'" App. at 17, the Reply stated that the Application was "not a request for Facebook's internal policies or procedures[,]" Dkt. 10 at 21.

On August 28, 2020, Facebook filed a Sur-reply, Dkt. 15, addressing the SCA arguments that The Gambia had raised for the first time in its Reply (Dkt. 10), which were focused on the ECS provisions, and specifically reserving the right to argue in a future motion that it was also subject to the SCA's prohibitions on disclosure for an RCS, "if necessary." Dkt. 15 at 2–3 n.1. However, Facebook explained that it was focused on The Gambia's attacks on the ECS prohibition solely "for simplicity" in aid of the court's decision on the initial Application. *Id.* The Gambia also submitted a Response to Facebook's Sur-reply with permission from the Court, Dkt. 16.

Subsequently, on November 18, 2020, The Gambia and Facebook appeared before Magistrate Judge Faruqui for a six-hour hearing on The Gambia's Application. *See* Dkt. 19, Hr'g Tr. During that hearing, The Gambia again seemed to recharacterize the scope of its requests. For the first time, The Gambia provided a subject-matter limitation for the requested content, stating that it sought only content "relevant to the ICJ case," meaning documents related to "spreading anti-Rohingya hate speech on Facebook[.]" *Id.* at 45:7-46:19.

### B.     The Magistrate Judge's Order

On September 22, 2021, Magistrate Judge Faruqui issued an Order on The Gambia's Application, which granted in part and denied in part its request to serve Facebook with a subpoena. *See* Order. As relevant here, the Order grants The Gambia's request to subpoena Facebook for content from accounts, pages, and groups that Facebook removed from its platform as a result of its investigation of coordinated inauthentic behavior in 2018, reasoning that any content Facebook "deleted from the platform but retained" is not in "electronic storage" subject to the SCA's ECS disclosure prohibitions because it is not in "backup storage." *Id.* at 13. The Order

15

further dismisses Facebook's privacy arguments against this atextual statutory limitation on the SCA on the ground that Facebook lacked "moral suasion" because of unrelated privacy claims against, and media criticism of, Facebook.  *Id.* at 18–19.  After explaining the important role that Facebook and other providers play in moderating harmful content, the Order concludes that Facebook and other providers "h[o]ld the keys to many of the SCA's privacy protections," and that users can avoid the "parade of horribles" involving the "loss of privacy protection for de-platformed content" by "joining sites that do not de-platform content."  *Id.* at 19–20.

The Order further summarily holds in a footnote that *all* of the user content (even private messages) could be subpoenaed despite the SCA because Facebook is not subject to the SCA's prohibitions on RCS providers.  *Id.* at 11–12 n.6.  Despite the fact that Facebook had expressly reserved the right to argue, if necessary after a subpoena issues, that the RCS prohibitions present an additional barrier to its ability to produce these communications, the Order summarily holds that Facebook waived the argument.  *Id.*

Finally, the Order dismisses Facebook's argument that The Gambia should be required to follow the procedures set out by Congress in the CLOUD Act or in MLATs for foreign governments to seek communications stored in the U.S.  *Id.* at 27–28.  And the Order holds in categorical fashion that Facebook "must produce *any* non-privileged documentation that relates to the internal investigation" of these removed accounts.  *Id.* at 29 (emphasis added).

## LEGAL STANDARD

An applicant seeking discovery under 28 U.S.C. § 1782 must satisfy three statutory criteria: (1) the person from whom discovery is sought must "reside[]" or be "found" in the district; (2) the discovery must be for use in a "proceeding in a foreign or international tribunal"; and (3) the applicant must be an "interested person."  28 U.S.C. § 1782.  If these requirements are met, "[t]he statute authorizes, but does not require," the district court to compel the requested discovery.  *Intel*,

542 U.S. at 255.  "Section 1782 does not give either foreign tribunals or litigants before them any 'right' to assistance."  *In re Microsoft Corp.*, 2006 WL 825250, at *3 (N.D. Cal. Mar. 29, 2006).

When exercising its discretion to grant a Section 1782 application, courts must weigh several additional factors, known as the *Intel* factors, including (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding"; (2) the nature and character of the foreign proceeding, and whether the foreign court is receptive to judicial assistance from the United States; (3) whether the request is an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the discovery request is "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 264–65.

The applicant bears the "burden to come to the court with [a] narrowly-tailored request in the first instance," and failure to do so is grounds for denying an application outright.  *In re Ex Parte Application of Nokia Corp.*, 2013 WL 6073457, at *3 (N.D. Cal. Nov. 8, 2013); *In re Cathode Ray Tube Antitrust Litig.*, 2013 WL 183944, at *4 (N.D. Cal. Jan. 17, 2013).

## STANDARD OF REVIEW ON OBJECTIONS

Under Federal Rule of Civil Procedure 72(b), a "district judge must determine *de novo* any part of the magistrate judge's disposition [of a *dispositive* order] that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  *Id.*  While most discovery disputes are non-dispositive, motions under Section 1782 may be reviewed under this standard when "they dispose of all issues in the proceeding."  *See* Wright & Miller, 12 Fed. Prac. & Proc. Civ. Section 3068.3 (2d ed.); *see also Kestrel Coal Pty. Ltd. v. Joy Glob., Inc.*, 362 F.3d 401, 403 (7th Cir. 2004) (Section 1782 application orders "are final and appealable because they dispose of all issues in the proceeding").

By contrast, a district court reviews a *non-dispositive* order from a magistrate judge under

Federal Rule of Civil Procedure 72(a), and "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *Equal Emp. Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d Cir. 2017). Under the "contrary to law" standard, the district court must review "*de novo*" any of the magistrate judge's legal conclusions. *See Am. Ctr. for Civ. Just. v. Ambush*, 794 F. Supp. 2d 123, 129 (D.D.C. 2011); *see also Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 91 (3d Cir. 1992) ("[T]he phrase 'contrary to law' indicates plenary review as to matters of law."). By contrast, "factual findings and discretionary decisions" are reviewed under the "clearly erroneous" standard, and may be reversed even if "there is evidence to support [them], [where] the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Am. Ctr.*, 794 F. Supp. 2d at 129 (internal citations omitted); *Federal Savs. & Loan Ins. Corp. v. Commonwealth Land Title Ins. Co.*, 130 F.R.D. 507, 508 (D.D.C. 1990).

The D.C. Circuit has not decided which of these Rule 72 standards of review applies to a district court's review of a magistrate judge's decision granting or denying a Section 1782 application, and there is a split among courts on this question. *Compare Advanced Micro Devices v. Intel Corp.*, 2004 WL 2282320, at *1 (N.D. Cal. Oct. 4, 2004) (applying de novo review), *with Siemens AG v. Western Dig. Corp.*, 2014 WL 1569605, at *2 (C.D. Cal. Apr. 17, 2014) (reviewing for abuse of discretion). Here, the portions of the Order that Facebook challenges must be reversed or set aside under either standard, and most of its errors are matters of law subject to plenary review under both Rule 72(a) and (b).

## ARGUMENT

Consistent with the Order, Facebook intends to work with The Gambia to produce relevant public information and non-content metadata, should The Gambia issue a subpoena for those materials. But federal law prohibits Facebook from disclosing the content of a user's non-public

communications in response to The Gambia's proposed subpoena.  Those portions of the Order declaring otherwise cannot stand.

## I.      The Order's "Electronic Storage" Holding Is Contrary to Law

The SCA prohibits Facebook from disclosing the content of a user's communications, absent the user's consent or another statutory exception.  The Order nevertheless finds these critical privacy protections end when an ECS like Facebook "permanently" removes a communication because, according to the Order, the communication is no longer held in "electronic storage" as a "backup copy" when the "original copy" is gone from the platform.  Order at 14–15.

But nothing in the SCA's text prohibiting disclosures by an ECS places such a limitation on the privacy rights that Congress gave to internet users.  And no court has ever found one in this context.  The Order's manufacturing of such a limitation renders meaningless the rights of billions of internet users and undermines the core objectives Congress sought to advance in the SCA.  This Court should set aside Section III.A.3 of the Order and hold that Facebook is barred from disclosing the communications The Gambia seeks (absent an applicable SCA exception).

### A.      The Ordinary Meaning of the SCA's Text Demonstrates the Removed Communications Are Held "For Purposes of Backup Protection"

As the Order holds, Facebook is an "entity providing an" "electronic communications service to the public" under the SCA.  18 U.S.C. § 2702(a)(1); Order at 11.  Because Facebook is an ECS, the SCA provides that it "shall not knowingly divulge to any person or entity the contents of a [user's] communication while in electronic storage by that service."  *Id.*  "Electronic storage" is defined to include "*any* temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "*any* storage of such communication by an electronic communication service for purposes of backup protection of such communication."  *Id.* § 2510(17)(B) (emphases added).  This SCA definition of "electronic storage," as shown by its

19

use of "any," should be construed "broadly, [since Congress] stat[ed] that it did not intend to limit [storage in the SCA] to particular mediums, forms, or locations." *Hately*, 917 F.3d at 786, 793 n.7 (citing H.R. Rep. No. 99-647, at 39).

The common understanding of the term "for purposes of backup protection" compels the conclusion that the communications sought by The Gambia are held "for purpose of backup protection," and thus in "electronic storage" under the SCA.  As the Fourth Circuit has explained, "[t]he most relevant definition of 'backup' is 'a *copy* of computer data (such as a file or the contents of a hard drive.)'"  *Hately*, 917 F.3d at 791 (collecting dictionary definitions).  A "copy" means merely that the file is a "duplicate" of something.  *Id.* (collecting dictionary definitions).  And "protection" is commonly understood to mean "the act of protecting," including "shielding . . . [from] destruction."  *Id.*  Thus, the plain reading of the SCA's "electronic storage" provision requires only that an ECS hold a relevant communication as a "copy" or "duplicate" of a user "communication stored to prevent, among other things, its destruction."  *Id.*

The content sought by The Gambia falls well within this text.  Facebook preserved a "copy" in storage of the communications from hundreds of Myanmar accounts, groups, and pages that it removed from its platform in 2018 to prevent the loss of these communications.  Specifically, Facebook stored a duplicate of these communications, among other reasons, in case it was lawfully called upon to produce them by an international body like the United Nations after their removal. *E.g.*, Hr'g Tr. at 80:17–81:25.  Accordingly, Facebook's storage of these communications serves the "purpose" of providing critical "backup protection" against the total loss of these communications now that they are no longer visible on the platform.  *E.g.*, *id.*  Moreover, Facebook routinely maintains "for purposes of backup protection"—i.e., as a "substitute"—such removed communications in case a user petitions Facebook successfully to restore their account to the

platform.  *Id.* at 151:3–15.  In fact, even The Gambia recognized that Facebook "preserved" the removed communications here as a substitute for the communications once seen on the platform. Dkt. 10 at 4, 12 ("Facebook is . . . a preserver of information.").[5]

The Order misreads the SCA and federal caselaw to conclude that Facebook (and other ECS providers) can *never* hold communications that the provider removes from their platform "for purpose of backup protection" as defined by the SCA unless an "original" copy still exists on its public-facing platform.  Order at 14.  That distinction is not found in the SCA's text.  In fact, despite the Order's focus on defining a "backup copy" and "original copy," the SCA's definition of "electronic storage" speaks only in terms of whether a communication is stored electronically "for purposes of backup protection."  18 U.S.C. § 2510(17)(B).  The SCA nowhere requires that the provider maintain an "original copy" in order to have a backup.  *See Hately*, 917 F.3d at 795 (holding "[n]othing in the [SCA's] definition of electronic storage . . . or the statute's legislative history provides any indication that Congress intended 'backup protection' and 'backup copy' to have the same meaning" and explaining why "backup protection" is broader, but at least includes

---

[5] In reaching its conclusions, the Order misstates several of Facebook's arguments.  For example, the Order says that Facebook removed the communications for the purpose of "self-reflection, not for backup."  Order at 16 (citing Hr'g Tr. at 80–81).  But the record shows nothing of the sort; to the contrary, Facebook argued it retained them for various purposes, including for potential use by the U.N.  *See, e.g.*, Hr'g Tr. at 81:9-11, 151:3-12.  The Order also describes the removed content as "permanently deleted" (*see* Order at 14 n.8)—but the Removal Post it cites says only that Facebook "remove[d]" and "preserve[d]" the content.  *See* Hr'g Tr. at 80:21-24, 81:1-8, 151:3-12, Dkt. 15 at 4.  Nor is there anything in the record to support the Order's distinction between "original" and "backup" copies as to these particular removed communications.  The Order's findings are unsupported by facts in the record and were therefore clearly erroneous.  *In re Chevron Corp.*, 650 F.3d 276, 291 (3d Cir. 2011) (remanding for additional fact-finding where conclusions were not supported in the record).

a "copy" held for "administrative purposes"); *see also Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004) ("An obvious purpose for storing a message on an ISP's server after delivery is to provide a second copy of the message . . . if, for example, the message is accidentally erased . . . . Storage under these circumstances thus literally falls within the statutory definition.").[6]

Nor does such a distinction make sense when "backup protection" is most commonly understood to *enable* the retrieval of a communication after the original version is destroyed or lost.  Indeed, Congress recognized when it drafted the SCA that email services most often store copies of user communications for purposes of backup on their systems in case they were "call[ed]" upon to retrieve the communication at a later date.  *Id.* at 792.  Modern ECSs work in an analogous manner, typically storing "multiple copies of the messages [associated with] a user's account" on redundant servers *both* for the "purposes of [the provider's] own and its users 'protection'" as a safeguard to prevent a message from becoming permanently lost or irretrievable. *Id.* at 793.  As the Ninth Circuit has explained, one of the most *common* reasons for storing something electronically "for purposes of backup protection" is to maintain the content of the communication in the event that another version is "erased."  *Theofel*, 359 F.3d at 1075–76.  It thus makes little sense to say—as the Order does—that a communication stored by a provider in case of future need for retrieval cannot be construed as a "substitute" for a communication no longer available.  Order at 14.

---

[6]  The Order further misreads this *holding* from *Theofel* on the scope of the backup storage sub-provision by selectively quoting dicta that *rejected* the government's attempt to limit unnaturally the scope of the "backup storage" provision to only content held as backup for purposes pursuant to "temporary, intermediate storage under subsection (A)" of 18 U.S.C. § 2510(17).  *See* Order at 16 (quoting *Theofel*, 359 F.3d at 1070).  Moreover, as the Ninth Circuit has explained, "nothing in the Act requires that the backup protection be for the benefit" of either the ISP or the user specifically; instead, the statutory text is broad enough to encompass a backup benefit provided to either the ISP or the user (or both).  *Theofel*, 359 F.3d at 1075.

The Order cites no case supporting such a novel view of the SCA.  Instead, it selectively quotes from a few cases that have held a *user* who keeps or deletes an "original copy" of an email in their inbox may not be said to be holding that email copy "for purposes of backup protection" where it is the only copy.  *See* Order at 12–18 (citing *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 839 (8th Cir. 2015); *Flagg v. City of Detroit*, 252 F.R.D. 346, 363 (E.D. Mich. 2008); *Jennings v. Jennings*, 736 S.E.2d 242, 245 (S.C. 2012); *Gonzales v. Uber Techs., Inc.*, 2018 WL 4616266, at *4 (N.D. Cal. Sept. 26, 2018)).  But even assuming these cases are consistent with the text of the SCA, none of them opined on the question before this Court, where a *provider* stores a "duplicate" of a communication to preserve it as a "substitute" in the absence of the communication that once appeared on its platform.[7]

The Order's imposition of an ongoing need for an "original copy" is also particularly inappropriate in the SCA context and misunderstands how electronic storage works.  As the Fourth Circuit explained in *Hately*, "relying on definitions of 'backup' that define the term relative to an 'original' makes little sense in the context of messages stored by electronic communication services . . . because the 'original would seem to be most readily understood as the copy of a message that a *sender* types into" a service.  *Hately*, 917 F.3d at 796.  This copy of the message is then typically sent to the recipient's email service, "meaning that the recipient's email service never receives, must less stores, the 'original' message'" within the Order's strained understanding of that term.  *Id.* (citing S. Rep. No. 99-541, at 8, which recognized the "most common form" of

---

[7]  There is further good reason to doubt that these cases, even in the context where it is the user that deletes or opens the emails, are consistent with the text of the SCA.  *See, e.g.*, *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008) (noting that "[t]he majority of courts which have addressed the issue have determined that e-mail stored on an electronic communication service provider's systems after it has been delivered, as opposed to e-mail stored on a personal computer, is a stored communication subject to the SCA").

email "messages [protected by the SCA] are typed into a computer terminal, and then transmitted over telephone lines to a recipient computer operated by an electronic mail company[; i]f the intended addressee subscribes to the service, the message is stored by the company's computer 'mail box' until the subscriber calls the company to retrieve its mail"). Or, "[p]ut differently, all copies of any email held by a recipient's email service, web-based or otherwise, are 'copies,' rather than the 'originals.'" *Id.* The Order's attempt to distinguish "original" copies of a communication visible on a social media platform at any given time from a "backup copy" thus has no basis in ECS reality, much less the SCA's text. *Cheng v. Romo*, 2013 WL 6814691, at *4–5 (D. Mass. Dec. 20, 2013) (rejecting overly technical reliance on the distinction between "original" and "backup" copies when it would unnaturally limit the important privacy rights in the SCA in a manner contrary to the purpose of the statute).

In short, the Order's attempt to bring the removed communications stored by Facebook outside of the SCA's definition of "electronic storage" relies on an "analytical framework [that] lacks textual support." *Hately*, 917 F.3d at 793 n.8 (rejecting district court's attempt to read a distinction into the "electronic storage" definition between "storage copies" or "service copies" since the statute does not use those terms). This Court should vacate that portion of the Order.

**B.    The Order's Atextual Limitation of the ECS Disclosure Prohibition Contradicts the SCA's Purpose and Destroys Critical Privacy Rights**

The Order's invention of a novel and atextual limitation on the SCA's ECS disclosure prohibitions would render meaningless the critical privacy protections that Congress sought to secure when it passed the SCA. No court has ever concluded that a *provider's* decision to remove content from visibility on its platform could eliminate a *user's* privacy rights—and the Order cites none. Nor is it reasonable to infer this gaping hole in a statutory provision whose very purpose is to create a *prohibition* on an ECS's ability to turn over a user's communications to anyone

(including law enforcement) whenever it desires to do so.

As the Supreme Court has admonished, "a fair reading of legislation demands a fair understanding of the legislative plan." *King v. Burwell*, 576 U.S. 473, 498 (2015).  In other words, a court "must respect the role of the Legislature, and take care not to undo what it has done" when reading statutory language.  *Id.*  And, even if statutory text is found to be ambiguous, the court must look to "other indicia of congressional intent such as the legislative history" to interpret the statute.  *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015) (quoting *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 53 (4th Cir. 2011)).

Here, the SCA "was born from congressional recognition that neither existing federal statutes nor the Fourth Amendment protected against potential intrusions on individual privacy arising from illicit access to 'stored communications in remote computing operations and large data banks that stored emails.'"  *Hately*, 917 F.3d at 782 (internal quotations omitted); *see also supra* at pp. 4–6.  "'Most importantly,' Congress recognized that the uncertainty surrounding the legal protections, if any, afforded to electronic communications would 'promote the gradual erosion of th[e] precious right [to privacy].'"  *Id.* at 783 (quoting S. Rep. No. 99-541, at 5). Congress thus sought in the SCA to remove the vulnerability of messages when they were "in the electronic mailbox of the receiver" and limit the ability of "electronic mail companies [to] reveal a great deal of information about an individual," restrained only by whatever protection "the courts may decide [to grant] based on the facts" of a particular case.  *Id.* (quoting S. Rep. No. 99-541, at 4).  The SCA thus expresses Congress's "judgment that users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility," *Theofel*, 359 F.3d at 1072, and one of the SCA's three "principal" means of protecting that user privacy interest is to prohibit the "knowing disclosure of 'electronic communications' by 'electronic

communications services' and remote computing services.'" *Hately*, 917 F.3d at 783.

The Order's narrowing of the SCA's "electronic storage" provision devastates that core objective.  Under it, any time an ECS desires to share a user's communications (even private ones), the service provider could simply deactivate the user's account, thereby making the contents of the user's communications available for disclosure—to the U.S. government, to foreign governments, to private litigants, or anyone else. *See* 18 U.S.C. § 2703(a) (restrictions on the U.S. government's ability to require disclosure of an "electronic communication, that is in electronic storage in an electronic communications system").  That is neither what the statute says nor what Congress intended in passing it. *See, e.g.*, H.R. Rep. No. 99-647, at 19 (1986) ("But most important, if Congress does not act to protect the privacy of our citizens, we may see the gradual erosion of a precious right.  Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances.").

The clear object of the SCA was to *prevent* a provider from sacrificing a user's privacy whenever it was expedient to do so.  Indeed, the House Report on the SCA explicitly recognized that "[a]n 'electronic mail' service, which permits a sender to transmit a digital message to the service's facility, where it is held in storage until the addressee requests it, would be subject to Section 2701," which covers communications in "electronic storage."  H.R. Rep. No. 99-647, at 63; *see also* S. Rep. No. 99-541, at 36 (recognizing access to a communication located in a facility's storage from another subscriber without specific authorization would violate Section 2701(a)).  The fact that a service provider maintains a backup version of a user's communication on its server, then, even after a so-called "original" of the communication has been lost or deleted from its platform, cannot take the communication outside the statute's disclosure prohibitions.

When Congress enumerates specific exceptions, courts are not free to invent their own

additional ones, as the Order seeks to do.  *See, e.g.*, *O'Grady*, 139 Cal. App. 4th at 1443 ("[B]y enacting a number of quite particular exceptions to the rule of non-disclosure [in the SCA], Congress demonstrated that it knew quite well how to make exceptions to that rule . . . . Few cases have provided a more appropriate occasion to apply the maxim *expressio unius exclusio alterius est*.").  The Order also is wrong that the "privacy implications here are minimal," Order at 20—its holding affects *all* "permanently" removed content—not just the "vile content" at issue here.  Nor does the court have discretion to narrow a statute's scope where it decides that other needs in a particular case are more important.  *Id.* at 18.

This Court should set aside the Order's erroneous interpretation of "electronic storage," and instead read the SCA consistent with its purpose to hold that the sought-after communications here cannot be disclosed absent the consent of the user or another SCA exception.

## II.   The Order's Holdings with Respect to Whether Facebook Is a Remote Computing Service Are Contrary to Law and the Record

Notwithstanding the above, this Court need not even reach the question of whether Facebook is subject to the ECS disclosure prohibitions in this context because Facebook is also subject to the RCS disclosure prohibitions.[8]  At minimum, this Court should vacate the Order's summary and premature holding on this issue and send the RCS question back to the magistrate judge for full briefing.

Under the SCA, a provider is an RCS if they provide "computer storage or processing services by means of an electronic communications system."  18 U.S.C. § 2711(2).  There is no

---

[8]  Notably, Facebook need not be holding the removed communications in "electronic storage" to be subject to the RCS disclosure prohibitions.  A provider also can be both an ECS and an RCS under the SCA with regard to the same communications.  *See Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 989–90 (C.D. Cal. May 26, 2010) (holding that Facebook was both an ECS and RCS with respect to the communications at issue).

reasonable dispute that Facebook provides such services.

Facebook also meets all of the requirements to be subject to the RCS's disclosure prohibitions with regard to the removed content.  The SCA forbids any "entity providing remote computing service[s] to the public" from divulging (as relevant here) "the content of any communication received by electronic transmission that is carried or maintained on its service for a customer or subscriber 'solely for the purpose of providing storage or computer processing services to [the] subscriber or customer[.]'"  *Crispin*, 717 F. Supp. 2d at 973 (quoting 18 U.S.C. § 2702(a)(2)).  In this case, there can be no reasonable dispute that the contents at issue were received by Facebook via electronic transmission and were carried and maintained on Facebook's service for the purposes set forth in the statute.  The fact that Facebook later removed the content does not alter this conclusion.  *See Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 264 n.8 (S.D.N.Y. 2008) (providers "satisfy" RCS disclosure prohibition where "their authorization to access and delete potentially infringing private videos is granted in connection with defendants' provision of alleged storage services." (citation omitted)); Removal Post (describing Facebook's "ongoing investigations" into violations of its policies).

The Order thus errs in holding that Facebook is not subject to the SCA's disclosure prohibitions relevant to an RCS, reasoning only summarily in a footnote that Facebook must provide a user "retrieval mechanism" and publicly display the content to be subject to the RCS disclosure prohibition.  Order at 11 n.6.  With respect to the statutory prohibition against disclosure by an RCS, both are irrelevant.  18 U.S.C. § 2702(a)(2)(A), (B).

The Order cites no case that supports its imposition of these requirements.  Instead, the Order selectively quotes a single case that came to the opposite conclusion.  *See* Order at 11 n.6. In *Crispin v. Christian Audigier, Inc.*, the court held that Facebook was subject to *both* the RCS

and ECS disclosure prohibitions with respect to user Wall posts and messages.  717 F. Supp. 2d at 989–90.  In so doing, it explicitly *rejected* the argument that because Facebook displays content, that content is not maintained for purposes of providing computer storage or processing services. *See Crispin*, 717 F. Supp. 2d at 990.  The court explained that the RCS disclosure prohibitions in fact do *not* turn on whether content is displayed at all.  *Id.*  Rather, a communication *could* be both "in storage" *and* publicly viewable at the same time, and "the number of users who can view the stored message has *no legal significance*."  *Id.* (emphasis added); *id.* at 990 n.51 (explaining "purported 'display' purpose cannot last indefinitely in any event" as more messages are added and rejecting the notion that the SCA's privacy protections hinge on that distinction).

Similarly, *Crispin* and other cases reject the Order's attempt to read a *user* "retrieval" requirement into the RCS disclosure prohibition when there is none.  *E.g., id.* at 990 (holding RCS provision "does not limit storage to retention for the benefit of the user").  For instance, in *Flagg v. City of Detroit*, 252 F.R.D. 346 (E.D. Mich. 2008), the court held a cell phone carrier was subject to the RCS disclosure prohibitions with respect to archived text messages it stored from a former user's account even where it was the carrier, rather than the customer, that had direct access to these archives.  This conclusion is compelled by the fact that the SCA's privacy protections, as explained above, do not require records be stored in any particular manner or form.  *See supra* at pp. 4–6, 19–20; H.R. Rep. No. 99-647, at 39 ("[C]omputer storage is defined as an element of 'remote computing service.'  These definitions are not intended to limit the term[] . . . to any particular medium of storage."); S. Rep. No. 99-541, at 3 (services "create electronic copies of private correspondence for later reference," which "is processed for the benefit of the user but often it is maintained . . . to ensure system integrity.  For the person or business whose records are involved, the privacy or proprietary interest in that information should not change.").

Moreover, to the extent the Order implies Facebook does not "provid[e] remote computing services to the public" if removed communications are not displayed publicly, it rests on a misreading of the statutory text.  An RCS or ECS provide their services "to the public" if they provide such services "to the community at large."  *Andersen Consulting LLP v. UOP*, 991 F. Supp. 1041, 1042 (N.D. Ill. 1998) (citing Black's Law Dictionary 1227 (6th ed. 1990)).  The statute's reference to the "public" is meant solely to distinguish between services like email provided for public use—which would be covered by the SCA—and private systems operated for strictly internal purposes, which would not.  *E.g.*, S. Rep. No. 99–541, at 8 ("Electronic mail systems may be available for public use or may be proprietary, such as systems operated by private companies for internal correspondence."); Kerr, 72 Geo. Wash. L. Rev. at 1226–27 (explaining the "distinction between public and nonpublic" availability refers to the service itself—not specific communications, and distinguishing between "public" commercial providers such as ISPs from "private" providers such as the U.S. military).  Here, Facebook plainly provides its platform to the public for purposes of storage and computer processing.

Finally, the Order holds incorrectly that Facebook waived the argument that it qualifies as an RCS by not raising this argument until its Sur-Reply.  *See* Order at 11 n.6.  The parties did not substantively dispute this issue and Facebook expressly *reserved* the argument, "if necessary" for a motion to quash.  *See* Dkt. 8 at 6; Dkt. 15 at 2 n.1; *see also supra* at p. 15.  Waivers are strongly disfavored, especially when they implicate the privacy rights of parties not before the Court.  *See Fuhr v. Credit Suisse AG*, 687 F. App'x 810, 818 (11th Cir. 2017) (holding district court erred in determining that bank waived privacy concerns relating to privacy laws enacted to protect the rights of its clients).  And Facebook can neither "waive" its users' privacy rights under the SCA nor the proper application of U.S. law to The Gambia's Application here.  *See, e.g.*, *August v. FBI*,

328 F.3d 697, 701–02 (D.C. Cir. 2003) (reversing district court's refusal to consider purportedly waived disclosure prohibition under FOIA where decision would affect "safety and privacy of third parties" and collecting cases); *see also Jud. Watch, Inc. v. U.S. Dep't of State*, 2017 WL 456417, at *12 (D.D.C. Feb. 2, 2017) (same).

In short, the Order errs in holding summarily that Facebook is not an RCS, which this Court should correct by overturning it or, at minimum, by removing this footnote from the Order.  *See*, *e.g.*, *Crispin*, 717 F. Supp. 2d at 990 (holding magistrate judge's order requiring Facebook to produce communications sought via subpoena was wrong and misconstrued the record).

## III.    The Order's Ruling Allows Foreign Governments to Obtain Communications without Following the Procedures Congress Established in the CLOUD Act

The Order also creates a loophole for a foreign government to obtain users' communications (even private ones) while evading the specific restrictions in the SCA.  If Congress intended to lift those restrictions, they could have, as they have done in other contexts, such as the CLOUD Act amendment which lifts the SCA  restrictions for certain qualifying foreign governments in the investigation of certain criminal offenses.  The CLOUD Act amended the SCA to allow qualifying foreign governments to obtain user communications directly from providers like Facebook only when that government enters into an executive agreement with the US government, and only in cases involving "the prevention, detection, investigation or prosecution of serious crime, including terrorism."  18 U.S.C. § 2523(b)(1)(B)(i).  The Order's failure to consider this argument and this loophole poses serious privacy and civil liberty risks, forcing Facebook to turn over *six years* of non-public communications of foreign military leaders to the leaders of another nation, with *no* guarantees that this content will be reviewed or used in accordance with the values and standards set forth by Congress—including in a manner that "demonstrates respect for the rule of law and principles of nondiscrimination" and that "adheres

31

to applicable international human rights obligations and commitments or demonstrates respect for international universal human rights," 18 U.S.C. § 2523(b)(1)(B)(ii)–(iii)—and with none of the oversight that Congress thought necessary in a situation involving a foreign government's request for these communications.  The Order's refusal to even *consider* this argument is plain legal error.

As the Supreme Court explained in *Intel*, a court should consider whether a Section 1782 request "attempt(s) to circumvent" U.S. policies prior to granting it.  *Intel*, 542 U.S. at 264–65; *see also In re Kalser*, 2006 WL 8433484, at *5 (S.D. Fla. Nov. 9, 2006) ("[T]he fourth *Intel* prong requires inquiry not only into whether proof-gathering restrictions will be circumvented, but whether policies of . . . the United States will be circumvented.").  Statutory disclosure procedures like those in the CLOUD Act "reflect a congressional judgment that certain delineated categories of documents may . . . warrant[] a more considered and cautious treatment."  *Cf. Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1344 (D.C. Cir. 1984) (directing district court to consider FOIA exemptions for purposes of discovery even if the exceptions did not strictly apply).  Specifically, Congress sought in the CLOUD Act to balance a foreign government's legitimate need for certain communications data held by U.S. companies against the civil liberties concerns, potential for abuse, and rights of account holders.  *Supra* at pp. 6–8.  The U.S. policy reflected in the CLOUD Act requires American officials to review the appropriateness of a foreign government's request for this type of information and imposes other procedural limitations designed to protect privacy and prevent abusive use of any produced communications.  *Id.*

The Order cannot ignore the U.S. policy choices reflected in the CLOUD Act.  *See Al Fayed v. United States*, 210 F.3d 421, 424–25 (4th Cir. 2000) (affirming denial of Section 1782 Application because applicant did not "assert[] rights under FOIA, the typical route for private parties to gain access to government documents" and the requested documents could pose

"national security concerns"); *see also Fuhr v. Credit Suisse AG*, 687 F. App'x 810, 816–18 (11th Cir. 2017) (holding district court abused its discretion in granting Section 1782 application where it disregarded circumvention concerns).  Yet that is what it does, declaring Facebook's CLOUD Act and MLAT arguments a "non-starter" that it "need not consider," Order at 27, and dismissing any privacy risks inherent to the requested discovery as "minimal," *id.* at 20.

This disregard for Congress's policy choices and the obvious privacy, diplomatic, and national security risks inherent to the Order's scope is not only wrong, but troubling.  The Order notes that Facebook is "by far the most common social media platform in use" in Myanmar.  *Id.* at 4.  The Order cannot reasonably *assume* that turning over six years of private communications from its top military leaders and *hundreds* of accounts to the foreign leaders of another state poses no risks.  The Order cites no basis in the record to draw that conclusion.  *Al Fayed*, 210 F.3d at 425 ("salutary purposes" of Section 1782 "do not anticipate the issuance of a subpoena for documents whose disclosure would be likely to harm the national security").[9]  Nor does the Order consider the human rights impact that disclosure may have on the other parties to these private communications—many of whom may be uninvolved in the horrific acts against the Rohingya people—or even witnesses or victims.

These sorts of concerns are reason alone to deny a Section 1782 Application.  Indeed, district courts have often denied Section 1782 Applications from foreign governments for circumventing the MLAT process that the CLOUD Act helps streamline.  *See In re Application of*

---

[9]  The Order suggests that Facebook could simply run keyword searches and turn over review of the results to The Gambia to assuage concerns of burden in reviewing years of private communications in Burmese.  Order at 26.  But the Order cites nothing in the record to support its assumption.  Regardless, the suggestion that Facebook could hand over years of private communications, based solely on a keyword hit, to the foreign leaders of another country without any safeguards (like those articulated in the CLOUD Act) only highlights the extraordinary breadth of the Order and need for further review.

33

*the Republic of Turkey*, 2021 WL 671518, at \*9–12 (S.D. Ohio Feb. 22, 2021) (denying Turkey's

Section 1782 application and instructing it to proceed through MLAT process); *Federal Republic*

*of Nigeria v. VR Advisory Servs., Ltd.*, 499 F. Supp. 3d 3, 14–17 (S.D.N.Y. 2020) (Nigeria "failed

to point to any other foreign sovereign who was granted permission under § 1782 to take discovery

in support of a criminal investigation without first clearing the MLAT process"), appeal pending,

No. 20-3909 (2d Cir. filed Nov. 17, 2020); *In re Application of O2CNI Co.*, 2013 WL 4442288, at

\*8 (N.D. Cal. Aug. 15, 2013) (rejecting Section 1782 application for failure to follow the MLAT

process).   Moreover, courts have denied Section 1782 applications where U.S. courts have no

jurisdiction to ensure any sensitive information is not misused by the requesting party in a manner

contrary to U.S. policy or values.  *Andover Healthcare, Inc. v. 3M Co.*, 817 F.3d 621, 624 (8th Cir.

2016) (denying Section 1782 request where "any order would have to permit disclosure to the

German court at a minimum, thus leaving [the respondent's confidential information] at the mercy

of German procedures"); *Baxalta Inc. v. Genentech, Inc.*, 2016 WL 11529803, at \*8–9 (N.D. Cal.

Aug. 9, 2016) (similar).

Here, The Gambia is seeking non-public communications in circumvention of U.S. policy

choices reflected in the CLOUD Act.  The Order's failure to consider this fact is at least an abuse

of discretion, *see In re Kalser*, 2006 WL 8433484, at \*5, especially where Facebook explained

that it is already working with the Myanmar Mechanism—an international body established to

collect, review, and distribute evidence of genocide against the Rohingya people while still

protecting the privacy and security of witnesses and victims.  *See supra* at pp. 11–12.  This Court

thus should vacate the Order's discretionary grant of The Gambia's proposed subpoena, at least

with respect to non-public communications.

**IV.     The Order's Summary Ruling That All of Facebook's Internal Investigative Materials Are Relevant and Discoverable Is Premature and Incorrect**

A Section 1782 applicant bears the "burden to come to the court with [a] narrowly-tailored request in the first instance." *Nokia*, 2013 WL 6073457, at *3.   Failure to do so is grounds for denying an application. *Id.* at *3.   The Gambia's Application nevertheless sought *all* non-privileged documents related to *any* internal investigation of coordinated inauthentic behavior by Facebook since 2012 for any account even "suspected" of being controlled by Myanmar officials. App. at 17.   Yet rather than narrow or deny this request, the Order grants it without making any findings supported by the record regarding its relevance to the ICJ proceeding or weighing its intrusiveness. *See* Order at 28–29.   That is clear error.

Permissible discovery under Section 1782 is limited to that which "is relevant to any party's claim[.]"   28 U.S.C. § 1782(a); Fed. R. Civ. P. 26(b).   The discovery also must be "'proportional' considering . . . 'whether the burden or expense of the proposed discovery outweighs its likely benefit.'"   *MetaLab Design Ltd. v. Zozi Int'l, Inc.*, 2018 WL 368766, at *4 (N.D. Cal. Jan. 11, 2018) (quoting Fed. R. Civ. P. 26(b)(1)); *In re an Order Pursuant to 28 U.S.C. § 1782*, 286 F. Supp. 3d at 12.   Accordingly, "if the district court determines that a party's discovery application under section 1782 . . . unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto[.]"   *United Kingdom v. United States*, 238 F.3d 1312, 1318–19 (11th Cir. 2007) (quoting *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 n.6 (2d Cir. 1995)).

Neither The Gambia's request for Facebook's internal investigation documents nor the Order granting it, comply with these requirements.   Specifically, The Gambia sought "[a]ll documents relating to any internal investigation conducted by Facebook of 'coordinated inauthentic behavior,'" irrespective of whether those documents relate to the ICJ proceeding.   App.

at 17.  That alone is a sufficient reason to deny the request.  *In re Postalis*, 2018 WL 6725406, at *6 (S.D.N.Y. Dec. 20, 2018) (denying Section 1782 application as "plainly overbroad" in framing request "irrespective of whether [they] related to the issues in the Brazilian litigations").  And the Order fails to grapple at all with Facebook's argument that this request would cover communications protected by the SCA (due to its other holdings) or that the request would seem to cover wholly irrelevant materials like documents reflecting Facebook's internal policies and procedures.  *E.g.*, Dkt. 8 at 4, 8–9, 11.  There is no indication whatsoever as to how such materials would be useful or useable in the ICJ proceedings, as the outcome of those proceedings will turn on factual findings made by the ICJ, not hearsay documents discussing internal findings made by Facebook.  *See, e.g.*, *Rainsy v. Facebook, Inc.*, 311 F. Supp. 3d 1101, 1111 (N.D. Cal. 2018).

Moreover, requests that are "not relevant to the[] type[] of claim" at issue in the foreign jurisdiction are properly denied.  *In re JSC United Chem. Co. Uralchem*, 2020 WL 4251476, at *5, *8 (D.N.J. July 24, 2020).  But despite the Order's assertion (without citation) that Facebook's internal investigation "may be even more significant to The Gambia's ability to prove genocidal intent," Order at 29, it is factually undisputed that Facebook's investigation actually "was not . . . designed to investigate genocide" but "the use of multiple Facebook or Instagram [ ] accounts, pages, groups, events, working in concert to engage in inauthentic behavior."  Hr'g Tr. at 107:19-108:22.  There is no evidence to suggest—and The Gambia did not argue—that "Facebook's [ ] processes for preventing false or deceptive news and threatening or harassing statements" has any relevance to the ICJ proceeding, which is adjudicating liability for the crime of genocide.  *See Rainsy*, 311 F. Supp. 3d at 1111 (denying Section 1782 request where documents related to Facebook's internal procedures had no relation to claims in the foreign proceeding).  To the contrary, The Gambia admitted that "it may well be . . .  that we don't need the internal

investigation documents" and that "it's likely that there wouldn't be a lot left within the investigative report that wouldn't be duplicative."  Hr'g Tr. at 52:2–3.

The Order further recognizes how The Gambia (or it) *should* have properly tailored this request to be relevant and non-cumulative.  The Order observes that "[m]uch of The Gambia's request for internal investigation data involves Facebook's analysis of non-content metadata of the deleted content."  Order at 29 n.17.  And, indeed, The Gambia did indicate a particular interest in non-content metadata at the hearing, Hr'g Tr. at 25:21-23, 42:19-43:2, which the Order correctly recognizes may be produced pursuant to a specific SCA exception.  Order at 29 n.17 (citing 18 U.S.C. § 2702(c)(6)).

But rather than limit the application to this non-content metadata, the Order directed Facebook to turn over "any" non-privileged document related to its internal investigations.  *Id.* at 29.  The Order thus did not "reject[] or trim[]" the overbroad application, and instead opted to ignore the request's overbreadth *and* The Gambia's concessions regarding the documents' potential irrelevance to its claims.  *Intel*, 542 U.S. at 245.  In declining to conduct an analysis of whether the request was tailored to only documents relevant to the claims being litigated before the ICJ and non-content metadata subject to an SCA exception, the Order clearly errs under *Intel*.  This Court should modify this holding to reject this request outright or narrow it to non-content metadata shedding light on The Gambia's ICJ allegations.

## CONCLUSION

The Order granting in part The Gambia's Section 1782 Application errs in several significant respects.  This Court should modify or set aside those portions of the Order to restore the privacy rights and civil liberties of billions of global internet users.  In the meantime, Facebook is willing to work with The Gambia to produce tens of millions to hundreds of millions of

document pages of relevant public information and non-content metadata to help The Gambia in its case against Myanmar.

Dated:  October 13, 2021                           Respectfully submitted,

                                                   */s/ Joshua S. Lipshutz*
                                                   Joshua S. Lipshutz (D.C. Bar No. 1033391)
                                                   GIBSON, DUNN & CRUTCHER LLP
                                                   1050 Connecticut Avenue, N.W.
                                                   Washington, D.C. 20036-5306
                                                   Telephone:  (202) 955-8217
                                                   Facsimile:  (202) 530-9614
                                                   jlipshutz@gibsondunn.com


                                                   Natalie J. Hausknecht (*pro hac vice*)
                                                   GIBSON, DUNN & CRUTCHER LLP
                                                   1801 California Street, Suite 4200
                                                   Denver, CO 80202-2642
                                                   Telephone:  (303) 298-5783
                                                   Facsimile:  (303) 313-2826
                                                   nhausknecht@gibsondunn.com

                                                   *Counsel for Respondent Facebook, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the attorney of record for any party indicated as non-registered participants on this 13th day of October 2021.


 */s/ Joshua S. Lipshutz*
Joshua S. Lipshutz (D.C. Bar No. 1033391)