# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| *In re*: Application Pursuant to 28 U.S.C. § 1782 of<br><br>THE REPUBLIC OF THE GAMBIA<br><br>Petitioner,<br><br>v.<br><br>FACEBOOK, INC.<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.: 1:20-mc-00036-JEB-ZMF** |

**THE REPUBLIC OF THE GAMBIA'S RESPONSE TO FACEBOOK'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER GRANTING IN PART AND DENYING IN PART THE GAMBIA'S SECTION 1782 APPLICATION ON SEPTEMBER 22, 2021**

## TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION .................................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND.........................................3

    A.    Factual Background ..................................................................................3

    B.    Procedural Posture ...................................................................................6

        1.    The ICJ Proceedings ...................................................................6

        2.    The Instant Proceeding ...............................................................8

III.    ARGUMENT ...................................................................................................10

    A.    Standard of Review................................................................................11

    B.    Magistrate Judge Faruqui Correctly Found that 28 U.S.C. § 1782
        Applies to This Case ..............................................................................13

    C.    The Stored Communications Act Does Not Provide A Broad
        Prohibition Against the Disclosure of User Content; It Is A
        Criminal Law That Provides Some Privacy Protections for Stored
        Communications When Fourth Amendment Law Would Otherwise
        Provide None and Ensures Judicial Oversight Over Law
        Enforcement Attempts to Obtain Certain User Communications.........................14

    D.    The Order's Holding that Deleted Content Held for the Provider's
        Own Purposes Is Not "In Electronic Storage" Is Not Clearly
        Erroneous or Contrary to Law .............................................................18

    E.    The Order's Determination That Facebook Waived the
        Opportunity to Raise its Meritless "Remote Computing Service"
        Argument Is Not Clearly Erroneous or Contrary to Law And in any
        Event That Ruling Is Correct ................................................................23

    F.    The Order's Holding That the CLOUD Act Had No Application to
        This Case is Not Clearly Erroneous or Contrary to Law ......................29

    G.    The Magistrate Judge's Determination That Facebook Must
        Produce Any Non-Privileged Documentation That Relates To its
        Internal Investigation is Not Clearly Erroneous or Contrary to Law....................35

    H.    Alternate Grounds for Upholding the Order........................................38

    I.    Rule 72(a) Objection to The Denial of a Deposition ...........................40

J.       The Need to Reject Facebook's Continued Requests for Delay ............................41

IV.    CONCLUSION ...................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aikens v. Shalala*,
    956 F. Supp. 14 (D.D.C. 1997) ...................................................................................23

*ASPCA v. Feld Ent. Inc.*,
    659 F.3d 13, 21 (D.C. Cir. 2011) ...............................................................................12

*Att'y Gen. of British Virgin Is. v. Hyman*,
    No. 19-mc-164, 2020 WL 2615519 (D.D.C. May 23, 2020) ....................................13

*August v. FBI*,
    328 F.3d 697 (D.C. Cir. 2003) ..............................................................................25, 26

*In re Barnwell Enters. Ltd*,
    265 F. Supp. 3d 1 (D.D.C. 2017) ...............................................................................13

*Chevron Corp. v. Page* (*In re Naranjo*),
    768 F.3d 332 (4th Cir. 2014) .......................................................................................9

*CTS Corp. v. EPA*,
    759 F.3d 52 (D.C. Cir. 2014) .....................................................................................25

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
    895 F.3d 90 (D.C. Cir. 2018) .....................................................................................22

*In re DoubleClick Inc. Privacy Litig.*,
    154 F. Supp. 2d 497 (S.D.N.Y. 2001) .......................................................................20

*Duncan v. Walker*,
    533 U.S. 167 (2001) ...................................................................................................38

*Ellis v. Jackson*,
    319 F. Supp. 3d 23 (D.D.C. 2018) .............................................................................23

*Flagg v. City of Detroit*,
    252 F.R.D. 346 (E.D. Mich. 2008) ............................................................................27

*Fuhr v. Credit Suisse AG*,
    687 F. App'x 810 (11th Cir. 2017) ........................................................................25, 26

*Gonzales v. Uber Techs., Inc.*,
    No. 17-cv-02264, 2018 WL 4616266 (N.D. Cal. Sept. 26, 2018) ...........................21

*Hately v. Watts*,
  917 F.3d 770 (4th Cir. 2019) .................................................................22

*In re Hulley Enters. Ltd.*,
  400 F. Supp. 3d 62 (S.D.N.Y. 2019).....................................................11

*In re Application for an Order Pursuant to 28 U.S.C. § 1782*,
  473 F. App'x 2, 2012 WL 1138816, at *1 (D.C. Cir. Mar. 30, 2012 .....................13

*In re Application of Shervin Pishevar Pursuant to 28 U.S.C. § 1782*,
  439 F. Supp. 3d 290 (S.D.N.Y. 2020)....................................................11

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004)...........................................................13, 14, 34

*Jennings v. Jennings*,
  736 S.E.2d 242 (S.C. 2012) ...............................................................21

*Jud. Watch, Inc. v. U.S. Dep't of State*,
  No. 15-0688, 2017 WL 456417 (D.D.C. Feb. 2, 2017) ...........................25

*Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*,
  26 F.3d 375 (3d Cir. 1994)..................................................................25

*Low v. LinkedIn Corp.*,
  900 F. Supp. 2d 1010 (N.D. Cal. 2012) ...............................................26

*Market Co. v. Hoffman*,
  101 U. S. 112 (1879)...........................................................................38

*New Life Evangelistic Ctr. Inc. v. Sebelius*,
  847 F.Supp. 2d 50 (D.D.C. 2012) .......................................................12

*In re Pons*,
  No. 19-23236, 2020 WL 1860908 (S.D. Fla. Apr. 13, 2020) .................11

*Quon v. Arch Wireless Operating Co., Inc.*,
  529 F.3d 892 (9th Cir. 2008) .........................................................26, 27

*Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hebrew Homes Health
  Network, Inc.*,
  No. 1:17-cv-01215, 2019 WL 4346325 (D.D.C. Sept. 12, 2019)...........23

*Singh v. Superintending Sch. Comm.*,
  593 F. Supp. 1315 (D. Me. 1984) .......................................................23

*Smith v. Maryland*,
  442 U.S. 735 (1979)...........................................................................15

*SmithKline Beecham Corp. v. Apotex Corp.*,
  439 F.3d 1312 (Fed. Cir. 2006) .................................................................25

*Taylor v. District of Columbia*,
  205 F. Supp. 3d 75 (D.D.C. 2016) .............................................................23

*Theofel v. Farey-Jones*,
  359 F.3d 1066 (9th Cir. 2004) .............................................................21, 39

*United States v. Artis*,
  282 F. Supp. 3d 1202 (N.D. Cal. 2017) ......................................................18

*United States v. Miller*,
  425 U.S. 435 (1976)....................................................................................15

*United States v. Weaver*,
  636 F. Supp. 2d 769 (C.D. Ill. 2009) .........................................................20

*Viacom Int'l Inc. v. YouTube Inc.*,
  253 F.R.D. 256 (S.D.N.Y. 2008) ...........................................................27, 28

**Statutes**

18 U.S.C. § 2510...............................................................................19, 21, 22, 26

18 U.S.C. § 2523...........................................................................................30, 31

28 U.S.C. § 1782 .......................................................................................... *passim*

Stored Communications Act,
  18 U.S.C. §§ 2701-2712 ........................................................................ *passim*
  18 U.S.C. § 2703.........................................................................................16

**Other Authorities**

*Application of the Convention on the Prevention and Punishment of the Crime of
  Genocide (The Gambia v. Myanmar), Order* (Jan. 23, 2020), https://www.icj-
  cij.org/files/case-related/178/178-20200123-ORD-01-00-EN.pdf. ..........................7

D.D.C. Local Rule 72.2 ...........................................................................11, 12

Fed. R. Civ. P. 72 ........................................................................................ *passim*

Int'l Court of Justice, Frequently Asked Questions (last visited Oct. 27, 2021),
  https://www.icj-cij.org/en/frequently-asked-questions...........................................31

Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a
  Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1215 (2004).....................27

Paul Mozur, *A Genocide Incited on Facebook, With Posts From Myanmar's Military*, The N.Y. Times (Oct. 15, 2018) ...............................................................5

*Removing Myanmar Military Officials From Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/ ...............................................................................................5, 40

Restatement (Second) of Torts § 173 (Am. Law Inst. 1965) ..........................................39

U.S. Dep't of Justice, *Agreement between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Access to Electronic Data for the Purpose of Countering Serious Crime*, Article 11 (1) (updated June 16, 2020), https://www.justice.gov/dag/cloud-act-agreement ....................................................33

U.S. Dep't of Justice, *Division V-CLOUD Act*, Sec. 102 Congressional Findings (Mar. 21, 2018), https://www.justice.gov/dag/page/file/1152896/download .........................32

U.S. Dep't of Justice, *Promoting Public Safety, Privacy, and the Rule of Law Around the World: The Purpose and Impact of the CLOUD Act*, White Paper (April 2019), https://www.justice.gov/dag/page/file/1153436/download ...............................33

U.S. Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 115 (last visited Oct. 27, 2021), https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ssmanual2009.pdf ....................................................17, 20

U.S. Dep't of Justice, *U.S and UK Sign Landmark Cross-Border Data Access Agreement to Combat Criminals and Terrorists Online*, Office of Public Affairs (Oct. 3, 2019), https://www.justice.gov/opa/pr/us-and-uk-sign-landmark-cross-border-data-access-agreement-combat-criminals-and-terrorists ...................32

## I.     INTRODUCTION

After multiple rounds of briefing and six hours of oral argument, Magistrate Judge Faruqui permitted the Republic of The Gambia ("The Gambia") to subpoena the contents of permanently deleted Facebook accounts of the Republic of the Union of Myanmar ("Myanmar") government officials that were removed from the platform and had been used in a coordinated manner to incite a genocide in Myanmar.  He did so after determining that such information was of critical relevance to a pending international proceeding brought by The Gambia against Myanmar in the International Court of Justice ("ICJ").  That much is undisputed.  And with respect to the parts of the accounts that were available to the public initially, as well as non-content related to those accounts, Facebook now does not dispute (though it did below) that it must turn over those items to The Gambia.

What remains in dispute is whether federal law prohibits the Court from ordering the disclosure of certain non-public material from Facebook.  It does not.  The Order below correctly found that federal law does not prohibit the disclosure of the subpoenaed material.  Specifically, the Order below correctly determined that The Gambia's filing warranted relief under 28 U.S.C. § 1782, and then carefully analyzed the text and purpose of the Stored Communications Act (SCA), to determine that those provisions did not prohibit production of the materials.  The Order rightly recognizes that while Congress sought to protect the privacy concerns of users when appropriate in the SCA, it also sought to balance user privacy against other compelling interests when appropriate.  Such a balance is not unique to the SCA, as no law or legal doctrine establishes the sort of sweeping privacy protections Facebook describes in its filing.  Indeed, if Facebook were a lawyer attempting to prevent disclosure of client communications that had themselves been fraudulent and used in the commission of a genocide, settled, black letter law would compel disclosure of such communications under the crime-fraud exception.  In other words, the most

sacrosanct privilege in our law – the attorney-client privilege – would not protect communications such as these.

Whatever concern Congress had for user privacy in 1986, there is simply no showing that when it passed the SCA it wanted computer users to have more privacy than afforded by the attorney-client privilege.  In fact, given the numerous exceptions to user privacy contained in the SCA, and the precise and narrow way Congress defined protected content, there is every reason to believe Congress would have been offended by Facebook's blanket "user privacy" claims. Congress did not pass the SCA to allow computer users to hide evidence where the service provider itself had already concluded that the account had been used fraudulently and in violation of the terms of service.  The relevant statute here does not say that "no court may compel a service provider to disclose user content in a civil case under any circumstances" (or anything of the sort) and thus Facebook's claims that the statute be interpreted in such a manner surely do not rest on the Congressional text.

Rather, at bottom, Facebook's claims rest on the policy argument that the court's ruling supposedly creates a sweeping invasion into user privacy by allowing service providers the discretion to release content simply by deleting it.  Setting aside the oddity of a claim by Facebook that the magistrate judge's Order gives it *too much* power over user content, what Facebook seems to forget is that the law already allows service providers to divulge any user content – deleted or undeleted, protected or otherwise – to "anyone it wishes" (to use Facebook's own language, ECF No. 24 at 1) whenever Facebook deems it necessary to protect its own interests.  18 U.S.C. § 2702(5).  Or, as the Order below explained, "Facebook already held the keys to many of the SCA's privacy protections."  ECF No. 22 at 19.

At end the of the day, Facebook appears to relish those "keys" and wants to become the sole arbiter of what user content gets disclosed and how it gets disclosed. That Facebook would use that power to bury[1] critical evidence of genocidal intent by foreign government actors demonstrates why Congress knew better than to give Facebook the last word. In adopting 28 U.S.C. § 1782, Congress empowered *courts* to order production in precisely these circumstances, where critical evidence found in this district is of extreme relevance to an important international proceeding. And in adopting the SCA, Congress did not enact a law that would prevent courts from exercising their power to compel production in these circumstances. The magistrate judge thus faithfully applied both Congressional enactments to reach the correct and just result. This Court should overrule Facebook's objections and allow Magistrate Judge Faruqui's Order to take effect forthwith.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

This matter stems from a pending international human rights proceeding brought by The Gambia, a sovereign State located on the coast of West Africa, before the ICJ, in The Hague, Netherlands against Myanmar. The ICJ proceeding in turn seeks to hold Myanmar accountable

---

[1] Facebook will likely quibble with the charge that is seeking to "bury" this evidence, claiming that it has chosen instead to provide it to the Independent Investigative Mechanism for Myanmar (IIMM). To be sure, the IIMM is an important body doing important work, but it has no power to hold Myanmar accountable for the genocide of the Rohingya. Thus, from an accountability standpoint, the evidence will remain "buried" if Facebook has its way. Moreover, this "decision" by Facebook, which it references repeatedly in its objections, was almost certainly prompted by the desire to ensure that Facebook, not the courts, gets to decide what content gets released and what content remains in Facebook's files. It occurred only after The Gambia filed this suit, and its production has been stilted and limited to what Facebook in its sole discretion chooses to provide. *See* ECF No. 22 at 27-28.

for commission of the crime of genocide against the Rohingya people, an ethnic and religious minority in Myanmar.

In his September 22, 2021 Order, Magistrate Judge Faruqui accurately and succinctly described the shocking facts that are the subject of the ICJ proceeding:

> In 2012, violence erupted in the Rakhine State, where the Rohingya Muslims lived. *Id.* at ¶ 624. "The violence saw the burning and looting of houses, murders, summary executions and large-scale displacement affecting both ethnic Rakhine and Muslims." *Id.* at ¶ 643. The U.N. Mission "conclude[d] that the 2012 and 2013 violence in Rakhine State was pre-planned and instigated and that the Myanmar security forces were actively involved and complicit." *Id.* at ¶ 747.
>
> Beginning in October 2016, the Myanmar military carried out so-called "clearance operations" constituting systematic mass executions, disappearances, detention, and torture of Rohingya civilians, and the destruction of homes, mosques, and Qurans. *See id.* at ¶¶ 1069–95. "In addition to . . . mass targeted killings, members of the security forces shot individual persons, including at point blank range, and executed people, including those injured, by slitting their throats using long knives." *Id.* at ¶ 893. "Infants and children were frequently killed by gunfire, stabbed or burned to death." *Id.* at ¶ 942. "Another feature of the 'clearance operations' was the widespread destruction of Rohingya homes and villages, causing further death and injury through burning. . . . Death by burning in this manner disproportionately affected vulnerable persons less able to run and escape from the 'clearance operations,' including the elderly, disabled, young children and pregnant women." *Id.* at ¶ 905. Myanmar military forces "perpetrated on a massive scale" "[r]ape and other sexual and gender-based violence . . . includ[ing] mass gang rapes, sexually humiliating acts, sexual slavery and sexual mutilations." *Id.* at ¶ 920. "Many of the women and girls had infants and children with them, who were killed or severely injured, while their mothers were raped." *Id.* at ¶ 924. "Many victims were killed after being raped. Most had their throats slit or were burned to death." *Id.* at ¶ 927.

ECF No. 22 at 4.

Facebook holds a unique place in Myanmar society due to the relative unfamiliarity of the country with the Internet and digital platforms (which were introduced to the general public in Myanmar in 2011). In essence, Facebook serves as the internet in Myanmar, and its platform was essential to this incitement campaign. Beginning in 2012, Myanmar officials began what a U.N. report described as an organized hate speech campaign on Facebook, using the platform "to spread

anti-Muslim, anti-Rohingya, and anti-activist sentiment," ECF No. 22 at 5, using "multiple fake accounts and news pages to spread hate speech, fake news, and misinformation for political gain." *Id.* As Magistrate Judge Faruqui noted, this campaign of hate speech "weaponized Facebook" to dehumanize the Rohingya and brand them as an entire community of illegal immigrants. ECF No. 22 at 5-6. This was an essential predicate to the genocide that followed.

In August 2018, Facebook announced that it had conducted an internal investigation into the misuse of its platform in connection with the hate campaign against the Rohingya and acknowledged it had been "too slow" to prevent its platform from being used in such a manner. ECF No. 22 at 6. Between August and December of 2018, Facebook deleted and banned the accounts of a host of key Myanmar officials and organizations, including the Commander in Chief of Myanmar's armed forces, the military's television network, and a number of "seemingly independent news and opinion pages that covertly pushed the message of the Myanmar military." *Id.* Many of the pages Facebook removed appeared to be entertainment, beauty, and lifestyle pages, but, as Facebook has confirmed, were in-fact covert accounts linked to the Myanmar military. *See* Paul Mozur, *A Genocide Incited on Facebook, With Posts From Myanmar's Military*, The N.Y. Times (Oct. 15, 2018), https://www.nytimes.com/2018/10/15/technology/myanmar-facebook-genocide.html ("The company's head of cybersecurity policy, Nathaniel Gleicher, said it had found 'clear and deliberate attempts to covertly spread propaganda that were directly linked to the Myanmar military.'"). The most popular pages, with a combined estimate of four million followers, were titled "Beauty and Classic," "Young Female Teachers," Collection of Soldier's Photos," "Lord of Heaven," "Down for Anything," "Let's Laugh Casually," "We Love Myanmar," "Knowledge," and "All About Myanmar." *Removing Myanmar Military Officials From Facebook*, Facebook (Aug. 28, 2018) (updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-

myanmar-officials/.    Facebook removed the content after finding that certain individuals and organizations had been surreptitiously controlled by the Myanmar military, thus violating Facebook's terms of service.  ECF No. 22 at 6.  Facebook preserved the content it deleted.  *Id.*

### B.    Procedural Posture

#### 1.    The ICJ Proceedings

The Gambia filed its ICJ case on November 11, 2019, seeking relief under the 1948 Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9. 1948, 78 U.N.T.S. 277 (the "Genocide Convention"). The Gambia and Myanmar are both parties to the Genocide Convention, which provides for jurisdiction before the ICJ for "[d]isputes between the Contracting Parties relating to the interpretation, application or fulfilment of the present Convention, including those relating to the responsibility of a State for genocide."  The ICJ is the only international body with jurisdiction to hold Myanmar accountable for these horrific acts (since both Myanmar and The Gambia are parties to the Genocide Convention, over which the ICJ has jurisdiction), and this is the only pending international proceeding seeking to hold Myanmar accountable for the genocide.  The Gambia and Myanmar are the only parties to the case.[2]

A finding that acts of genocide occurred against the Rohingya requires The Gambia to prove that Myanmar committed any of the acts enumerated in Article II of the Genocide Convention – which include killing, causing serious bodily and mental harm, inflicting conditions that are calculated to bring about physical destruction, and imposing measures to prevent births – with the intent to destroy the Rohingya, in whole or in part.   Evidence that Myanmar government officials acted in a "coordinated" fashion to weaponize Facebook, through the creation of false

---

[2] The IIMM is an investigative body of the U.N., but it has no ability to hold Myanmar accountable for its conduct and is not a party to any proceeding, including that of the ICJ.

accounts designed to dehumanize the eventual victims of the genocide, is highly probative of this issue.  ECF No. 22 at 25.

Although Facebook seems to imply in its objections that the ICJ case is stalled indefinitely, ECF No. 22 at 13, that is not true.  At the outset of the case, in December 2019, oral proceedings were held before the ICJ on a request by The Gambia that the court order provisional measures (akin to a preliminary injunction) to protect its rights and the rights of the Rohingya during the pendency of the ICJ Proceedings. Myanmar objected on a variety of jurisdictional grounds.  On January 23, 2020, in a unanimous 17-0 ruling, the court rejected Myanmar's jurisdictional arguments and ordered Myanmar to take all measures within its power to prevent the commission of all acts of genocide against the Rohingya, including killings, causing serious bodily or mental harm, inflicting conditions of life calculated to bringing about their physical destruction, and imposing measures to restrict births. *See Application of the Convention on the Prevention and Punishment of the Crime of Genocide (The Gambia v. Myanmar), Order* ¶ 86 (Jan. 23, 2020), https://www.icj-cij.org/files/case-related/178/178-20200123-ORD-01-00-EN.pdf. The court also ordered Myanmar and all units under its direction, control, or influence to not commit any act of genocide, conspiracy to commit genocide, incitement to genocide, attempt to commit genocide, or  complicity in genocide. *See id*. Myanmar was ordered as well to preserve all evidence relating to allegations of the crime of genocide, and to report back to the court in four months and then every six months thereafter on its compliance with the Order. *See id*. In issuing its January 23, 2020 order, the ICJ underscored that the Rohingya "remain extremely vulnerable" to genocide, and that "there is a real and imminent risk of irreparable prejudice to the rights invoked by The Gambia." *See id*.

In October 2020, The Gambia filed its merits brief in the ICJ proceedings.  Under ICJ procedures, a defendant may respond to such a filing by raising "preliminary objections," which are akin to a motion to dismiss.  In January 2021, Myanmar filed its preliminary objections, raising the same jurisdictional arguments that had been unanimously rejected at the provisional measures stage.  While Facebook is correct that the effect of Myanmar's preliminary objections filing is to stay further merits proceedings pending a ruling – much as the filing of a motion to dismiss often stays progress on the merits until resolved – and is further correct that the ICJ has not made a "public statement" about those objections (which would be, to say the least, unusual), the preliminary objections will be heard in February 2022, and a ruling will likely occur within a few months of that hearing.  At that point, perhaps as early as April 2022, the case should quickly progress toward the merits.  Given the scope of the production and the logistical issues that remain in determining the precise scope of Facebook's production, the discovery ordered by Magistrate Judge Faruqui is, despite Facebook's implicit suggestions to the contrary, urgently needed so that it can be meaningfully used in this important international litigation.  (*See also* Section VI below).

### 2.    The Instant Proceeding

On June 8, 2020, The Gambia filed the instant proceeding, seeking to take discovery under 28 U.S.C. § 1782.  In its filing, The Gambia attached the subpoenas it proposed to serve on Facebook, and demonstrated that this request was, in fact, the quintessential type of case Congress had in mind when it enacted § 1782:  (1) The Gambia is the only petitioner in the only international tribunal considering Myanmar's accountability for the genocide of the Rohingya, (2) the information in Facebook's possession is of critical importance to those proceedings on the issue of genocidal intent, (3) the ICJ is not resistant to such discovery, and (4) the information The Gambia seeks is narrowly tailored to the issues raised in that proceeding.   In its initial filing, The Gambia did not, to be sure, raise objections to its *own* motion by suggesting that an order of production

would violate the SCA because it did not (and does not) believe that the SCA prohibits disclosure. But The Gambia did serve its motion on Facebook directly, despite the fact that many § 1782 proceedings begin with an *ex parte* order allowing service of the subpoena. *See, e.g.*, *Chevron Corp. v. Page* (*In re Naranjo),* 768 F.3d 332, 338 n.4 (4th Cir. 2014). The Gambia chose to proceed in contested litigation so that Facebook would have the opportunity to raise any objection it wanted, and the court could consider those objections at the same time it considered whether service of the subpoena was proper under section 1782.

At the outset, Facebook insisted on a two-month period (to August 4, 2020) to allow it to file objections; however, after The Gambia objected to the length of delay, it agreed to an extension to June 30, 2020.  ECF No. 5 at 1.  At that point, Facebook raised the possibility of voluntary production of the subpoenaed materials, ECF No. 6 at 1, and The Gambia stipulated to extensions of time while those discussions occurred.  ECF Nos. 6, 7.  When those discussions turned out not to be serious, no further stipulations occurred and Facebook filed its Memorandum in Opposition on August 4, 2020, the original date it had proposed for an extension.

In its opposition, Facebook argued, among other things, that production of the subpoenaed items would supposedly violate the SCA.  Nonetheless, and despite its claims that it would be illegal for it to produce the content information The Gambia sought, Facebook announced soon afterward that it would begin production to the IIMM of some of the materials The Gambia requested.  ECF No. 22 at 27-28.  As the Order below notes, however, Facebook's production has reportedly been stilted and it has been done solely pursuant to Facebook's own discretion.  *Id.*

After The Gambia replied to Facebook's SCA objections, Facebook demanded a right to surreply, arguing that The Gambia's SCA arguments had supposedly been "raised for the first time" in its reply brief.  Despite the silly nature of Facebook's protestation – asserting that a Petitioner

9

cannot properly respond in a reply brief to defensive objections "raised for the first time" by the Respondent – The Gambia stipulated to further briefing on these issues on an expedited basis. Briefing completed on September 4, 2020.  On November 18, 2020, the court heard six hours of oral argument on the issues raised in the briefing.[3]  At the close of the hearing, the court offered both parties the opportunity for supplemental briefing if they so desired.  11/18/20 Status Conf. Tr. at 159-60 (court requests a party to email by the following week if it desires additional briefing). Both parties declined the opportunity and thus no additional briefing was filed.

On September 22, 2021, the court entered an Order granting in part and denying in part The Gambia's request for discovery.   On September 30, 2021, after the parties stipulated to a one- week extension of time for either party to object, this Court entered a scheduling Order extending the time for objections.  ECF No. 25.  On October 13, 2021, Facebook filed its objections in compliance with the scheduling order.  ECF No. 26.  This timely response follows.

## III.   ARGUMENT

Section 1782 was designed to permit the sort of discovery requested here and the SCA does not prevent federal courts from ordering production of deleted content that is of critical relevance to an international proceeding.  To be sure, the SCA created conditional privacy protections for certain types of defined user content, but those protections do not apply as broadly as Facebook claims and they can, and often are, overcome after judicial oversight.  That is all that occurred here, with the court determining that the types of information The Gambia sought were not subject

---

[3] At the argument, The Gambia argued – and the court understood – that it wanted all relevant communications by the named officials and other account holders, not just those that had been released to the public.  11/18/20 Status Conf. Tr. 11/18/20 at 33:23-34:4, 37:7-38:2; 43:24-45:6. Facebook's suggestion that The Gambia is seeking only communications already released to the public (*see* ECF No. 24 at 14) is meritless.

to SCA protections.  This Court should uphold the production ordered by Magistrate Judge Faruqui in its entirety.

A.      **Standard of Review**

Before addressing the merits, we pause briefly to address the standard of review.  Even though Magistrate Judge Faruqui made very clear that he was entering an Order and not a report and recommendation, ECF No. 22 at 2 n.1, and even though Rule 72(a) and Local Rule 72.2(c) clearly apply to objections made to non-dispositive matters such as this one, Facebook seems hesitant to acknowledge that its objections are governed by Fed. R. Civ. P. 72(a), suggesting at times that it is unclear whether Rule 72(a) or Rule 72(b) applies here.  *See* ECF No. 24 at 17-18.

No such ambiguity exists.  As Magistrate Judge Faruqui correctly noted, his ruling on The Gambia's application was "non-dispositive," as the Order repeatedly contemplates additional proceedings to determine the full scope of what Facebook must produce.  *See, e.g.*, ECF No. 22 at 23 n.14 ("The parties will have to meet and confer to resolve any questions about content in between, with the backdrop of the Court's ruling that all pages and groups intended to be public should be disclosed. Future litigation may revolve around specific inquiries at to the nature of such content."); ECF No. 22 at 26 ("The parties are otherwise left to negotiate how to efficiently comply with this Court's order.").

This is why magistrate judge rulings in § 1782 cases are generally non-dispositive, as the great majority of courts hold.  *In re Application of Shervin Pishevar Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 301 (S.D.N.Y. 2020); *see also In re Pons,* No. 19-23236-MC-LENARD, 2020 WL 1860908, at *3 (S.D. Fla. Apr. 13, 2020) ("The great majority of courts to address the issue" have determined that a magistrate judge may dispose of "section 1782 discovery motions" by order; collecting cases); *In re Hulley Enters. Ltd.,* 400 F. Supp. 3d 62, 71 (S.D.N.Y. 2019) (same).  To be sure, Facebook cites a decision outside this district that has found at least some

§ 1782 rulings to be dispositive, but even Facebook admits that the test under Rule 72(a) is whether the order is "non-dispositive."  ECF No. 24 at 17.  As Facebook also acknowledges, an Order is dispositive only where it "disposes of all issues in the proceeding."  *Id.*  Here (as in most §1782 cases), the Order below expressly left issues open for further discussion, compliance, and "future litigation."  ECF No. 22 at 23 n.14.  *This* section 1782 ruling clearly is "non-dispositive" as it expressly contemplates additional proceedings on these issues.

By their terms, Fed. R. Civ. P. 72(a) and Local Rule 72.2(c) govern objections to non-dispositive "orders" issued by a magistrate judge.  These rules set forth the parameters of this Court's review:

> A party may not assign as error a defect in the order not timely objected to.  The district judge in the case must consider timely objections and modify or set aside any part of the order that is *clearly erroneous or is contrary to law*.

Fed. R. Civ. P. 72(a) (emphasis added); Local Rule 72.2(c) ("a district judge may modify or set aside any portion of a magistrate judge's Order under this Rule found to be clearly erroneous or contrary to law").  Under this standard, the objections should be sustained only where "the court is left with a definite and firm conviction that a mistake has been made."  *New Life Evangelistic Ctr. Inc. v. Sebelius*, 847 F.Supp. 2d 50, 53 (D.D.C. 2012) (quoting *ASPCA v. Feld Ent. Inc.,* 659 F.3d 13, 21 (D.C. Cir. 2011)).  This is a high bar, which is presumably why Facebook strives to fight its application here.  This Court should sustain the objections only if it is left with a definite and firm conviction that a mistake has been made.  But ultimately, as we demonstrate below, the standard of review should not matter because Magistrate Judge Faruqui's Order is correct when reviewed under any standard.

**B.      Magistrate Judge Faruqui Correctly Found that 28 U.S.C. § 1782 Applies to This Case**

On the merits, because this is a petition brought under 28 U.S.C. § 1782 seeking evidence for use before an international tribunal, we first address whether the magistrate judge properly applied the statute to this proceeding.  The magistrate judge did.  Section 1782 provides a U.S. court with the authority to compel testimony and documentary evidence from a person or entity found in its district "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782.  When such a request is filed, a court first considers whether it has the authority to grant the request and second whether it has the discretion to do so…" *In re Barnwell Enters. Ltd,* 265 F. Supp. 3d 1, 8 (D.D.C. 2017).  The magistrate judge's Order correctly concluded that these elements exist here, and Facebook does not meaningfully object to that determination.  In short, the statutory elements exist because (1) Facebook is indisputably found in the district, (2) the discovery requested will be used before the ICJ, and (3) the request is made by the Petitioner before the ICJ. In short, and especially given that the proceedings before the ICJ are the only ones in which Myanmar is being held accountable for its genocide of the Rohingya, this is a quintessential example of why Congress adopted section 1782.  *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004) ("Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals.").

Nor can there be any meaningful doubt that Magistrate Judge Faruqui correctly exercised his "broad discretion" by granting the petition.  *See Att'y Gen. of British Virgin Is. v. Hyman,* No. 19-mc-164, 2020 WL 2615519, at *4 (D.D.C. May 23, 2020); *In re Application for an Order Pursuant to 28 U.S.C. § 1782,* 473 F. App'x 2, 2012 WL 1138816, at *1 (D.C. Cir. Mar. 30, 2012). The Gambia is unquestionably a participant in a pending ICJ proceeding, and the evidence sought

here is of critical relevance to that proceeding:  As Facebook's own human rights investigation made clear, its platform was fraudulently used by certain Myanmar officials to incite the very genocide that is the subject of the international proceeding.  Thus, there can be no meaningful dispute that the four discretionary factors – (1) whether the respondent is a participant in the international proceedings, (2) whether the tribunal is resistant to using this kind of discovery, (3) whether the application circumvents the tribunal's proof-gathering restrictions, and (4) whether the requested discovery is unduly intrusive or burdensome – weigh in The Gambia's favor here. *See Intel Corp.,* 542 U.S. at 255. Indeed, Facebook does not raise any meaningful challenge to the magistrate judge's exercise of its discretion here; none of its objections directly contests that point or claims that he abused his discretion.  To be sure, Facebook does complain at various points in its brief about "burden" and "intrusiveness," and in another argument it suggests that the Order below constituted an abuse of discretion because of the purported failure to consider the "policy" behind the CLOUD Act, but those untethered complaints are not nearly enough to show an abuse of discretion by the magistrate judge in granting the petition, and it does not appear that Facebook is seriously complaining on that front.

> **C.     The Stored Communications Act Does Not Provide A Broad Prohibition Against the Disclosure of User Content; It Is A Criminal Law That Provides Some Privacy Protections for Stored Communications When Fourth Amendment Law Would Otherwise Provide None and Ensures Judicial Oversight Over Law Enforcement Attempts to Obtain Certain User Communications.**

Because Facebook's objections do not squarely focus on any of the elements of a § 1782 action, its primary objection to the Order below seems to be that Magistrate Judge Faruqui erred because, in Facebook's view, the SCA imposes a broad, blanket prohibition of disclosure of any user content, and thus prohibits it from complying with The Gambia's subpoenas.  But the SCA, passed in 1986, is not the sort of general privacy protection statute for internet users that Facebook

describes; rather, its main focus was on remedying the fact that the Fourth Amendment, as interpreted by the Supreme Court under the third party doctrine, seemed to provide *no* privacy protections for user content, maintained in the hands of a third party like an electronic service provider. *See United States v. Miller*, 425 U.S. 435, 442-44 (1976) ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."); *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.").

The SCA sought to remedy this gap by establishing some privacy protections for some electronic communications, regulating the relationship between service providers and law enforcement, treating electronic communications like the U.S. mail, and thus prohibiting service providers from divulging certain protected content in the absence of judicial supervision. Or, as the Order below correctly explained, "[t]he SCA is not a catch-all statute designed to protect the privacy of stored Internet communications; instead it is narrowly tailored to provide a set of Fourth Amendment-like protections for computer networks." ECF No. 22 at 9 (internal quotation marks omitted).

Thus, the first service-provider-related provision of the law (18 U.S.C. § 2702) prohibits electronic service providers (ESPs), which Facebook claimed in the lower court accurately described its role, ECF No. 8 at 6-7, from divulging a certain type of protected content – "the contents of an electronic communication while in electronic storage" absent following the procedures set forth in the SCA. However, and reflective of the fact that Congress was not

attempting to provide blanket secrecy for all user content, subsection (b) immediately creates nine exceptions to the general prohibition, instances where even the most protected communications (those in "electronic storage") may be disclosed to law enforcement authorities (or the public) without any judicial supervision.  These provisions essentially create a variety of circumstances in which user content has no meaningful privacy protections:  For example, subsection (b)(3) permits disclosure of otherwise protected content to law enforcement or anyone else "with the lawful consent of the originator or an addressee or intended recipient of such communication or the subscriber in the case of a remote computing service."  Likewise, under subsection (b)(5), disclosure of otherwise protected content is permitted "as may be necessarily incident . . . to the protection of the rights or property of the provider of that service . . .".  And the law contains other exceptions designed to allow disclosure of otherwise protected content, without a court order, when necessary to protect against death or serious physical injury.  *See* 18 U.S.C. § 2703(6) (to the National Center of Missing and Exploited Children), 2703(7) (content obtained inadvertently by the carrier and appears to relate to the commission of a crime), 2703(8) ("to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency.").

While these initial provisions set the boundaries of what user content receives some protection and what user content receives none, the other major provision of the SCA then regulates the relationship between ESPs and law enforcement, when law enforcement seeks to obtain protected electronic communications in the course of a federal law enforcement investigation.  That provision creates a veritable "code of criminal procedure" that federal and state law enforcement officers must follow in order to obtain protected content from service

providers.  U.S. Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 115 (last visited Oct. 27, 2021), https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ssmanual2009.pdf.

To begin, subsection (a) of section 2703 repeats the language of the previous section by limiting its application to the "contents of a wire or electronic communication that is in electronic storage in an electronic communications system."  Thus, these provisions apply only when law enforcement seeks user communications that are "in electronic storage in an electronic communications system."  For those communications, and only those communications, it then imposes a warrant requirement if the protected communication has been in electronic storage for less than 180 days.  Subsections (b) and (c) then set forth more limited procedures that apply when criminal law enforcement seeks protected content in electronic storage for more than 180 days and for non-content related information.

The reason for this detailed examination of sections 2702 and 2703 is to show that the SCA does not impose a broad, blanket prohibition of disclosure of user content, as Facebook contends.  As noted, each of these SCA provisions – sections 2702 and 2703 – reserves the most stringent ESP procedures for only the following content: "a wire or electronic communication *that is in electronic storage in an electronic communications system.*"  By defining protected content in this way, Congress clearly did not intend to create privacy protections for all "wire or electronic communications in the possession of a service provider" or to all "user content."  It could have chosen such language but it instead chose a narrower definition (and even then created a number of exceptions) because it simply was not trying to create a general privacy statute for internet users.  Congress was instead adopting a criminal law that deterred service providers from divulging, and law enforcement officials from seeking, certain protected communications in the absence of

17

judicial oversight when existing Supreme Court precedent – namely, the third party doctrine – seemed to create *no* protected privacy interest in such materials for computer users.  We will discuss below why Congress sought to limit these protected privacy interests only to certain communications, using an analogy to the U.S. mail, where communications remained sacrosanct while in the delivery process.

> **D.     The Order's Holding that Deleted Content Held for the Provider's Own Purposes Is Not "In Electronic Storage" Is Not Clearly Erroneous or Contrary to Law**

Facebook's primary objection to the Order below is that  "[t]he SCA prohibits Facebook from disclosing the content of a *user's communications* absent the user's consent or another statutory exception."  ECF No. 24 at 19 (emphasis added).  But Facebook's argument ignores the statutory text, which does not protect all "user communications," as Facebook claims, but rather only those communications that are "in electronic storage in an electronic communications system."  18 U.S.C. § 2702(a)(1).  Facebook seeks to equate the two by arguing that the term "while in electronic storage" should be construed to mean "while in the possession of the electronic service provider" because Congress intended "electronic storage" to be construed "broadly." ECF No. 24 at 19-20.  But elsewhere in its filing, Facebook concedes that these are criminal provisions, ECF No. 24 at 1, 5, and criminal laws are generally not construed "broadly"; to the contrary, they are construed "narrowly."  *See United States v. Artis*, 282 F. Supp. 3d 1202, 1204 (N.D. Cal. 2017) ("If the scope of a criminal statute is not clear, the statute should be construed narrowly.").  In any event, Facebook's argument depends entirely on ignoring the precise terms Congress used to define the scope of "while in electronic storage."  Magistrate Judge Faruqui correctly rejected this argument and this Court should as well.

As Magistrate Judge Faruqui noted, when Congress defined "electronic storage" it provided a "statutory definition . . . much narrower than its name suggests." ECF No. 22 at 12.  In particular, Congress defined "electronic storage" to mean:

> (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and
> (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication;

18 U.S.C. § 2510(17).

This definition focuses on the analogy to the U.S. mail, protecting content while in the delivery process by the ESP.  Thus, there are two ways that content can be in electronic storage, and one does not even arguably apply; the content indisputably was *not* in temporary storage during the transmission process and so it clearly does not meet the definition of § 2510(17)(A).  Consequently, the dispute here boils down to whether the content The Gambia seeks to acquire falls within the definition of subsection (B), which governs "any storage of such communication by an electronic communication service **for purposes of backup protection of such communication."** 18 U.S.C. § 2510(17)(B) (emphasis added).  More precisely, the question is whether content permanently deleted from the platform by the ESP (Facebook) because it had been posted on fraudulent accounts but preserved for the purposes of its own internal investigation or, as Facebook contends, for the purpose of "bring[ing] those responsible to justice," ECF No. 24 at 1, is being stored "for purposes of backup protection of such communication."  The Order below correctly holds that it was not.

To start with a plain meaning analysis, the files Facebook is currently keeping in its own possession are not "backup" copies because they are not backing anything up.  They are, by Facebook's own admission, evidentiary originals, forensically preserved for potential future review and analysis.  As Congress has made clear, it is the "purpose" of the storage that controls

when determining whether the content falls within the scope of the SCA's protections:  The storage must be "for purposes of backup protection."   Courts have determined that electronic communications are stored "for purposes of backup protection" only in two circumstances:  (1) where they are being preserved as temporary "backup" in case the original is contaminated, mis-delivered or not delivered at all, or (2) where they are being preserved to provide the *user* with a "backup" copy in case the original is destroyed or misplaced.  As we discuss below and as the Order noted, (ECF No. 22 at 15-17), all courts agree with the first definition of "backup protection," while only a few agree with the second.  But as the Court below correctly found, it doesn't matter:  Neither "backup" function exists here.

Courts have traditionally construed the scope of "backup protection" quite narrowly, limited only to the situation where the "backup" copy is preserved as a temporary safeguard against contamination, mis-delivery or non-delivery.  As the Department of Justice has explained:

> the "backup" component of the definition of "electronic storage" refers to copies made by an ISP to ensure system integrity. As one district court explained, the backup component "protects the communication in the event the system crashes before transmission is complete. The phrase 'for purposes of backup protection of such communication' in the statutory definition makes clear that messages that are in post-transmission storage, after transmission is complete, are not covered by part (B) of the definition of 'electronic storage.'"

U.S. Dep't of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 123 (last visited Oct. 27, 2021),

https://www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ssmanual2009.pdf.

Under this definition, Facebook's "post-transmission storage" is not covered under the definition of "electronic storage."  *See, e.g., United States v. Weaver*, 636 F. Supp. 2d 769, 773 (C.D. Ill. 2009) (interpreting "electronic storage" as excluding previously opened emails stored by Microsoft for Hotmail users). *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511

(S.D.N.Y. 2001) ("The cookies' long-term residence on plaintiffs' hard drives places them outside of § 2510 (17)'s definition of 'electronic storage' and, hence, Title II's protection.").

The reason for this rule is plain: Congress's conception of "'backup' necessarily presupposes the existence of another copy to which this [backup record] would serve as a substitute or support." *Jennings v. Jennings,* 736 S.E.2d 242, 245 (S.C. 2012).  Thus, as the Order below notes, without an original, there is nothing to back up. Indeed "the lifespan of a backup is necessarily tied to that of the underlying message. Where the underlying message has expired . . ., any copy is no longer performing any backup function.  An [ECS] that kept permanent copies of [deleted] messages could not fairly be described as 'backing up' those messages."  ECF No. 22 at 14 (quoting, in part, *Gonzales v. Uber Techs., Inc.,* No. 17-cv-02264, 2018 WL 4616266, at *4 (N.D. Cal. Sept. 26, 2018)).  Likewise, Congress's view was informed by electronic communications as analogous to snail mail, where strict privacy protections exist during the delivery process, but after delivery, a delivered letter is treated like any other item for search and seizure purposes.

To be sure, as Magistrate Judge Faruqui noted in his order, ECF No. 22 at 16-17, some courts have construed the term "for purposes of backup protection" more broadly.  The leading case in this area is *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004), which determined that a communication is being stored for the purposes of backup protection when the user keeps it for later use.  But as the court below correctly determined, ECF No. 22 at 15-16, this broader view looks entirely to whether the user has decided to keep a copy for her own backup purposes; here, the user has no original and no backup; Facebook's storage of removed content is not available to the user to access.  *See id.* at 1075 ("An obvious purpose for storing a message on an ISP's server after delivery is to provide a second copy of the message in the event that the user needs to

download it again—if, for example, the message is accidentally erased from the user's own computer.  The ISP copy of the message functions as a 'backup' for the user."); *Hately v. Watts*, 917 F.3d 770, 786 (4th Cir. 2019) (interpreting "backup" in the context of an opened email and observing that "[w]hen a user of a web-based email client . . . opens a message and then chooses not to delete the message after he reads it, the message remains 'reserved' on the host server for 'future use'—*i.e.*, in the event the *user* needs to view the message again") (emphasis added).

Here, the user has no access to the content and never will.  It is not a "backup" under any definition of the term.  No court has ever gone so far as to adopt Facebook's interpretation of backup—anything on its servers—which deprives the Congressional language of any meaning. As the Order below correctly determined, Congress limited the SCA to protection of backup storage rather than all electronic storage. *See* 18 U.S.C. § 2510(17). In this context, it was correct to "construe [the SCA] so that effect is given to all its provisions." *Del. Dep't of Nat. Res. & Env't Control v. EPA,* 895 F.3d 90, 99 (D.C. Cir. 2018) (internal quotations omitted).

Finally, Facebook makes a host of policy arguments about why its broad construction of protected content will better serve the Congressional intent to protect user privacy.  As the court below noted, Facebook's adoption of the mantle of user privacy is "rich with irony."  ECF No. 22 at 18. But even if the ACLU or the Electronic Frontier Foundation were raising this argument, it would necessarily fail.  The short answer is that the SCA is not directed at "user privacy" writ large and it doesn't even use that term; the law was intended solely to create some enforceable privacy interests for certain electronic content when the Fourth Amendment would have provided none.  Given the SCA's origins and purpose, it is not surprising that Congress adopted only limited privacy protections, not the blanket protections described by Facebook; nor is it surprising that Congress did not include within the scope of protection those electronic communications to which

the user himself or herself had been denied access by the electronic service because they had engaged in the commission of a fraud in making the communications, and had made the communications for the purpose of violating international law.

### E. The Order's Determination That Facebook Waived the Opportunity to Raise its Meritless "Remote Computing Service" Argument Is Not Clearly Erroneous or Contrary to Law And in any Event That Ruling Is Correct

Likely recognizing that its interpretation of "while in electronic storage" cannot withstand scrutiny, Facebook's second contention aims solely at a single footnote in the decision below, challenging the Order's holding that Facebook is not providing "remote computing service" (RCS) within the meaning of § 2702(a)(2).  On this point, Facebook asks for a remand, presumably so that it could argue that as an RCS (rather than an ESP), it need not establish that the content here is "in electronic storage."   But this argument fares no better.  The magistrate judge correctly determined that Facebook waived this argument by not raising it below and that it failed on the merits as well. ECF No. 22 at 11 n.6.

**First**, Facebook waived the argument that it is providing RCS by not making that argument before the magistrate judge.  *See id.*  Rule 72 of the Federal Rules of Civil Procedure "does not permit a litigant to present new initiatives to the district judge."  *Aikens v. Shalala*, 956 F. Supp. 14, 19 (D.D.C. 1997); *see Taylor v. District of Columbia*, 205 F. Supp. 3d 75, 89 (D.D.C. 2016); *Ellis v. Jackson*, 319 F. Supp. 3d 23, 29 (D.D.C. 2018); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hebrew Homes Health Network, Inc.*, No. 1:17-cv-01215, 2019 WL 4346325, at *1 (D.D.C. Sept. 12, 2019).  "Parties must take before the Magistrate Judge, 'not only their best shot but all of their shots.'"  *Aikens*, 956 F. Supp. at 23 (quoting *Singh v. Superintending Sch. Comm.*, 593 F. Supp. 1315, 1318 (D. Me. 1984)).  "[F]ailure to present an argument to the Magistrate Judge constitutes a waiver of that argument."  *Taylor*, 205 F. Supp. 3d at 89.

Here, there is no question that Facebook did not argue to the magistrate judge that it is providing RCS.  In its Opposition to Petitioner's Application Pursuant to 28 U.S.C. § 1782, Facebook argued only that it is providing "electronic communication service" (ECS); it did not argue, much less mention in passing, that it is providing RCS.  *See* ECF No. 8 at 6-10.  Facebook first referenced RCS in its Surreply in Further Opposition to Petitioner's Application Pursuant to 28 U.S.C. § 1782, but only then in a footnote.  *See* ECF No. 15 at 2 n.1 (stating, for the first time, that "Facebook is also a 'remote computing service' under 18 U.S.C. § 2702(a)(2)").  And in that footnote, Facebook did not actually develop any argument in support of its contention that it is providing RCS.  Instead, Facebook merely acknowledged that its "brief focuses on the requirements of Section 2702(a)(1)," i.e., that Facebook is providing ECS, and then said that "Facebook *reserves its right* to argue that the requirements of Section 2702(a)(2) are met as well, if necessary."  *Id.* (emphasis added).  But Facebook never argued to the magistrate judge that it is providing RCS.  During the lengthy hearing before the magistrate judge on November 18, 2020, Facebook did not argue that it is providing RCS.  Facebook even declined the opportunity for further briefing on any issues.  11/18/20 Status Conf. Tr. at 159 (counsel for Facebook: "I don't know that there is anything really that needs further briefing unless the Court requests it").  And by asking this Court now "to send the RCS question back to the magistrate judge for full briefing" (ECF No. 24 at 27), Facebook all but concedes that it did not properly raise this issue before the magistrate judge.

Undoubtedly, Facebook's (1) conclusory statement that it is providing RCS, (2) in a footnote, (3) in a surreply brief does not constitute a preserved argument.  As the D.C. Circuit noted in the context of an appeal, "A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only a conclusory fashion results in

forfeiture." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).  That is especially so when that footnote does not even appear in the party's opening brief.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."); *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.") (internal quotation marks omitted).

Facebook appears to make two arguments in support of its position that the Order incorrectly held that Facebook waived this argument.  Neither is availing.  First, Facebook contends that the "parties did not substantively dispute this issue and Facebook expressly *reserved* the argument, 'if necessary' for a motion to quash."  ECF No. 24 at 30.  In fact, The Gambia *does* dispute that Facebook is providing RCS; The Gambia had no reason to dispute the issue before the magistrate judge because Facebook never raised it before the magistrate judge.  As for Facebook's claim that it "reserved" the argument "'if necessary' for a motion to quash," the Court should dismiss this argument out of hand.  Facebook cites no law – and The Gambia is aware of none – that would allow a party to preserve an argument by simply saying (in a footnote) that the argument is "reserved" "if necessary" for a future motion.  If that were the law, parties in litigation would always "reserve" the right to make additional arguments and no argument could ever be found to have been waived.

Facebook also contends that "[w]aivers are strongly disfavored, especially when they implicate the privacy of rights of parties not before the Court."  *Id*.  But the cases Facebook cites for this proposition – *Fuhr v. Credit Suisse AG*, 687 F. App'x 810, 818 (11th Cir. 2017), *August v. FBI*, 328 F.3d 697, 701-02 (D.C. Cir. 2003), and *Jud. Watch, Inc. v. U.S. Dep't of State*, No. 15-

0688, 2017 WL 456417, at *12 (D.D.C. Feb. 2, 2017) – are inapposite and do not help Facebook

here. *Fuhr* does not even involve a waiver. There, the Eighth circuit reversed the district court's

ruling on section 1782 discovery because the district court made a credibility determination that

was clearly a mistake. *Fuhr*, 687 F. App'x at 819. *August* and *Judicial Watch* are both FOIA

cases that bear little resemblance to the facts or procedural posture of this case.

**Second**, the Order's conclusion that Facebook is not acting as an RCS with respect to the

deleted content is not "clearly erroneous" or "contrary to law." In fact, the Order's conclusion is

correct. "[T]he term 'remote computing service' means the provision to the public of computer

storage or processing services by means of an electronic communications system." 18 U.S.C. §

2711(2). An "electronic communication system" (as opposed to electronic communication

*service*) "means any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the

transmission of wire or electronic communications, and any computer facilities or related

electronic equipment for the electronic storage of such communications." 18 U.S.C. § 2510(14).

Although "computer storage" and "processing services" are not defined by statute, their meaning

is clear from the legislative history. As the Ninth Circuit explained in *Quon v. Arch Wireless*

*Operating Co., Inc.*, 529 F.3d 892 (9th Cir. 2008):

> In the Senate Report, Congress made clear what it meant by 'storage and processing
> of information.' It provided the following examples of storage: 'physicians and
> hospitals maintain medical files in offsite data banks.' Congress appeared to view
> 'storage' as a virtual filing cabinet…The Senate Report also provided an example
> of 'processing of information': 'businesses of all sizes transmit their records to
> remote computers to obtain sophisticated data processing services.'

*Id*. at 902.

As the Order correctly notes, "'[w]hether an entity is acting as an RCS or an ECS (or

neither) is context dependent, and depends, in part, on the information disclosed.'" ECF No. 22

at 11 n.6 (quoting *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1023 (N.D. Cal. 2012)). It also

depends on the provider's purpose or role with respect to the information at issue.  As one commentator explained, "The classification of ECS and RCS are context sensitive; the key is the provider's role with respect to a particular copy of a particular communication, rather than the provider's status in the abstract."  Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1215 (2004).  Courts that have determined an entity to be acting as an RCS have done so where the communication at issue is stored or processed for the *benefit* of the user.  *See, e.g.*, *Flagg v. City of Detroit*, 252 F.R.D. 346, 362-63 (E.D. Mich. 2008) (finding SkyTel to be an RCS provider with respect to a database of text messages maintained for the City); *Viacom Intern. Inc. v. YouTube Inc.*, 253 F.R.D. 256, 264 (S.D.N.Y. 2008) (finding YouTube to be an RSC provider with respect to videos stored on a web page for the benefit of the user and those the user designates).  This makes sense because the SCA's disclosure prohibition applies only to services "to the public."  18 U.S.C. § 2702(a)(2).

"The question in this case is whether Facebook was acting as an RCS for the deleted content it preserved."  ECF No. 22 at 12 n.6.  Once Facebook deleted the content, Facebook was no longer providing a service to the "public . . ." at all within the meaning of 18 U.S.C. 2711(2).  Rather, Facebook was maintaining the content for its *own* purposes, namely, for an "autopsy of its role in the Rohingya genocide."  *Id*. at 16.  Thus, Facebook was not acting as an RCS for the deleted content it preserved.

Moreover, Facebook has not established that the content deleted by Facebook was provided by Myanmar officials to Facebook for the provision of "computer storage" or "processing services" within the meaning of section 2711(2).  There is no evidence in the record that Myanmar officials sent the content to Facebook so that it could be stored in a "'virtual filing cabinet'" or "'to obtain sophisticated data processing services.'"  *See Quon*, 529 F.3d at 902.  Of course, Facebook

suggests otherwise, asserting that "there can be no reasonable dispute that the contents at issue were received by Facebook via electronic transmission and were carried and maintained on Facebook's service for the purposes set forth in the statute."  ECF No. 24 at 28.  But there are no facts in the record to support Facebook's bald assertion. Facebook also says that "[t]he fact that Facebook later removed the content does not alter [its] conclusion" (*id.*), but Facebook cites to a case – *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008) – that has nothing to do with deleted content; the issue in *Viacom* was whether *private* videos, not deleted videos, could be disclosed under the SCA.  *See id.* at 264-65.[4]  In sum, Facebook was not acting as an RCS for the deleted content it preserved.

There is one final point to make on this issue:  Facebook seeks a remand to the magistrate judge for "full briefing" of whether it is an RCS within the meaning of § 2702(a)(2), ECF No. 24 at 27, but it is hard to see how that would be anything other than a big waste of time.  Even if Facebook were acting as an RCS (which it is not), the content protected by section 2702(a)(2) consists of only that stored "on behalf of . . . a subscriber or customer" (§2702(a)(2)(A)) or "solely for the purpose of providing storage or computer processing services **to such subscriber or customer.**" § 2702(a)(2)(B) (emphasis added).  Neither of these provisions would even arguably apply to content stored for Facebook's own use, where the subscriber or customer account has been deleted.  Deleted content is not being stored "on behalf of" or "solely for the purposes of providing storage or computer processing services to" "a provider a customer."  So even if Facebook were acting as an RCS here, which it is not, the content being sought here is not the type protected by either prong 2702(a)(2)(A) or 2702(a)(2)(B)) of the RCS provision.  Perhaps that

---

[4] The court in *Viacom* also considered copies of videos deleted or removed from YouTube but did not analyze the issue under the SCA.  In any event, the court ordered YouTube to produce the removed videos.  *See id.* at 261.

explains why Facebook did not raise the issue until now and why it seeks "full briefing" rather than to have this Court actually resolve the issue in this proceeding.

### F.      The Order's Holding That the CLOUD Act Had No Application to This Case is Not Clearly Erroneous or Contrary to Law

Next, Facebook objects because the Order below supposedly "creates a loophole for a foreign government to obtain users' communications (even private ones) while evading the specific restrictions in the SCA." ECF No. 24 at 31. According to Facebook, this "loophole" arose when the magistrate judge "failed to consider" a recent amendment to the SCA (18 U.S.C. § 2523(b)(1)(B)(i)), contained in a more expansive package of legislation called the CLOUD Act, which exempted even protected content from the SCA's protections and process when sought by a foreign government that had entered into an executive agreement with the U.S. government. *Id.* at 31-32. Facebook's argument lacks merit: The magistrate judge's Order **did** consider Facebook's argument and rightly rejected it as a "non-starter." ECF No. 22 at 27.

As the magistrate judge recognized, the SCA Amendment referenced by Facebook had no application to this litigation. As Congress explained in adopting it, the Amendment was designed to address the situation where "communications-service providers face potential conflicting legal obligations when a foreign government orders production of electronic data that United States law may prohibit providers from disclosing." U.S. Dep't of Justice, *Division V-CLOUD Act*, Sec. 102 Congressional Findings (Mar. 21, 2018), https://www.justice.gov/dag/page/file/1152896/download. In other words, the worry was conflicting orders from a foreign court to produce electronic communications for use in a foreign criminal prosecution, not the situations where a foreign litigant comes to the U.S. courts for an initial discovery determination.

In the circumstance that prompted the SCA Amendment, service providers understandably feared that compliance with an order might violate the terms of the SCA and could potentially create the circumstances where a foreign court ordered production but U.S. law prohibited it; in such circumstances a provider would have no option but to challenge production in a U.S. court. Such challenges remain important to ensure that foreign governments cannot obtain information in violation of due process or in violation of U.S. statutes, but in adopting the SCA amendments Congress recognized that there might be a better, faster way for foreign law enforcement from due-process-friendly U.S. allies to obtain such records. The CLOUD Act thus created an alternate high-speed, low burden route, allowing allied governments seeking user content from U.S. service providers to simply bypass the SCA altogether by securing a production order from their own courts. To be sure, Congress limited application of this alternate route by requiring an Executive Agreement in which the Department of Justice (DOJ) certified that the foreign government processes were sufficient as to allow production without consideration of potential SCA issues by a U.S. court, and it further limited that application to content requests that were "for the purpose of obtaining information relating to the prevention, detection, investigation, or prosecution of serious crime, including terrorism." 18 U.S.C. § 2523(b)(4)(D)(i). With such an agreement, a foreign government can obtain the information without consideration of the SCA. *See* 18 U.S.C. § 2702 (b)(9) (allowing a provider to divulge the contents of communication to "a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfied section 2523"). In other words, Congress allowed allied foreign law enforcement services to opt out of the SCA in some criminal investigations, upon a showing that the foreign government's legal system would adequately protect privacy and due process-related interests.

In so doing, Congress did not repeal all other discovery mechanisms that could potentially be available to foreign governments, expressly, implicitly, or otherwise.  Facebook cites no authority for its position that, after the CLOUD Act, a foreign government should not be able to seek electronic content under § 1782 for use in an ICJ proceeding, and, to our knowledge, no such authority exists. Rather, it is clear from both the text and the legislative history that by creating an easier option for certain allies who could demonstrate that their legal systems provided sufficient privacy and due-process protection in the face of law enforcement requests, Congress was not attempting to eliminate the other processes (like section 1782) through which foreign governments have traditionally sought evidence in U.S. proceedings.

Indeed, if Facebook's argument were correct, there would be no way for The Gambia to obtain such evidence at all.  The CLOUD ACT processes discussed above apply only to evidence sought for the purposes of enforcement of the criminal laws. 18 U.S.C. § 2523(b)(4)(D)(i).  But the ICJ proceeding is civil, not criminal, as the ICJ is a human rights court that hears disputes between States, with no prosecutorial capabilities. *See* Int'l Court of Justice, Frequently Asked Questions (last visited Oct. 27, 2021), https://www.icj-cij.org/en/frequently-asked-questions ("The International Court of Justice has no jurisdiction to try individuals accused of war crimes or crimes against humanity. As it is not a criminal court, it does not have a prosecutor able to initiate proceedings.").  The Gambia could not enter into an Executive Agreement with DOJ to obtain such human rights evidence, nor could any other country.  Thus, at bottom, Facebook is arguing that Congress's adoption of the CLOUD Act amendment to the SCA destroyed the ability of *any foreign government* to obtain such information for use in an ICJ proceeding, and only foreign governments are proper parties to such proceedings.  This would mean that, despite the existence

31

of section 1782, U.S. courts would no longer be available to compel testimony and evidence before the ICJ.  As the magistrate judge rightly pointed out, that is simply a "non-starter."

But there is more.  Facebook's argument would also mean that even if the evidence were sought for an appropriate foreign criminal proceeding, only those foreign countries with CLOUD Act Executive Agreements could receive such information.   That would mean that the only country in the world that can receive electronic content evidence from the U.S. now consists of the United Kingdom, which is currently the only country with an executive agreement.  *See* U.S. Dep't of Justice, *U.S and UK Sign Landmark Cross-Border Data Access Agreement to Combat Criminals and Terrorists Online*, Office of Public Affairs (Oct. 3, 2019), https://www.justice.gov/opa/pr/us-and-uk-sign-landmark-cross-border-data-access-agreement-combat-criminals-and-terrorists.

While the U.S has also reportedly entered into formal negotiations with the European Union on September 26, 2019, and with Australia on October 7, 2019, no executive agreements have come from those negotiations. Thus, Facebook's argument that the CLOUD Act is the exclusive option for foreign governments to obtain user communications from providers would mean that the E.U. and Australia, along with every other government in the world (except the U.K.) now have no route in the U.S. courts for obtaining electronic communications from U.S. service providers at all.  Surely Congress, having found that "timely access to electronic data held by communications-service providers is an essential component of government efforts to protect public safety and combat serious crime, including terrorism," did not create a system that would foreclose all such data access to every country who has not yet signed an executive agreement.  *See*, U.S. Dep't of Justice, *Division V-CLOUD Act*, Sec. 102.

Additionally, the only existing CLOUD Act executive agreement provides further proof of non-exclusivity. Within the executive agreement between the U.S. and the U.K., there is an explicit

provision of non-exclusivity: "This Agreement is without prejudice to and shall not affect other legal authorities and mechanisms for the Issuing Party to obtain or preserve electronic data from the Receiving Party and from Covered Providers subject to the jurisdiction of the Receiving Party, including legal instruments and practices under the domestic law of either Party as to which the Party does not invoke this Agreement; requests for mutual legal assistance; and emergency disclosures." U.S. Dep't of Justice, *Agreement between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Access to Electronic Data for the Purpose of Countering Serious Crime*, Article 11 (1) (updated June 16, 2020), https://www.justice.gov/dag/cloud-act-agreement.

This is presumably why the Department of Justice has interpreted the CLOUD Act to be a non-exclusive remedy: "A CLOUD Act agreement would not be the exclusive mechanism for either party to the agreement to obtain electronic data; other mechanisms such as MLATs or domestic orders outside the agreement would remain available." U.S. Dep't of Justice, *Promoting Public Safety, Privacy, and the Rule of Law Around the World: The Purpose and Impact of the CLOUD Act*, White Paper (April 2019), https://www.justice.gov/dag/page/file/1153436/download.

Finally, Facebook (likely recognizing the flaws in its exclusivity arguments) seems to suggest that, even if the CLOUD Act does not directly apply, the magistrate judge somehow abused his discretion by failing to give adequate consideration to this supposedly alternate route for discovery.  ECF No. 24 at 34.  This argument fares no better, however, in a proceeding where the magistrate judge considered rounds of briefing and hours of oral argument.  On its face, moreover, the argument lacks merit because the CLOUD Act actually did not create any alternate route for discovery in this civil ICJ proceeding; it applies only to the collection of evidence for

foreign criminal proceedings.  In any event, for the reasons stated above, Congress did not mean to eliminate available U.S. mechanisms that foreign governments use to collect evidence from the U.S., meaning that it cannot be an abuse of discretion not to consider such arguments.  This is especially so where Magistrate Judge Faruqui did expressly consider the question of whether The Gambia was seeking to circumvent alternate routes for collection of the evidence in his analysis of the discretionary section 1782 factors.  *See* ECF No. 22 at 7-8.

In short, Facebook's argument – that the granting of The Gambia's § 1782 application circumvents the policy choices of the U.S. reflected in the CLOUD Act – lacks merit. The CLOUD Act and § 1782 are two different statutes with different goals. They create two different paths for foreign governments to request discovery, and the statues have implemented different regulations and protections.  With an executive agreement, a foreign government can skip the U.S. process in some criminal cases and get a production order from its own courts.  Without an executive agreement, it must follow the normal process for collection of evidence from the U.S., which here is the filing of a section 1782 proceeding, which expressly applies to the collection of U.S. evidence for use in an international civil proceeding.  To be sure, the section 1782 process is more cumbersome than the CLOUD Act procedures, since federal judges make discretionary rulings on each individual section 1782 request. *See Intel Corp.*, 542 U.S. at 247 (2004) (section "1782(a) authorizes, but does not require, a federal district court to provide judicial assistance to ... interested persons in proceedings abroad.").  Concerns over privacy, diplomatic, and national security risks that Facebook raises (ECF No. 24 at 33) are addressed via the *Intel* factors that federal judges must apply each time a § 1782 application is reviewed. There is no abuse of discretion in the magistrate judge's determination that Congress did not mean to abrogate that process when it adopted the CLOUD Act streamlined procedures for certain foreign criminal investigations.

**G.     The Magistrate Judge's Determination That Facebook Must Produce Any Non-Privileged Documentation That Relates To its Internal Investigation is Not Clearly Erroneous or Contrary to Law.**

Facebook also objects to the Order's directive that Facebook produce non-privileged information from its internal investigation, which resulted in a finding that the Myanmar generals had fraudulently used the platform by hiding their identities and coordinating their de-humanizing messages about the Rohingya – *i.e.*, their "inauthentic coordinated behavior."   According to Facebook, this ruling constitutes an abuse of discretion because it supposedly was "premature and incorrect."  ECF No. 24 at 35.

Given the multiple rounds of briefing and six hours of argument on this matter, it is difficult to understand how Facebook could meaningfully contend that such a ruling was "premature."  The briefing sought non-privileged information related to the investigation, and the argument focused on the issue as well.  And counsel for The Gambia made very clear both during briefing and argument why the information about the investigation was relevant to the ICJ proceeding:

> What did Facebook use to determine that these Myanmar patriot accounts really were linked up to the Myanmar military? We'd love to have that information because if we can show that many of these accounts -- even though they called themselves something different, were being secretly operated by the Myanmar military and it was concealing that, that is -- I am sure from your time in the Department of Justice, Your Honor, that is the sort of information of intent -- the evidence of intent that you would have loved to acquire for your case because it shows concealment which is often the best evidence of intent.  (p.42)

11/18/20 Status Conf. Tr. at 42; *see also id.* at 26 ("Given that Facebook has conducted an investigation, determined that its system was misused because of inauthentic coordinated behavior, and released some information about what was being done on its system to the public, we believe that that sort of information also would be disclosable.")

In response to further questions from the court later in the argument, counsel provided a further explanation on the relevance issue, this time focusing on the court's question regarding user "non-content":

> [Request] 13 asked for evidence of coordinated inauthentic behavior. And . . the "inauthentic" part of it is exactly where you would get non-content. . . . because they likely would have had to trace the IP address or use some other information in order to determine that. We also know, from what Facebook has said publicly, that they have made those sorts of determinations. In Facebook's . . . blog posts they did say . . . that all of the people behind this activity attempted to conceal their identities and coordination. This is a quote, Our investigation found links to members of the Myanmar military. So Facebook -- whatever Facebook has done so far, we know that their investigation into coordinated inauthentic behavior both likely included non-content because that's likely how they linked these accounts to the Myanmar military. Because I assume that if you set up a fake account trying to hide your identity, that the content of your account -- at least the public content is not going to then reveal your identity, so it had to come from somewhere else, likely the IP address or some other information like that.

11/18/20 Status Conf. Tr. at 137-38.

In light of these extensive discussions of relevance at the hearing, Facebook does not seriously dispute that such evidence would be relevant.  Instead it simply repeats its position below that because its investigation was not focused directly on the issue of genocidal intent, some of the evidence may not be relevant. ECF No. 24 at 36.  But if discovery were limited to requests that produced *only* relevant information and nothing else, virtually every discovery request would fail that test.  Here, there can be no doubt that to the extent Facebook examined evidence that the account holders were actually Myanmar Generals who were hiding their identity – and thus the accounts were "inauthentic" and that those generals were working in a "coordinated" fashion – such information would be probative of intent, since concealment is often the best evidence of intent.  That is precisely what Magistrate Judge Faruqui found.  Rather than directly challenge relevance, Facebook then attempts to take a snippet of the lengthy oral argument out of context to suggest that The Gambia supposedly admitted that the information might not be relevant.  ECF

No. 24 at 36-37.  But that is simply not true; Facebook's reference is to The Gambia's response to the court's question about whether it was likely that Facebook's **investigation report** discussed content that was not subsumed by other requests; in response to that question, counsel stated that in light of the investigative privilege issues that could be raised through production of the report, if the court ordered production of content in response to the other discovery requests, it is possible that anything in the investigative report itself would be "duplicative."  11/18/20 Status Conf. Tr. at 51-52.

Thus, the discussion Facebook references didn't even involve a question about the *relevance* of user content at all.  Nor is there any suggestion that, in light of the numerous discussions of relevance mentioned above (and in the full colloquy at pages 51-52), that the magistrate judge viewed (or was required to view) The Gambia's statements as undermining its earlier and later relevance argument.  To be sure, The Gambia's response did suggest that other discovery requests might produce similar or overlapping evidence of genocidal intent but discovery requests are crafted without knowledge of what the other party might have and so they are often overlapping.  But this overlap produces no additional burden at all:  If the responsive information is produced in connection with one request, it need not be produced a second time, as Facebook well knows.  In any event, to the extent Facebook is claiming that the court did not adequately consider relevance or tailor the Order to the non-content described above, that argument lacks merit.  The Gambia made a strong showing of relevance both at the hearing and in its moving papers both as to the content that supported the investigative report and the non-content (which Facebook now admits it must produce), and the court correctly so found after ample consideration of the issue.

### H.        Alternate Grounds for Upholding the Order

The Order below is not an abuse of discretion and is fully supported by the law, and the Court should overrule Facebook's objections in its entirety.  However, should the Court disagree, The Gambia respectfully requests that it uphold the order of production on two alternate grounds, each of which was fully presented below. ECF No. 10 at 5-11; ECF No. 16 at 2-5.

**First,** The Gambia submits that the foreign government officials, whose electronic communications form the bulk of The Gambia's requests, do not fall within the scope of SCA protections.  The SCA is designed to protect the communications of "users," which is a defined term under the Act meaning "person or entity." Government officials are clearly not "entities."  A "person" is carefully defined under the statute as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation."  Because U.S. government officials are expressly defined as "users," Congress's omission of foreign government officials suggests a clear intent to exclude them from the definition of "users" whose communications are protected under the SCA. If Congress wanted to add foreign officials to the definition of "user," it easily could have done so but instead chose only to protect U.S. government officials. Moreover, to the extent that Congress thought that those same U.S. officials would fall within the definition of "individuals," as the magistrate judge found, it erroneously renders the Congress's express mention of U.S. officials as surplusage. *Duncan v. Walker,* 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.' . . . .  We are thus 'reluctan[t] to treat statutory terms as surplusage' in any setting."); *Market Co. v. Hoffman,* 101 U. S. 112, 115 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'").  Accordingly, the protections of the SCA do not extend to foreign government

officials or its agents, meaning that the SCA provides no ground for excluding from the subpoena the communications of foreign government officials. This serves as an alternative ground for upholding the Order as to foreign government officials.

**Second**, the SCA also does not apply for an entirely separate reason: It limits the term "users" to those who are "duly authorized" by the provider to engage in a particular use of the electronic communications service. Here, the Myanmar government, its officials, and its agents have not complied with Facebook's regulations – which is why their accounts were removed – meaning that they are not "duly authorized" "users" under the plain language of the SCA.

The SCA protects the privacy rights of a "user" of an "electronic communication service" ("ECS"). A "user" is defined as "any person or entity who (A) uses an electronic communication service; and (B) *is duly authorized by the provider* of such service *to engage in such use."* The statute does not define "authorized." However, in *Theofel v. Farey-Jones,* 359 F.3d 1066 (9th Cir. 2004), applying the common law doctrine of trespass, the Ninth Circuit interpreted the meaning of "authorized" in the context of section 2701(c)(1), a different section of the SCA. *See id.* (holding that because permission to access the emails at issue was gained through deceit—i.e., the use of an invalid subpoena—it was not "authorized."). Applying the doctrine of trespass as stated in the Restatement 2nd of Torts, the Myanmar government, its officials, and its agents gained access to Facebook's platform by facially agreeing to its terms, conditions, and policies and misrepresented their true purpose in using the platform. *See* Restatement (Second) of Torts § 173 (Am. Law Inst. 1965) ("A conscious misrepresentation as to the purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material fact.").

Under the Restatement definition, which requires a conscious and fraudulent misrepresentation, minor infractions would not strip SCA protections. Facebook's own terms and

conditions warn that Facebook will disclose information where it has a "good-faith belief it is necessary to detect, prevent and address … unauthorized use of [its] Products, violation of [its] terms or policies, or other harmful or illegal activity." Here, Facebook itself has determined that hundreds of accounts, pages, and posts linked to the Myanmar government, its military, and its agents have violated the terms of Facebook's use policies by engaging in, among other things, "coordinated inauthentic behavior," inciting violence, engaging in hate speech, and using fake accounts. Indeed, because these actors have misused its platform, their Facebook accounts, pages, and other content have been removed and, in some instances, Facebook has blocked violators from the use of its service. *See, e.g., Removing Myanmar Military Officials from Facebook,* Facebook (Aug. 28, 2018) (updated Dec. 18, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/ ("Today, we are taking more action in Myanmar, removing a total of 18 Facebook accounts, one Instagram account and 52 Facebook Pages, followed by almost 12 million people. We are preserving data, including content, on the accounts and Pages we have removed."). Because these actors have engaged in use that is not "duly authorized" they are not "user[s]" within the meaning of the SCA, and thus not protected under the Act.

## I.     Rule 72(a) Objection to The Denial of a Deposition

Because the Order below denied Gambia's request for a deposition, The Gambia objects to that portion of that Order (and that portion alone). The Gambia understands that under § 1782 the court has considerable discretion on these issues and under Rule 72(a) that denial is reviewed for abuse of discretion. But The Gambia would nonetheless submit that the court's determination that a deposition would be burdensome to Facebook and is not likely to produce relevant information is unsupported by the record and conflicts with the remainder of the Order below, which correctly determined that evidence of coordinated inauthentic behavior is of critical relevance to the ICJ proceeding. Facebook is a billion-dollar company whose core competency is

data analysis and data organization.  For Facebook, presenting testimony in a deposition to discuss what Facebook has already investigated would be no monumental task.  It certainly would not be unduly burdensome within the accepted meaning of that term.

> **J.      The Need to Reject Facebook's Continued Requests for Delay**

Facebook does not challenge the consent portion of the Order below and claims it will produce as soon as subpoenaed.   It also does not appear to challenge the portion of the Order below that required production of responsive non-content that it used to determine that the account holders had engaged in coordinated inauthentic behavior.  As to those portions of the Order, the Court should issue an interim Order allowing The Gambia to serve the subpoenas immediately.  The Court should direct that the "meet and confer" discussions directed by the Order below, ECF No. 22 at 14, commence immediately so that Facebook can begin production of the uncontested materials.   As to the disputed portions of the Order, moreover, The Gambia emphasizes that contrary to Facebook's suggestions in its description of the ICJ proceedings, there is considerable urgency here.   Facebook claims in its brief that its production to The Gambia will include "millions" of documents.  Given that the ICJ merits proceedings have already commenced and are likely to resume full speed ahead by the early spring, time is of the essence.  This Court should not countenance additional delays, as Facebook has already been fully heard on its challenge to the subpoena and its objections have been considered and properly overruled.

## IV.    CONCLUSION

For the reasons stated above, this Court should overrule Facebook's Objections and allow Magistrate Judge Faruqui's Order to take effect, with the sole exception of the Order's deposition holding, which should be allowed as well.

Dated:  October 28, 2021                    Respectfully submitted,

                                            */s/ Timothy P. O'Toole*
                                            Timothy P. O'Toole (D.C. Bar No. 469800)
                                            Michael J. Satin (D.C. Bar No. 480323)
                                            MILLER & CHEVALIER CHARTERED
                                            900 16th Street, N.W.
                                            Washington, D.C. 20006
                                            Telephone: (202) 626-5552
                                            Fax: (202) 626-5801
                                            totoole@milchev.com
                                            msatin@milchev.com

                                            *Counsel for Applicant, The Republic of The*
                                            *Gambia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document filed through the ECF system will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF) on this 28th day of October 2021.

*/s/ Timothy P. O'Toole*

Timothy P. O'Toole (D.C. Bar No. 469800)