**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

*In re* Application Pursuant to 28 U.S.C. § 1782
of

THE REPUBLIC OF THE GAMBIA,

            Petitioner,

     v.

FACEBOOK, INC.,

           Respondent.

Case: 1:20-mc-00036-JEB-ZMF

**FACEBOOK'S REPLY TO THE GAMBIA'S RESPONSE TO FACEBOOK'S
OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER AND FACEBOOK'S
OPPOSITION TO THE GAMBIA'S OBJECTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

    I.       The Gambia Misrepresents Rule 72(a)'s "Contrary to Law" Standard ................. 3

    II.     The SCA's Disclosure Prohibitions Apply to Provider-Removed User Content ........................................................................................................................ 4

          A.      The ECS Disclosure Prohibitions Bar Disclosure ...................................... 4

          B.      The RCS Disclosure Prohibitions Bar Disclosure ...................................... 6

          C.      The Order's RCS Holding Was Premature and Improper ......................... 8

    III.    The Order Fails to Weigh Countervailing U.S. Policy ......................................... 11

    IV.    The Order's Internal Investigations Ruling Is in Error ......................................... 14

    V.    The Gambia's Alternate Grounds Are Improper and Meritless............................ 16

    VI.    The Gambia's Objection to the Order's Denial of a Deposition Is Meritless....... 18

    VII.   The Gambia's Request for an Interim Order Is Inappropriate ............................. 19

CONCLUSION ................................................................................................................... 21

## INTRODUCTION

Facebook will produce public content and non-content metadata for hundreds of accounts affiliated with the Myanmar government that Facebook removed in 2018.  This will provide The Gambia with the most relevant information in Facebook's possession to support The Gambia's claims of genocide asserted against Myanmar at the International Court of Justice ("ICJ").  Consistent with U.S. law, Facebook will produce millions of pages of this information when Facebook is served with a tailored and lawful subpoena to do so.

But The Gambia's Response seeking to justify the disclosure of *more* information from Facebook contravenes U.S. law.  Facebook appreciates the legitimacy and importance of The Gambia's efforts to hold Myanmar accountable for crimes of genocide at the ICJ.  Here, though, The Gambia misrepresents the serious and far-ranging consequences of the ruling it seeks, the requirements of U.S. law, the record in this matter, and Facebook's arguments.

*First*, The Gambia misrepresents the standard of review that applies to the Order's legal holdings and applications of law.  *See* Dkt. 24 at 17–18 (collecting cases).  Under either standard found in Federal Rule of Civil Procedure 72, this Court must review those rulings *de novo*.  *Id.*

*Second,* The Gambia distorts what the Order's holding really means.  If this Court rules that the Stored Communications Act's ("SCA") disclosure prohibitions do not apply to provider-removed user content, those prohibitions have no meaning.  Providers will have unconstrained discretion to turn over protected user content by removing it.  They will *not* need to justify that decision within the confines of the SCA exceptions Congress set out.  Nor will any court supervise their decisions.  And the penalties the SCA imposes for non-compliance will no longer shield individuals—and in particular, dissidents, victims, and activists—when domestic or foreign governments coerce U.S. providers to expose their private content.  *See, e.g.*, Freedom House, *Freedom on the Net 2021*, https://freedomhouse.org/report/freedom-net/2021/global-drive-

control-big-tech (reporting on governmental efforts to "subdue free expression and gain greater access to private data").  Nothing in the SCA supports this absurd result.  Courts do not invent atextual limitations on the definitional section of a statute that would destroy the purpose, structure, and effect of that statute.  *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms."); *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) (same).

*Third,* The Gambia fails to address the serious privacy, human rights, and national security risks that arise from its request for *six years* of private communications for the military leaders (however unsympathetic) of another nation.  That request circumvents settled U.S. policy in the CLOUD Act and treaties that have long-required U.S.-like privacy protections prior to allowing these types of disclosures.  Tellingly, The Gambia does not argue it will be constrained by *any* law to prevent the abuse of these private communications once it has them.  And the fact that The Gambia has not negotiated any agreement with the U.S. to exchange this type of information (even if true) should give this Court *more* pause—not less—in evaluating its Section 1782 request.  The Order's refusal to wrestle with these genuine and serious issues is plain legal error under binding Supreme Court precedent, and The Gambia's only claim that the Order adequately addressed these concerns in a one-word write-off is not credible.

*Finally*, The Gambia's other arguments are meritless.  The Gambia acknowledges that Section 1782 applications require post-subpoena motions practice.  *E.g.*, Dkt. 28 ("Resp.") at 11–12.  Yet the Order improperly overreaches to *sua sponte* tee up its own premature Remote Computing Service ("RCS") argument that it then summarily shoots down, even though Facebook had explicitly reserved the argument for a later motion to quash.  Order at 11–12 n.6.  The Gambia also cannot unwind its concession that the internal investigative materials it seeks are cumulative,

which make the Order's grant of its request for these materials improper under *Intel*.  Moreover, the remaining issues The Gambia raises in its Response are not supported with citations to either the record or caselaw, and thus must be denied.

This Court should grant Facebook's Objections to set aside or modify the Order, and deny The Gambia's sole unsupported objection to the Order's deposition ruling.

## ARGUMENT

## I.     The Gambia Misrepresents Rule 72(a)'s "Contrary to Law" Standard

The Gambia incorrectly asserts that when a district court reviews a magistrate judge's non-dispositive order under Federal Rule of Civil Procedure 72(a), "objections should be sustained only where 'the court is left with a definite and firm conviction that a mistake has been made.'" Resp. at 12.  While that is true with respect to an order's *factual* findings, it misrepresents the *de novo* standard that applies to legal holdings or applications of law even under Rule 72(a).

As Facebook laid out in its Objections, Rule 72(a) requires this Court set aside a magistrate judge's non-dispositive order if it is "clearly erroneous" *or* "contrary to law."  Dkt. 24 ("FB Obj.") at 17–18.  The "clearly erroneous" standard applies to an order's *factual* findings, and "is met when, 'although there is evidence to support a determination, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *Intex Recreation Corp. v. Team Worldwide Corp.*, 42 F. Supp. 3d 80, 86 (D.D.C. 2013) (quoting *Am. Ctr. for Civ. Justice v. Ambush*, 794 F. Supp. 2d 123, 129 (D.D.C. 2011)).

By contrast, the "contrary to law" standard requires *de novo* review of an order's legal conclusions or applications of law.  *Id.*; *Quatama Park Townhomes Owners Ass'n v. RBC Real Estate Fin., Inc.*, 365 F. Supp. 3d 1129, 1133, 1141–42 (D. Or. 2019) (holding under Rule 72(a) "the Court [ ] will evaluate the Magistrate Judge's legal conclusions to determine if any are contrary to law, which involves a *de novo* review of those issues").

3

This Court must make a *de novo* determination of what the SCA and Section 1782 require as a matter of law, regardless of whether Rule 72(a) or Rule 72(b) provide the applicable standard for this Court's review of the Order.  FB Obj. at 17–18.

## II.    The SCA's Disclosure Prohibitions Apply to Provider-Removed User Content

No court has ever held that the SCA's disclosure prohibitions turn on a *provider's* unilateral decision to remove access to user content that the provider holds in electronic storage.  The Gambia ignores the reality that the consequences of such an unprecedented holding would be devastating to the online privacy of *billions* of global internet users, including every American.

In reality, The Gambia's position would eliminate the SCA's restrictions on a provider's ability to disclose a user's stored communications whenever it chooses to do so.  It would return the law to the same state it was in four decades ago before the SCA was even passed, when providers could disclose a user's protected stored communications (or not) without any reference to the specific, enumerated exceptions Congress codified in the SCA to cabin that discretion.

But that is not how courts read statutes.  *Banks*, 3 F.4th at 449 ("Congress [does not] enumerate[] the" exceptions only to then destroy the rule).  There is nothing in the SCA's text or purpose to support The Gambia's argument that neither the ECS nor RCS disclosure prohibitions protect the *provider*-removed user content that it seeks.  This Court should hold that one or both of these provisions prohibit disclosure of this requested user content (absent the application of an explicit statutory exception in the SCA).

### A.    The ECS Disclosure Prohibitions Bar Disclosure

The Gambia raises three arguments in defense of the Order's Electronic Communication Service ("ECS") ruling—none of which support its position.  In fact, The Gambia's arguments serve only to further undermine the Order's unnatural and erroneous reading of the SCA's definition of "electronic storage."

4

*First*, The Gambia describes what it says Congress sought to accomplish in the SCA.  Resp. at 14–18.  According to The Gambia, the SCA "does not impose a broad, blanket prohibition of disclosure of user content," but instead only "prohibit[s] service providers from divulging certain protected content *in the absence of judicial supervision*" and "creates a 'veritable code of criminal procedure' that federal and state law enforcement officers *must follow* in order to obtain protected content from service providers."  Resp. at 15–17 (emphases added).

But that description of the SCA's purpose makes the Order's ECS holding untenable.  If the Order is right that a user's "protected content" *loses* that protection whenever a *provider* unilaterally removes access to the content, these SCA objectives are illusory.  A provider would never be subject to "judicial supervision" over its decision to disclose "protected content[.]"  Resp. at 15–17.  The provider could always act on its own accord to eliminate the SCA's restrictions by removing protected content and disclosing the no-longer protected content whenever it wants.  Nor would it be true that law enforcement "must follow" the SCA's procedures to "obtain[] protected content from service providers." Resp. at 16–17.  Officers could simply ask providers to remove and disclose any formerly protected content since the SCA would not apply.  The SCA's core purpose (even as The Gambia describes it), then, would be imaginary and the status quo before the SCA was even passed would be restored.

*Second*, The Gambia argues that the SCA's definition of "electronic storage" should be read narrowly as it is meant to provide only an "analogy to the U.S. mail."  Resp. at 19–22.  But again, this argument underscores why the Order's narrow reading of the "electronic storage" provision is so unfounded in the circumstances of this case.  Here, the third party holding the communications for a user in the place of the U.S. Postal Service ("USPS") *is* an ECS like Facebook.  It thus makes little sense to contend that the SCA's disclosure prohibitions and privacy

protections hinge entirely on the unilateral decision of an ECS on whether to waive them.  The Fourth Amendment would still protect the contents of a letter held in a postal facility by USPS even if USPS unilaterally decided that it would not deliver the letter and instead invited law enforcement into the facility to crack it open.  *Cf. United States v. Van Leeuwen*, 397 U.S. 249, 251–53 (1970) (applying warrant requirement to mail USPS held without delivery).

*Third,* The Gambia points to inapposite caselaw analyzing whether a *user's* unilateral conduct, such as by opening but not deleting an email, removes that content from "electronic storage" under the SCA.  Resp. at 20–22.  As Facebook already explained, these cases are wrong and contradict the far more persuasive reasoning provided by the Fourth and Ninth Circuits about the scope of the "electronic storage" provision and its "for purposes of backup protection" language.  FB Obj. at 19–24 (collecting cases).  But even assuming for the sake of argument that these cases are correct, they have no bearing on whether it would be reasonable for this Court to interpret the SCA's "backup protection" provision to hinge on the conduct of a *provider*.  An individual may always waive their own privacy.  But that does not make it plausible to read an SCA provision as waivable by a provider where the provision is specifically designed to *prevent* a provider from being able to waive a user's privacy.

The Gambia and the Order urge an interpretation of the SCA that would destroy the statute and render its core objective null and void.  For the reasons already detailed by Facebook at length, nothing in the statute's text or legislative history supports such an unreasonable interpretation of the statute.  FB Obj. at 19–27.  This Court should reject the Order's ECS holding.

## B.     The RCS Disclosure Prohibitions Bar Disclosure

The Gambia raises three arguments to contend that the RCS disclosure provision does not apply here to provider-removed content.  These arguments fare no better than its ECS arguments.

*First,* The Gambia argues that Facebook is not an RCS with respect to the provider-

6

removed content at issue because "[t]here is no evidence . . . that Myanmar officials sent the content to Facebook so that it could be stored in a 'virtual filing cabinet' or 'to obtain sophisticated data processing services.'"  Resp. at 27.  Instead, The Gambia contends that there are "no facts in the record to support Facebook's bald assertion" that "the contents at issue were received by Facebook via electronic transmission and were carried and maintained on Facebook's service for" these purposes.  *Id.* at 28.  But these facts are not seriously subject to dispute.

Facebook provides online platforms for more than three billion users to send and receive online communications.  FB Obj. at 8–9.  Facebook's platforms and other messaging applications have replaced email and other analog communications.  *Id.* at 9.  And The Gambia itself recognizes in its Section 1782 Application that the user content it seeks here is from such users who shared that content via the internet with Facebook in order to obtain the benefit of Facebook's sophisticated data processing and storage services like the ability to create, store, and spread content with others over the course of more than six years.  Dkt. 1 at 8–9.

*Second*, The Gambia contends that Facebook is not "an . . . entity providing remote computing service to the public" under 18 U.S.C. § 2702(a)(2) because the content that The Gambia seeks is no longer viewable "to the public."  Resp. at 27–28.  This argument makes little sense—emails, for example, are never viewable to the public, nor is most of the other content protected by the RCS provision or content stored in a "virtual filing cabinet."  Rather, as courts have repeatedly held, the SCA's "to the public" language requires only that an RCS provide its service "(e.g., e-mail) to the community at large."  *Andersen Consulting LLP v. UOP*, 991 F. Supp. 1041, 1042 (N.D. Ill. 1998) (finding that "to the public" requires only that the provider's "system was available for public use"); *Jones v. H Group, Inc.*, 2012 WL 195724, at *6–7 (D. Or. Jan. 23, 2012) (same); *Walker v. Coffey*, 956 F.3d 163, 170–71 (3d Cir. 2020) (same).  The Gambia does

not argue that Facebook's platform and apps were unavailable to the community at large.

 *Third*, The Gambia argues that provider-removed content is not "stored or processed for the benefit of the user." Resp. at 27.  But, as Facebook already explained, the statutory text of the RCS requires only that Facebook initially received the removed content "by electronic transmission" and "carried or maintained [those contents] on its service for a customer or subscriber 'solely for the purpose of providing storage or computer processing services to the subscriber or customer[.]'" *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 973 (C.D. Cal. 2010) (quoting 18 U.S.C. § 2702(a)(2)).  The Gambia does not dispute that those facts were met here.  And the mere fact that an RCS may need to process or store the content for other purposes also does not take it outside the RCS provision. *See, e.g.*, S. Rep. No. 99-541, at 3 (1986).  Put simply, "the statute does not limit storage to retention for the benefit of the user only." *Crispin*, 717 F. Supp. 2d at 990.  Indeed, the two cases The Gambia cites stand only for the unsurprising proposition that a provider is an RCS when it stores content for the benefit of users.  Resp. at 27 (citing *Flagg v. City of Detroit*, 252 F.R.D. 346, 362–63 (E.D. Mich. 2008) and *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 264 (S.D.N.Y. 2008)).

 The Gambia fails to cite even a single case showing that a *provider's* decision to remove content from its platform eliminates the privacy protection granted by the SCA—under either the statute's ECS or RCS provisions.  This Court should set aside the Order.

 **C.     The Order's RCS Holding Was Premature and Improper**

 The Order observes in a footnote that whether Facebook is an RCS with respect to the requested user communications here is an issue not yet presented by the parties, but nonetheless holds that the "argument is without merit" *and* that Facebook has waived it, even though Facebook explicitly preserved it for future motions practice.  Order at 11–12 n.6.  The Gambia's defense of this ruling is meritless.  The Gambia cannot avoid the well-settled principle that the waiver of

8

third-party privacy rights is strongly disfavored.  And, by ruling on an important issue not yet presented to the court for resolution in the litigation and without the benefit of adversarial testing, the Order's footnote ruling overreaches and must be set aside.

As Facebook argued in its Objections, federal courts strongly disfavor the waiver of an argument where, as here, it would forfeit the privacy rights of parties not before the court.  FB Obj. at 30.  The Gambia implicitly concedes this principle applies and offers no serious response to this caselaw.  Instead, it attempts to distinguish *August v. FBI*, 328 F.3d 697 (D.C. Cir. 2003) and *Judicial Watch, Inc. v. U.S. Dep't of State*, 2017 WL 456417 (D.D.C. Feb. 2, 2017), on the ground that both "involve FOIA," rather than the SCA.  Resp. at 26.  But that is irrelevant.  Both cases affirm that courts strongly disfavor waiver where it would affect the "safety and privacy of third parties."  *August*, 328 F.3d at 701–02; *Jud. Watch*, 2017 WL 456417, at *11–12 (same).  Moreover, The Gambia's claim that *Fuhr v. Credit Suisse AG*, 687 F. App'x 810 (11th Cir. 2017) "does not even involve a waiver" is false.  Resp. at 26.  The *Fuhr* court held that the district court erred in finding that a bank waived privacy concerns related to laws enacted to protect its clients.  *Fuhr*, 687 F. App'x at 818 n.12.

The Gambia's other argument that Facebook's Objection to the Order's ruling also should be waived because that argument was not raised below is even more confounding.  Resp. at 23.  Having expressly preserved the issue for a later procedural stage, Facebook could not object to the Order's RCS holding before it was even made.  Thus, the caselaw The Gambia cites in its Response is inapposite.  *Id.* at 23–25.  Each of those cases deals with a circumstance not presented here where a *party* tried to raise *sua sponte* a new issue to the district court *not* decided by the magistrate judge.  Here, the exact opposite is true: the magistrate judge improperly *sua sponte* ruled on an issue not yet presented to it by the parties.  Facebook has objected that the ruling was wrong and

improper at its earliest and only opportunity.

The fact that the Order overreaches in making this RCS holding is further clear.  Federal courts do not raise and dispose of their own arguments.  *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579–82 (2020) (reversing Ninth Circuit for ruling on arguments invented and framed by the court, not the parties).  Facebook also had no burden to raise *any* argument at the initial application stage, rather than preserving its argument for a future motion to quash to streamline the issues.  As The Gambia admits, third-party targets of Section 1782 subpoenas often present *no* argument at all until a later motion to quash.  Resp. at 9.  And, generally, parties are free to raise different issues in subsequent stages of litigation even where they do have a burden to carry at each stage—which Facebook did *not* have here.  *Montgomery v. Risen*, 197 F. Supp. 3d 219, 239 (D.D.C. 2016) ("Defendants do not have an obligation to raise every anticipated defense in a motion to dismiss.").  In fact, the Order and The Gambia recognize that "future litigation" was both *expected* and remains *anticipated* here.  *E.g.*, Order at 23 n.14; Resp. at 11–12.

Nor can The Gambia argue it is prejudiced by having the RCS issue decided now.  *Klimowicz v. Unum Life Ins. Co.*, 2007 WL 2904195, at *6 (D.N.J. Sept. 28, 2007) (no prejudice where argument was "raised at a pragmatically sufficient time" and opposing party "had a full and fair opportunity to present his arguments").  To the contrary, The Gambia *asks* this Court to decide the RCS issue, rather than remand or reserve it for future litigation.  Resp. at 28–29 (stating "it is hard to see how [remand to the magistrate judge] would be anything other than a big waste of time" and asking "to have this Court actually resolve the issue").  Facebook does not oppose The Gambia's request for this Court to decide the RCS issue now in the interests of expediency.  Even where Section 1782 petitions have been referred to a magistrate judge for full disposition, district courts have not hesitated to step in and issue independent orders to resolve important issues of law.

*E.g.*, *In re Veiga*, 746 F. Supp. 2d 8, 14 n.2 (D.D.C. Oct. 20, 2010). Both parties seem to be in agreement now that it is preferable to have this Court do the same.

## III. The Order Fails to Weigh Countervailing U.S. Policy

The Gambia offers *nothing* to assuage the serious privacy, national security, and human rights risks stemming from its desire to circumvent U.S. policies codified in the CLOUD Act and memorialized in MLATs and other treaties with like-minded countries. The Gambia never asserts that it can protect these U.S. policy interests if Facebook turns over six years of private communications from hundreds of Myanmar-related accounts. Rather, The Gambia asserts that the Order properly dismisses those concerns summarily as a "non-starter." Resp. at 29. But binding Supreme Court precedent rejects that view. Federal courts must give due consideration to other U.S. policies when considering a Section 1782 discovery application. The Order's failure to do so is legal error that requires it be set aside. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004).

As Facebook previously argued, the Supreme Court has instructed lower courts to consider four *Intel* factors when evaluating a Section 1782 petition. FB Obj. at 17. The Gambia admits that these *Intel* factors require consideration of the "privacy, diplomatic, and national security risks that Facebook raises." Resp. at 34. That is correct; the third of these *Intel* factors "requires inquiry" specifically into "whether *policies* of . . . the United States will be circumvented" by granting a Section 1782 petition. *In re Kalser*, 2006 WL 8433484, at *5 (S.D. Fla. Nov. 9, 2006); *see also Kang v. Noro-Mosley Partners*, 246 F. App'x 662, 664 (same); *In re Application of 000 Promneftstroy for an Order to Conduct Discovery for use in a Foreign Proceeding*, 134 F. Supp. 3d 789, 791 (S.D.N.Y. 2015) (same). Because lower courts are directed to examine this factor, the Order's failure to "adequately consider" Facebook's argument on this point is reversible error, *United States v. Vanover*, 831 F. App'x 71, 73–74 (4th Cir. 2020).

11

The inquiry into whether a Section 1782 request for discovery aligns with other U.S. policies is in fact *central* to the *Intel* analysis.  For instance, in *Al Fayed v. United States*, 210 F.3d 421, 424–25 (4th Cir. 2000), the Fourth Circuit affirmed denial of a Section 1782 application because "Congress's salutary purposes in enacting § 1782" would not be served by permitting issuance of a subpoena for documents that were potentially protected from disclosure by another statute such as the Freedom of Information Act ("FOIA").  The Fourth Circuit explained that Congress did *not* intend to undermine or bypass procedures codified elsewhere in U.S. law when it enacted Section 1782 or to allow foreign litigants to circumvent more specific procedural safeguards for the discovery they seek through a Section 1782 petition.  *Id.*

Courts likewise reject Section 1782 petitions from foreign governments where, as here, they circumvent important U.S. policies and procedures designed to protect civil liberties such as those found in MLATs or the CLOUD Act.  *See, e.g.*, *In re Application of O2CNI Co.*, 2013 WL 4442288, at *6, 8 (N.D. Cal. Aug. 15, 2013).  In *Federal Republic of Nigeria v. VR Advisory Servs., Ltd.*, for example, the district court rejected a request from Nigeria to issue subpoenas because it was attempting to "end-run[]" critical MLAT safeguards for the sake of efficiency.  499 F. Supp. 3d 3, 14–17 (S.D.N.Y. 2020).  As that court explained, agreements between the U.S. government and foreign governments to facilitate and monitor these types of discovery requests "promote[] comity and consistent outcomes as to [the discovery] requests, add[] protection for the domestic entities from whom discovery is sought . . . and assure[] that the U.S. government's expertise and analytic rigor is applied to the application, including to assure that the discovery is not sought for ulterior (non-prosecutive) ends."  *Id.* at 14.

Similarly, the district court in *In re Application of Republic of Turkey* rejected Turkey's Section 1782 request for discovery to aid in "an ongoing criminal investigation" as an attempt to

12

circumvent these sorts of U.S. policy safeguards.  2021 WL 671518, at *2, *10–12; *O2CNI Co.*, 2013 WL 4442288, at *8 (same).  In particular, that district court again pointed out that the foreign government in that case "ha[d] offered nothing to convince the [c]ourt that [a congressionally approved MLAT] review procedure would not benefit its quest for the information it seeks."  *In re Application of Turkey*, 2021 WL 671518, at *12.

Here, the same U.S. policy concerns that led these courts to reject Section 1782 applications from foreign governments are even *more* acute.  The Gambia has never offered *any* assurance that it can protect the private communications it seeks from Facebook from later misuse.  Instead, The Gambia protests that it cannot avail itself of any such process because either it would be too "cumbersome" or it has never negotiated a suitable mutual legal assistance treaty with U.S. officials, pursued an executive agreement under the CLOUD Act, reached out to the Department of Justice for assistance in seeking this discovery, or engaged in any other self-help mechanism that would require it to honor civil liberties or handle the discovery it seeks with due care.  Dkt. 10 at 18–19; Resp. at 30–34.  Thus, even assuming The Gambia is right that the CLOUD Act's procedures to aid foreign investigations of "serious crimes" cannot directly apply to The Gambia's accusation that Myanmar committed the serious crime of genocide, this admission should give the Court *greater* cause for concern than in the cases mentioned above—not less.  The Gambia effectively admits it has made *no* commitment to pursue or impose any U.S.-like privacy and procedural safeguards on itself ever.

The Order nevertheless writes these fundamental concerns off with no reasoned analysis and thereby commits plain legal error under *Intel.*  This Court should not grant The Gambia's request for private communications in a case where it has demonstrated no willingness to accommodate U.S. policy interests while seeking assistance from U.S. courts, especially given that

Facebook has agreed to provide the most relevant information The Gambia seeks in compliance with U.S. law and without undermining other U.S. policy interests.  The Order's decision to grant The Gambia's Section 1782 application in these circumstances requires correction.

## IV.   The Order's Internal Investigations Ruling Is in Error

The Gambia does not dispute that it bore the burden "to come to the court with [a] narrowly-tailored request in the first instance," nor that failure to do so is grounds for denying an application outright.  *In re Ex Parte Application of Nokia Corp.*, 2013 WL 6073457, at *3–4 (N.D. Cal. Nov. 8, 2013); *In re Cathode Ray Tube Antitrust Litig.*, 2013 WL 183944, at *4 (N.D. Cal. Jan. 17, 2013).  The Gambia also concedes that its request for Facebook's internal investigative documents is so broad as to be cumulative because it "might produce similar or overlapping evidence" to the public content and non-content metadata that Facebook has agreed to produce. Resp. at 37.  The Gambia nevertheless argues, without citation or foundation, that Facebook faces "no additional burden at all" in producing these records and thus should be ordered to do so.  *Id.* But that argument is factually wrong and legally incorrect in the Section 1782 context.

As explained above, Facebook will disclose to The Gambia public content and non-content metadata that Facebook preserved from hundreds of accounts, groups, and pages removed from its platform in 2018 for violating Facebook's Terms of Service.  *See* FB Obj. at 1, 18–19, 37.  Non-content metadata is how Facebook primarily determines if an account is being used for coordinated inauthentic behavior in violation of its terms of service.  For instance, Facebook may determine that an "independent news" account is actually controlled by a foreign military when the non-content metadata for the news account shows it shares the same administrator with an official military account.  This non-content data provides key information of potential evidentiary value that The Gambia needs to assist its effort to show which accounts spreading hate speech against the Rohingya people in 2018 were actually controlled by Myanmar officials or organizations.  *See*

14

Dkt. 19 at 104:8-23, 115:5-11.  The Gambia has recognized as much.  *Id.* at 36:6–11.

The record also shows this non-content metadata and public content are the primary evidence related to Facebook's internal investigations likely to be relevant to the ICJ's adjudication of The Gambia's claims.  As Facebook's counsel explained to the magistrate judge, Facebook's investigation into the Myanmar accounts removed from the platform in 2018 was focused on coordinated inauthentic behavior.  Dkt. 19 at 104:8-23, 106:19-107:3.  That investigation often did not involve review of the substance of the communications tied to the accounts that were removed, *see id.* at 103:13-104:3.  Moreover, even if these investigative documents do contain that sort of analysis, Facebook's internal decision that a particular public post was removable as "hate speech" under Facebook's Community Standards is not of any *evidentiary* significance; rather, the proper determination of whether content is actionable hate speech under international law must be made by an ICJ fact-finder based on the actual evidence of the content of that account's public posts, which Facebook has also already agreed to produce to The Gambia.

Nor did anything in Facebook's Objections misrepresent counsel for The Gambia's admission that "it may well be that we don't -- that we don't need the internal investigation documents if we have everything that Facebook relied on to determine coordinated inauthentic behavior," or counsel's similar statements that these documents may be duplicative.  Dkt. 19 at 52:2-5.  Section 1782 requests should not be cumulative, and this Court "is free to deny . . . in toto" this request as a result.  *United Kingdom v. United States*, 238 F.3d 1312, 1318–19 (11th Cir. 2001).  The record is clear that The Order errs in ruling that Facebook needs to produce irrelevant and cumulative internal investigative materials, especially to a government that could then use (or disclose) detailed investigative techniques revealed in those materials to circumvent Facebook's procedures for uncovering this type of conduct.  *See, e.g.*, Freedom House, *Silencing the*

*Messenger: Communications Apps under Pressure* (2016), https://freedomhouse.org/report/freedo
m-net/2016/silencing-messenger-communication-apps-under-pressure (cataloguing pressure on
U.S. platforms from governments related to political dissent and reporting on Gambian dissident).

## V.    The Gambia's Alternate Grounds Are Improper and Meritless

The Gambia's request that this Court "uphold" the Order on "alternate grounds" is
improper because it would require modifying or setting aside parts of the Order to which The
Gambia did not object.  Resp. at 38–40.  To properly "object" to an order, a party must "specifically
designate the order or part thereof to which objection is made, and the basis for the objection."  L.
Civ. R. 72.2(b).  Here, The Gambia makes no attempt to do so except as to the deposition ruling.
*See* Resp. at 40 ("The Gambia objects to that portion [denying a deposition] of that Order (and that
portion alone).").  The Gambia's self-styled "alternate" arguments for affirmance are improper.
*Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 98, 102 (D.D.C. 2009) (noting plaintiff's
objections "fail[] to comply with Local Civil Rule 72.2(b)" because they did not "'specifically
designate' the parts of the ruling to which he [ ] object[ed]").

But even if this Court considers these improper arguments, as the Order holds, neither has
any merit.  *First,* The Gambia argues Myanmar government officials do not qualify as "users"
under the SCA and their communications are not prohibited from disclosure.  Resp. at 38.  But this
argument is contrary to the statute's text and legislative history, and has been rejected by decades
of federal caselaw holding that the SCA applies equally to foreign individuals.  Dkt. 15 at 4–5
(collecting cases).

Specifically, "[t]he SCA defines 'user' with the broadest possible language: 'any person.'"
Order at 10 (quoting 18 U.S.C. § 2510(13)).  "Person" is further defined as "any employee, or
agent of the United States or any State or political subdivision thereof, and any individual,
partnership, association, joint stock company, trust, or corporation."  18 U.S.C. § 2510(6).  Courts

16

have long recognized that "'*[a]ny* person means any person, including foreign citizens.'"  Order at 10 (quoting *Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 729 (9th Cir. 2011)).

The Gambia offers no reason to limit this broad text to exclude one class of persons—foreign officials.  Instead, it argues foreign officials should be excluded because the statute in addition explicitly covers U.S. government agents by name.  Resp. at 38.  But "[t]he natural reading of the statute dictates otherwise."  Order at 10.  U.S. government agents are listed separately from "any individual" only to confirm their *inclusion* in the SCA's definition of "persons," not the exclusion of others who are still plainly "individuals" or "entities."  *Id.* at 10–11.

Moreover, the SCA's prohibition against divulging communications does not turn on the identity of the originator of the communication in the first place.  Rather, the SCA prohibits disclosure of "the contents of a communication" without any limitation on whose communication it must be.  18 U.S.C. § 2702(a); *see also* Dkt. 15 at 4–6.  The provision of the SCA that codifies the disclosure prohibition—*viz.*, Section 2702—does not even *incorporate* the term "users."

*Second*, The Gambia contends that the SCA does not prohibit disclosure of communications that violate a provider's terms of use because the term "users" includes only those who are "duly authorized by the provider of such service to engage in such use."  Resp. at 39 (quoting 18 U.S.C. § 2510(13)); *see* Order at 11 n.5 (dismissing The Gambia's argument).  This argument is as flawed as The Gambia's first one since the SCA's disclosure prohibitions do not even include the term "users."  *See* 18 U.S.C. § 2702(a)–(b).  Instead, the term "users" appears in Section 2701 of the SCA, which is a different provision that prohibits unauthorized access to communications in electronic storage with a facility that provides electronic communications services—*e.g.*, the hacking into communications maintained in electronic storage with a provider like Facebook.  18 U.S.C. § 2701(a), (c)(2).  This anti-hacking provision *permits* such access when

17

"authorized by a *user* of that service with respect to a communication of or intended for that *user*." *Id.* (emphasis added).  The "user" definition to which The Gambia points thus requires that a user be "us[ing] an electronic communication service" and be "duly authorized by the provider of such service to engage in such use" to exclude hackers from this latter provision.  18 U.S.C. § 2510(13).

In other words, the statutory text upon which The Gambia relies is meant merely to exclude non-users—*i.e.*, hackers or criminals, who break into a service with no authorization to use that platform at all—from the scope of people permitted to access user communications under Section 2701.  *General Bd. of Glob. Ministries of the United Methodist Church v. Cablevision Lightpath, Inc.*, 2006 WL 3479332, at *3 (E.D.N.Y. Nov. 30, 2006) (explaining SCA provisions were "designed to create a cause of action against computer hackers" and collecting cases); *id.* (explaining Section 2701 "address[es] 'the growing problem of unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the public'") (quoting S. Rep. No. 99-541, at 35).  Under Section 2701, such hackers are not "users," but that has absolutely no bearing on the scope of Section 2702's disclosure prohibitions, which do not even refer to "users."

The Court should reject The Gambia's attempt to invent another atextual limit on the scope of the SCA's disclosure prohibitions that would undermine the statutory scheme and its purpose, this time based on the definition of a term not even used by those provisions.  Dkt. 15 at 4–6.  The Gambia's so-called "alternative" grounds for affirming the Order are meritless.

## VI.   The Gambia's Objection to the Order's Denial of a Deposition Is Meritless

The Order's denial of a 30(b)(6) deposition regarding all "the subject-matters described [in the document requests]" is a discretionary determination that can be set aside only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Intex*, 42 F. Supp. 3d at 86 (quoting *Am. Ctr.*, 794 F. Supp. 2d at 129).  Here, The

18

Gambia summarily contends this denial was an "abuse of discretion" that "is unsupported by the record and conflicts with the remainder of the Order."  Resp. at 40.

But, in denying the request for a deposition, the Order incorporates its holdings regarding the production of documents and explains that a deposition "is too much to demand of Facebook" because it seeks "an analysis which The Gambia could conduct thorough [*sic*] its own examination of the documents."  Order at 29.  The Order further reasons that the deposition would be an undue burden because it would "add[] little in the way of concrete evidence."  *Id.*

The Gambia offers nothing to show these findings are "unsupported" by the record.  The Gambia in fact does not cite *anything* in the record in making this argument, much less something in tension with these findings.  Thus, The Gambia has not carried its burden to show the Order was "contrary" to the record and has not even met the minimal requirement to specify the "basis for [its] objection" here.  *See* L. Civ. R. 72.2(b).

The Order properly finds that the information sought by the deposition would be cumulative of the requested documents and, as explained above already, requests for cumulative evidence are properly denied under Section 1782.  *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191–92 (3d Cir. 1999) (affirming district court's denial of Section 1782 petition where additional redacted information sought from documents would be "cumulative"); Dkt. 8 at 12.  This Court should affirm the Order's denial of a 30(b)(6) deposition.

## VII.   The Gambia's Request for an Interim Order Is Inappropriate

The Gambia's final request for an interim order is procedurally improper and legally unsupported.  Facebook does not want to delay the resolution of this matter or the production of the public content and non-content metadata it can turn over to The Gambia under U.S. law. However, The Gambia's continued insistence that it also wants private communications for hundreds of accounts and all documents related to Facebook's internal investigation has hindered,

and will continue to hinder, the ability of the parties to begin productions expeditiously.

There is unfortunately no way for Facebook to separate easily the public and private content for each of the profiles that it removed from its platform in 2018.  Instead, Facebook has been engaging in a laborious and tedious process, at the cost of thousands of hours of labor, to complete the complex process of identifying and producing the data associated with the removed pages and accounts to the IIMM.  Facebook has committed the resources to do this extraordinary production so that it can aid the IIMM's important efforts to hold officials in Myanmar accountable for their crimes, while still respecting the privacy mandates imposed upon Facebook and other providers under U.S. law.

Accordingly, Facebook submits in the interests of judicial economy (and with an eye to the enormous burden required by this technical review process) that The Gambia's request for private communications associated with these accounts be fully resolved before any subpoena issues. Facebook may otherwise have to go through the lengthy review process to separate out content between public and private, only to be potentially told that distinction will not matter.

Moreover, courts typically do not issue interim orders in this context, and The Gambia offers no caselaw or factual justification to support its request now.  Facebook notes that despite The Gambia's ongoing rhetoric about "delay" and "urgency," The Gambia concedes that it cannot even begin to present written evidence to the ICJ until April 2022 at the *earliest*.  *See* Resp. at 8. The Gambia further represented to the magistrate judge that it needed these documents by October 2020 (*e.g.*, Dkt. 10 at 3), only to then admit after the magistrate judge called an urgent hearing on its application that its first opportunity to present written evidence is not actually its last and it would have until 2023 before an evidentiary hearing at the ICJ is held.  Dkt. 17 at 5:14–6:23.

Nor is it true that Facebook has caused any undue "delay" in this matter.  The Gambia, not

Facebook, requested to have the last word below and filed an unusual "response" to Facebook's Surreply.  Facebook also had no control over the time it took for the magistrate judge to work through the voluminous arguments that The Gambia presented to him regarding the SCA.  As The Gambia further admits, Facebook further tried to initially resolve this matter by offering to voluntarily produce public content and other information The Gambia seeks consistent with its obligations under the SCA, but The Gambia refused to narrow its request to comply with U.S. law to enable a speedier start to productions.  The Gambia's attempt to cast doubt on those settlement efforts now makes its protestations of delay ring hollow.

Facebook respectfully submits that there is no reason this matter cannot proceed in the ordinary Section 1782 course to a final and fair resolution.

## CONCLUSION

The Court should modify or set aside the Order's holdings that Facebook has objected to, and deny The Gambia's sole objection to the Order's deposition finding.


Dated:  November 4, 2021                           Respectfully submitted,

                                                                 */s/ Joshua S. Lipshutz*
                                                                 Joshua S. Lipshutz (D.C. Bar No. 1033391)
                                                                 GIBSON, DUNN & CRUTCHER LLP
                                                                 1050 Connecticut Avenue, N.W.
                                                                 Washington, D.C. 20036-5306
                                                                 Telephone:  (202) 955-8217
                                                                 Facsimile:  (202) 530-9614
                                                                 jlipshutz@gibsondunn.com

                                                                 Natalie J. Hausknecht (*pro hac vice*)
                                                                 GIBSON, DUNN & CRUTCHER LLP
                                                                 1801 California Street, Suite 4200
                                                                 Denver, CO 80202-2642
                                                                 Telephone:  (303) 298-5783
                                                                 Facsimile:  (303) 313-2826
                                                                 nhausknecht@gibsondunn.com

                                                                 *Counsel for Respondent Facebook, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the attorney of record for any party indicated as non-registered participants on this 4th day of November 2021.

 */s/ Joshua S. Lipshutz*
Joshua S. Lipshutz (D.C. Bar No. 1033391)